UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JAMES C. WALDORF, M.D.,

    Plaintiff,

v.                                                 Case No.: 3:24-cv-00657-MMH-MCR

MAYO CLINIC, a Minnesota
non-profit corporation;
MAYO CLINIC OF JACKSONVILLE,
a Florida non-profit corporation; and
MAYO CLINIC FLORIDA, a Florida
non-profit corporation,

    Defendants.

_____/

**PLAINTIFF JAMES C. WALDORF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE**

In their Motion to Strike (ECF No. 6), Defendants Mayo Clinic, Mayo Clinic Jacksonville, and Mayo Clinic Florida (collectively, "Mayo") ask the Court to strike paragraphs 37 through 43 of Plaintiff James C. Waldorf's Complaint and Demand for Jury Trial (the "Complaint") under Federal Rule of Civil Procedure 12(f). Contrary to Mayo's contention, the Complaint's allegations are relevant and entirely appropriate. The allegations of paragraphs 37 through 43, along with the other facts alleged in the Complaint, refute Mayo's assertion that Dr. Waldorf was fired because he "violated Mayo's rules." Defs.' Mot. to Strike 2. And those allegations form a critical part of a "convincing mosaic of circumstantial evidence" supporting Dr. Waldorf's claims for age discrimination and retaliation. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328

(11th Cir. 2011) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)). Mayo offers nothing to overcome the entirely appropriate disfavor with which this Court and others treat Rule 12(f) motions. Mayo's Motion to Strike should be denied.

## BACKGROUND

Until July 2023, Dr. Waldorf was a plastic surgeon employed by Mayo. Compl. ¶ 2, ECF No. 1. On July 17, 2023, when he was seventy-one years old—the oldest practicing plastic surgeon working at any Mayo campus—Dr. Waldorf's exemplary thirty-seven-year career with Mayo came to an end when he was given the choice to retire immediately or be fired, purportedly for "drug diversion." *Id.* ¶¶ 2, 8, 29-30. Dr. Waldorf was told he had violated Mayo's drug diversion policy by administering Botox that would otherwise have been discarded to his significant other, a nurse also employed by Mayo.[1] *Id.* ¶¶ 11, 14-16, 24.

Rather than being disgraced by such a serious charge, Dr. Waldorf retired. *Id.* ¶ 31. About a month after forcing Dr. Waldorf to retire, Mayo replaced him with a plastic surgeon approximately thirty years younger. *Id.* ¶ 34.

---

[1] In its Motion to Strike, Mayo incorrectly characterizes Dr. Waldorf's conduct as a "knowing violation" of its drug diversion policy. Defs.' Mot. to Strike 2. If it was a violation at all, it certainly was not "knowing." Mayo had never before notified Dr. Waldorf that such conduct violated its drug diversion policy. Compl. ¶ 35. Indeed, Mayo made a presentation to its Jacksonville plastic surgery department on that subject for the first time *after* terminating Dr. Waldorf. *Id.* The only innocent interpretation of that decision is that it was prompted by the realization that Dr. Waldorf and other physicians did *not* know such conduct violated its policies. More likely, it was simply an attempt to bolster a pretextual justification for terminating Dr. Waldorf.

2

On June 28, 2024, Dr. Waldorf filed this lawsuit. Dr. Waldorf's Complaint asserts claims against Mayo for age discrimination under the Age Discrimination in Employment Act[2] (Count I) and Florida Civil Rights Act[3] (Count II) and for third-party retaliation under the Equal Pay Act[4] (Count III). The retaliation claim alleges that Mayo fired Dr. Waldorf because his significant other repeatedly questioned Mayo's decision to pay her less than a similarly situated male colleague. *Id.* ¶¶ 58-63.

In support of these claims, the Complaint alleges in detail that several substantially younger physicians employed by Mayo have engaged in the same conduct that Mayo relied on to justify Dr. Waldorf's termination—administering Botox without scheduling the event, ordering it, or charging the recipient—without suffering any discipline. *Id.* ¶¶ 17-21, 24, 25.

The Complaint also alleges a number of other facts that support an inference of discrimination or retaliation. For example, the Complaint alleges that when Mayo fired Dr. Waldorf, it threatened to report him to the State Medical Board for drug diversion but ultimately declined to do so. *Id.* ¶ 32. It also describes Mayo-affiliated publications reflecting "the common sense understanding that 'drug diversion' refers to 'controlled substances' like opioids and fentanyl," not Botox. *Id.* ¶¶ 26-27. And it alleges that despite its history of tolerating conduct similar to Dr. Waldorf's, Mayo

---

[2] 29 U.S.C. §§ 621-634.

[3] §§ 760.01-760.11, Fla. Stat.

[4] 29 U.S.C. § 206(d).

announced *after* firing Dr. Waldorf that in the future it would treat such conduct as a violation of its drug diversion policy. *Id.* ¶ 35.

The Complaint also, in the paragraphs challenged by Mayo, describes instances in which Mayo has "overlooked or forgiven far more serious misconduct by substantially younger physicians." *Id.* ¶ 36. Mayo asserts that it decided to end his employment "[b]ecause Dr. Waldorf's conduct violated Mayo's rules." Defs.' Mot. to Strike 2. Paragraphs 37 through 43 refute that assertion by describing instances in which younger physicians received no discipline for far more serious "conduct [that] violated Mayo's rules." *Id.* Notably, the Complaint does so without providing information from which any of the patients affected could be identified.

Paragraph 37 alleges that Mayo declined to discipline the chair of its plastic surgery division in Jacksonville—a physician roughly fifteen or twenty years younger than Dr. Waldorf—for a covert sexual relationship with a visiting medical student who was seeking a residency in his division. Compl. ¶ 37.

Paragraph 40 alleges that as a result of a "violation of Defendants' pre-surgical protocol," a physician almost thirty years younger than Dr. Waldorf "carelessly removed the wrong breast of a female cancer patient," causing the patient to be "permanently deprived of *any* sensation in either of her breasts." *Id.* ¶ 40. Mayo did not fire that physician; indeed, he is still employed by Mayo. *Id.*

Paragraph 41 alleges that the same physician who engaged in a sexual relationship with a visiting medical student—at the direction of the physician who had removed the wrong breast—violated Mayo's "protocol . . . requir[ing] that Defendants

4

obtain permission from the patient, or her family, before performing any type of reconstructive surgery" by performing reconstructive surgery "without the patient's, or anyone's, consent." *Id.* ¶ 41. Mayo did not fire the physician who performed the reconstructive surgery. *Id.* In fact, he is still employed by Mayo. *Id.*

Paragraph 42 alleges that a few months after Dr. Waldorf was forced to retire, another substantially younger physician "failed to follow Defendants' surgical protocol, resulting in a sponge being left inside the patient after abdominal surgery." *Id.* ¶ 42. That physician's violation of Mayo's rules caused the patient to have to "undergo a second surgery under general anesthesia to remove the foreign object." *Id.* Yet he was not fired. *Id.*

Paragraph 43 alleges that within a year after Dr. Waldorf's termination, a substantially younger surgeon "failed to follow elementary surgical protocol" and, as a result, "left a Penrose drain inside [a] patient's body after surgery, creating a needless risk of post-surgical infection and sepsis." *Id.* ¶ 43. Mayo did not fire that physician. *Id.* Nor did Mayo report these "adverse incidents" to the Agency for Healthcare Administration, as required by section 395.0197(7), Florida Statutes. *Id.* ¶¶ 38, 40-43.

All of this egregious conduct by substantially younger physicians "violated Mayo's rules," just as Mayo claims Dr. Waldorf's conduct did. Defs.' Mot. to Strike 2. In some cases, the younger physicians' rule violations—unlike Dr. Waldorf's supposed misconduct—caused grave consequences for patients or seriously invaded patients' bodily autonomy. *See* Compl. ¶¶ 40-43. Yet none of this conduct resulted in

5

the younger physicians' termination. *Id.* ¶¶ 37, 39-43. Mayo now seeks to excise these inconvenient facts from Dr. Waldorf's Complaint.

## ARGUMENT

Federal Rule of Civil Procedure 12(f) allows the Court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike under Rule 12(f) "are not favored, often being considered 'time wasters,' and will usually be denied unless the allegations have no possible relation to the controversy *and* may cause prejudice to one of the parties." *Somerset Pharms., Inc. v. Kimball*, 168 F.R.D. 69, 71 (M.D. Fla. 1996) (emphasis added) (quoting *Carlson Corp./Se. v. Sch. Bd. of Seminole Cnty.*, 778 F. Supp. 518, 519 (M.D. Fla. 1991)); *see also United States ex rel. Chabot v. MLU Servs., Inc.*, 544 F. Supp. 2d 1326, 1330 (M.D. Fla. 2008) ("A motion to strike should be granted only if 'the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party.' Because this standard is rarely met, '[m]otions to strike are generally disfavored by the Court and are often considered time wasters.'" (citation omitted; alteration in original) (quoting *Reyher v. Trans World Airlines, Inc.*, 881 F. Supp. 574, 576 (M.D. Fla. 1995); *Somerset Pharms., Inc.*, 168 F.R.D. at 71)).

Indeed, motions to strike are "'infrequently granted' even when they are 'technically appropriate and well-founded' because striking is 'a drastic remedy.'" *Cargill, Inc. v. Keystone Indus., LLC*, No. 3:14-cv-299-J-20MCR, 2014 WL 1796678, at *3 (M.D. Fla. May 5, 2014) (quoting *Harvey v. Lake Buena Vista Resort, LLC*, 568 F.

6

Supp. 2d 1354, 1359 (M.D. Fla. 2008), *aff'd per curiam*, 306 F. App'x 471 (11th Cir. 2009)). Further, "[a] disputed question of fact cannot be decided on [a] motion to strike." *Id.* (second alteration in original) (quoting *Augustus v. Bd. of Pub. Instruction of Escambia Cnty.*, 306 F.2d 862, 868 (5th Cir. 1962)). Nor are courts typically "willing to determine disputed and substantial questions of law upon a motion to strike." *Id.* (quoting *Augustus*, 306 F.2d at 868). Such questions "quite properly are viewed as determinable only after discovery and a hearing on the merits." *Id.* (quoting *Harvey*, 568 F. Supp. 2d at 1360).

Here, Mayo cannot show that the allegations at issue "have no possible relation to the controversy," *Somerset Pharms., Inc.*, 168 F.R.D. at 71, or threaten the sort of severe unfair prejudice that might warrant the "drastic remedy" of striking them, *Cargill, Inc.*, 2014 WL 1796678, at *3 (quoting *Harvey*, 568 F. Supp. 2d at 1359). On the contrary, the facts alleged are relevant and entirely appropriate. They reveal the pretextual character of Mayo's explanation for its decision to fire Dr. Waldorf—that his conduct "violated Mayo's rules." Defs.' Mot. to Strike 2. And they form part of a "convincing mosaic of circumstantial evidence" supporting Dr. Waldorf's claims. *Smith*, 644 F.3d at 1328 (quoting *Silverman*, 637 F.3d at 734).

Mayo argues that paragraphs 37 through 43 of the Complaint cannot be relevant because the Mayo employees mentioned there are not sufficiently similarly situated to Dr. Waldorf to serve as comparators for the purposes of a establishing a prima facie

7

case under the *McDonnell Douglas*[5] burden-shifting framework. Defs.' Mot. to Strike 7-8. But as the Eleventh Circuit recently recognized, "*McDonnell Douglas* has no role to play . . . at the pleading stage." *Staple v. Sch. Bd. of Broward Cnty.*, No. 21-11832, 2024 WL 3263357, at *4 (11th Cir. July 2, 2024). The *McDonnell Douglas* framework "'is an evidentiary tool' affecting the order of proof on summary judgment, '*not* . . . an independent standard of liability.'" *Id.* (emphasis and alteration in original) (quoting *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944-45 (11th Cir. 2023)).

In any event, Mayo's argument is foreclosed by the Eleventh Circuit's decision in *Tynes v. Florida Department of Juvenile Justice*, 88 F.4th 939 (11th Cir. 2023), *petition for cert. filed*, No. 23-1235 (U.S. May 20, 2024). That case—which Mayo's motion does not cite, and which was decided after all of the cases relied on by Mayo—makes clear that comparator evidence that is not sufficient to support a prima facie case may nevertheless be relevant evidence of employment discrimination.

In *Tynes*, after a jury verdict in favor of the plaintiff on claims for race and sex discrimination, the employer moved for judgment as a matter of law. *Id.* at 943. At trial, the plaintiff had presented evidence of what she claimed were "similarly situated white and male employees" who "were treated differently." *Id.* at 942-43. The employer's motion argued that the plaintiff's comparators were not "similarly situated in all material respects" and that the plaintiff had therefore "failed to satisfy her burden

---

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

8

to establish a prima facie case under *McDonnell Douglas*." *Id.* at 943. The district court denied the motion, and the Eleventh Circuit affirmed. *Id.* at 943, 948.

The Eleventh Circuit explained that the *McDonnell Douglas* framework is not "a stand-in for the ultimate question of liability" or "a set of elements that the employee must prove." *Id.* at 941. A prima facie case under *McDonnell Douglas* "is not, and never was intended to be, the *sine qua non* for" a claim of employment discrimination. *Id.* at 944-45 (quoting *Smith*, 644 F.3d at 1328). "Often, however," the court observed, "parties (and sometimes courts) miss this fundamental point and wrongly treat the prima facie case as a substantive standard of liability." *Id.* at 945.

On the contrary, "the components of a prima facie case are not necessarily coextensive with the evidence needed to prove an employment discrimination claim." *Id.* at 946. For that reason, "the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Id.* (quoting *Smith*, 644 F.3d at 1328). "That," the court explained,

> is because *McDonnell Douglas* is "only one method by which the plaintiff can prove discrimination by circumstantial evidence." A plaintiff who cannot satisfy this framework may still be able to prove her case with what we have sometimes called a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."

*Id.* (citation omitted) (quoting *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n.3 (11th Cir. 2005) (per curiam); *Smith*, 644 F.3d at 1327-28). Under that "convincing mosaic standard," the court may "look beyond the prima facie case to consider all relevant evidence in the record." *Id.* at 947. Consequently, the employer's contention

9

that the plaintiff failed to present a prima facie case, even if correct, was insufficient to justify overturning the jury's verdict. *Id.* at 947-48.

Critically, the Eleventh Circuit concluded that the plaintiff's comparator evidence could support an employment discrimination claim even if the comparators were not sufficiently similar to the plaintiff to support a prima facie case under *McDonnell Douglas*:

> Of course, the strength of [the plaintiff's] comparator evidence is relevant to the ultimate question of intentional discrimination. But to the extent that there are material differences between [the plaintiff] and her comparators at this stage of the case, it is the jury's role—not ours—to determine how much weight the comparator evidence should be given. In other words, *it is possible that her comparators were insufficient to establish a prima facie case yet still relevant to the ultimate question of intentional discrimination.*

*Id.* at 947 (emphasis added) (citation omitted). Because the employer argued only that the plaintiff's comparator evidence was insufficient to establish a prima facie case, it had "forfeited any challenge to the ultimate finding of discrimination." *Id.* at 947. The Eleventh Circuit therefore affirmed. *Id.* at 948.

The lesson of the *Tynes* decision is clear. The *McDonnell Douglas* framework is only one way of proving discrimination. *Id.* at 946. Consequently, comparator evidence that is "insufficient to establish a prima facie case" may still be "relevant to the ultimate question of intentional discrimination." *Id.* at 947.

That lesson is sufficient to dispose of Mayo's motion. The heart of Mayo's argument is its assertion that to be relevant at all, a comparator must be sufficiently similarly situated to the plaintiff to support a prima facie case, "regardless of whether

10

the plaintiff seeks to rely on a purported comparator to support his *prima facie* case, to establish pretext, or to otherwise raise an inference of discrimination." Defs.' Mot to Strike 8. That is exactly the proposition the Eleventh Circuit rejected in *Tynes*. See *Tynes*, 88 F.4th at 947 ("[I]t is possible that [the plaintiff's] comparators were insufficient to establish a prima facie case yet still relevant to the ultimate question of intentional discrimination."). Mayo's argument thus rests on the same "widespread misunderstandings about the limits of *McDonnell Douglas*" that the Eleventh Circuit criticized in *Tynes*. *Id.* at 946.

The cases relied on by Mayo do not support a contrary conclusion. Mayo relies primarily on three cases to support the central premise of its argument that was rejected by *Tynes*. *See* Defs.' Mot. to Strike 8. None of those cases supports Mayo's position.

*Johnson v. Miami-Dade County*, 948 F.3d 1318 (11th Cir. 2020) (per curiam), does not mention the "convincing mosaic of circumstantial evidence" standard recognized in *Tynes* and other cases, much less reach any conclusion about what sort of evidence may be relevant under that standard. Nor does *Johnson* address the question answered directly in *Tynes*—whether comparator evidence insufficient to support a prima facie case under *McDonnell Douglas* may nevertheless be relevant to a claim of discrimination. Instead, in *Johnson*, the district court granted summary judgment for the defendant in part based on authority requiring comparators to be "nearly identical" to the plaintiff. *Johnson v. Miami-Dade Cnty.*, No. 16-21658-WILLIAMS, 2018 WL 11408402, at *6-7 (S.D. Fla. Mar. 30, 2018). The Eleventh Circuit vacated and

11

remanded that portion of the decision in light of an intervening case rejecting the "nearly-identical test" as "too strict." *Johnson*, 948 F.3d at 1326 (quoting *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc)). That the court found it necessary for the district court to reconsider a summary judgment decision based on no-longer-valid precedent does not support Mayo's position.[6]

In *Taylor v. Farm Credit of North Florida ACA*, No. 21-13807, 2022 WL 4493044 (11th Cir. Sept. 28, 2022) (per curiam), the Eleventh Circuit held that the district court did not abuse its discretion in refusing to allow loan applicants claiming race discrimination to obtain discovery of thousands of other loan files, including loans of materially different types and amounts, especially given that the plaintiffs had resisted invitations from the lender to narrow their request. *Id.* at *2, 4-5. There is no question here regarding discovery of thousands of files unrelated to Dr. Waldorf.

In *Richards v. City of Atlanta*, No. 1:19-cv-03963-WMR-RDC, 2021 WL 3056851 (N.D. Ga. Jan. 15, 2021)—another case decided without the benefit of the *Tynes* decision's clarification of the law—the district court addressed several fact-specific issues regarding the scope of discovery of potential comparator evidence designed to

---

[6] At the time of the *Johnson* decision, it was already settled by Eleventh Circuit precedent that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for" an employment discrimination claim. *Smith*, 644 F.3d at 1328. But *Johnson* was decided without the benefit of the *Tynes* opinion and may be an example of a case in which "parties (and sometimes courts) miss this fundamental point and wrongly treat the prima facie case as a substantive standard of liability," rather than just one way of proving discrimination. *Tynes*, 88 F.4th at 945; *see also Johnson*, 948 F.3d at 1325 (stating that "[w]hen a Title VII retaliation claim . . . is based on circumstantial evidence, this Circuit utilizes the three-part *McDonnell Douglas* burden-shifting framework," without noting that a plaintiff may also prove retaliation without relying on that framework (footnote omitted)).

12

establish pretext. *Id.* at *3-6. *Richards* does not address the "convincing mosaic of circumstantial evidence" standard. In any event, *Richards* does not hold that comparator evidence must be sufficient to support a prima facie case under *McDonnell Douglas* to be relevant to a claim of discrimination. Even if *Richards* had so held, it would not be good law after *Tynes*.

Contrary to Mayo's suggestion, then, "to the extent that there are material differences between [Dr. Waldorf] and [his] comparators . . . , it is the jury's role . . . to determine how much weight the comparator evidence should be given." *Tynes*, 88 F.4th at 947. That is not a question to be decided by the Court on a motion to strike. At the very least, it can hardly be decided on this limited record, in the absence of any discovery or factual development, that the facts alleged in the Complaint "have no possible relation to the controversy." *Somerset Pharms., Inc.*, 168 F.R.D. at 71; *see also Harvey*, 568 F. Supp. 2d at 1360 (observing that "disputed or substantial issues of law" "quite properly are viewed as determinable only after discovery and a hearing on the merits" (quoting 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1380 (2d ed. 1990))). Striking any part of the Complaint is wholly unwarranted.

## CONCLUSION

Mayo's Motion to Strike rests on a misconception the Eleventh Circuit disposed of in the *Tynes* decision. It simply is not true that to be relevant to a claim of employment discrimination or retaliation, comparator evidence must be sufficient to

support a prima facie case under *McDonnell Douglas*. Mayo should not be permitted to use Rule 12(f) to deny Dr. Waldorf the opportunity to present a convincing mosaic of circumstantial evidence in support of his claims. The motion should be denied.

Dated: July 26, 2024.

        FORTUNE LAW OFFICES, P.A.

        By: <u>s/ Scott Thomas Fortune</u>
            Scott Thomas Fortune
            Florida Bar No. 342815
            Primary Email: sfortune@fortunelegal.com
            814 1st Street North, Suite 100
            Jacksonville Beach, Florida 32250
            Telephone: (904) 246-2125
            Facsimile: (904) 246-1551

            Lead Counsel for Plaintiff James C. Waldorf, M.D.