UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JAMES C. WALDORF, M.D.,

     Plaintiff,

v.                            Case No.: 3:24-cv-00657-MMH-MCR

MAYO CLINIC, a Minnesota
non-profit corporation;
MAYO CLINIC JACKSONVILLE,
a Florida non-profit corporation; and
MAYO CLINIC FLORIDA, a Florida
non-profit corporation,

     Defendants.

_____/

## PLAINTIFF JAMES C. WALDORF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Mayo Clinic, Mayo Clinic Jacksonville, and Mayo Clinic Florida's (collectively "Mayo") Motion for Summary Judgment (ECF No. 53) should be denied. Plaintiff James C. Waldorf, M.D. has presented a convincing mosaic of circumstantial evidence sufficient to show age discrimination under the Age Discrimination in Employment Act ("ADEA") and the Florida Civil Rights Act ("FCRA") and associational retaliation under the Equal Pay Act ("EPA").

### STATEMENT OF FACTS[1]

### The Circumstances Surrounding Dr. Waldorf's Termination

In 2023, when Mayo fired Dr. Waldorf, he was seventy-one years old and its

---

[1] At the summary judgment stage, "[a]ll evidence and factual inferences are viewed in the light

oldest practicing plastic surgeon. Waldorf Dep. 12:19-20, 118:4. In his thirty years of service at Mayo, he had never received a negative performance review or any previous discipline. *Id.* at 17:4-6, 17:13-15, 17:21-18:2, 38:16-23. He had an excellent reputation. *See* Cangemi Dep. 157:25-158:7; Meschia Dep. 51:20-52:5; Rinker Dep. 16:3-13; Sluzevich Dep. 58:21-59:1, 59:10-15, attached as Exhibit 1; Thielen Dep. 20:16-19.

In late 2022 and early 2023, shortly before he was fired, Dr. Waldorf had discussed his "future with Mayo" with his supervisor, Dr. Brian Rinker, the chair of Mayo Jacksonville's division of plastic surgery; Alexis Kainz, the division's operations administrator; and others. Rinker Dep. 6:4-16, 13:15-17, 21:11-14, 23:20-22. Dr. Waldorf had asked to decrease his hours, "[n]o longer tak[e] call," and "stop performing surgeries in the OR." Waldorf Dep. 22:12-23:12, 23:22-25. No agreement was reached on those requests. *Id.* at 23:7-9, 23:13-15, 24:4-8, 24:16-20.

Around the same time, in early 2023, Mayo interviewed and hired Dr. Kunle Elegbede as a plastic surgeon on its Jacksonville campus. *See* Rinker Dep. 42:25-43:3, 43:12-14; Thielen Dep. 56:3-7; Thielen Dep. Ex. 1. Dr. Kent Thielen, Mayo Jacksonville's CEO, and Dr. James Meschia—the chair of the committee that Mayo says made the decision to fire Dr. Waldorf, *see* ECF No. 15-13 ¶ 3—participated in the decision to hire Dr. Elegbede. Thielen Dep. Ex. 1; Thielen Dep. 7:2-5. Dr. Elegbede, who is approximately thirty years younger than Dr. Waldorf, *see* ECF No. 27 ¶ 34, replaced Dr. Waldorf after he was fired. *See* Rinker Dep. 42:25-43:5; ECF No. 27 ¶ 34.

---

most favorable to the non-moving party, and all reasonable doubts about the facts are resolved in favor of the non-moving party." *Hardigree v. Lofton*, 992 F.3d 1216, 1223 (11th Cir. 2021).

On the afternoon of Friday, June 23, 2023, Dr. Waldorf asked a nurse, Alex Carter, if there was any leftover "BOTOX that's going to be discarded" because it would expire over the weekend. Waldorf Dep. 59:18-20, 65:20-23; *see also id.* at 56:22-57:13. When she said yes, Dr. Waldorf called Pamela Lovett—his significant other since 2012, who also worked at Mayo—and asked if she wanted the Botox. *Id.* at 13:7-11, 39:5-21, 41:11-13, 59:14-23. Ms. Lovett came to the plastic surgery division, where Dr. Waldorf injected her with the Botox. *Id.* at 60:2-12. He did not bill her "[b]ecause the BOTOX was waste and had no value." *Id.* at 56:3-4, 56:7-9. Nor did he log the procedure, a task he typically "assume[d] the nurses do." *Id.* at 56:5-6, 58:16-25.

At that time, no one at Mayo had ever told Dr. Waldorf he was "not to be using BOTOX waste without charging or without charting it." *Id.* at 163:24-164:17. Though Mayo contends that Dr. Waldorf's conduct violated its Drug Diversion Reporting and Response Policy (the "drug diversion policy"), that policy was just one of "[t]housands" available in Mayo's online "policy library." Minch Dep. 47:8-12. Dr. Waldorf, like most Mayo physicians, had never read it. Waldorf Dep. 49:4-6; *see also* Bruce Dep. 41:17-19; Cangemi Dep. 101:5-7; Fosko Dep. 73:21-74:4; Meschia Dep. 50:18-20; Rinker Dep. 33:20-34:6; Sluzevich Dep. 59:16-18.

Dr. Waldorf and Ms. Lovett made no effort to hide what they were doing. Lovett Dep. 91:15-17. Nurse Carter gave Dr. Waldorf the Botox "in the workroom visible to other employees." Minch Dep. Ex. 24 at 1. He injected it in the same procedure room he used for scheduled patients, after turning on a light outside the room indicating that it was in use. Lovett Dep. 91:10-14, 91:18-20. Had she wanted to

avoid detection, Ms. Lovett could have come and gone without passing the front desk, but she chose not to do so. Clower Dep. 18:4-6, 18:15-21, 19:24-20:19.

In the past, Dr. Galen Perdikis—who was then Dr. Waldorf's supervisor and the chair of Mayo Jacksonville's plastic surgery division—had twice injected Dr. Waldorf with Botox to treat muscle spasms without charging him for it. Waldorf Dep. 103:6-11, 104:1-105:2, 162:23-163:2, 163:15-23. Neither Dr. Perdikis nor Dr. Waldorf had attempted to hide what they were doing. *Id.* at 163:3-7; s*ee also id.* at 105:6-106:5. A current physician in the plastic surgery division, Dr. Sarvam TerKonda, had openly given Botox "touchups" to patients without documenting or charging for them. *Id.* at 106:16-25, 163:8-14. Neither Dr. Perdikis nor Dr. TerKonda—both of whom are substantially younger than Dr. Waldorf—was fired. *See id.* at 29:17-18, 34:12-17, 103:23-25, 107:1-3. Dr. Waldorf also knew that Dr. Alison Bruce, a dermatologist who practiced in Mayo's cosmetic center, was not fired for repeatedly administering Botox without documenting or charging for it. *Id.* at 113:24-115:4.

As those other physicians' conduct suggests, administration of a non-controlled substance, like Botox, without documentation or billing was not generally understood among Mayo medical staff to constitute drug diversion. Both Dr. Waldorf and Ms. Lovett—the latter of whom had served on Mayo's Drug Diversion Response Team or "DDiRT" for five years—understood the term "drug diversion" to be limited to controlled substances or narcotics. *Id.* at 48:3-49:1; Lovett Dep. 51:1-10, 51:16-20. Other former Mayo physicians thought controlled substances were the "main focus" of the drug diversion policy, Fosko Dep. 73:21-74:4, or did not know whether the

policy covered non-controlled substances, Cangemi Dep. 101:13-19. Even Dr. Meschia admitted he did not know "whether . . . diversion of noncontrolled substances was considered sufficient grounds for recommending termination" until he asked human resources representatives Rosemary McMullan and Connie Kuenzinger to "clarify" while Dr. Waldorf's case was under review. Meschia Dep. 54:11-20.

### Ms. Lovett's Equal Pay Inquiries

At the time of Dr. Waldorf's termination, his relationship with Ms. Lovett was widely known at Mayo, including by Ms. McMullan—a member of the personnel committee executive committee ("executive team"), which Mayo says made the decision to fire Dr. Waldorf, *see* McMullan Dep. 74:3-10; ECF No. 53-13 ¶ 3—and by Dr. Thielen. *See* McMullan Dep. 81:21-25; Thielen Dep. 55:3-20; *see also* Clower Dep. 14:2-9; Rinker Dep. 36:2-4; Waldorf Dep. 44:14-17. Ms. McMullan was also aware that Ms. Lovett had expressed "concern[] that she was not being paid . . . as much as" her male counterpart, Richard Pence, who had the same title and "the same level of role." McMullan Dep. 115:22-25, 116:9-22.

Beginning in 2021, Ms. Lovett had inquired with Matthew McNally, a human resources representative, about the level of her pay. *See* Lovett Dep. Exs. 14-19; McMullan Dep. Ex. 11. Ms. Lovett never received an intelligible explanation of why she had not reached the maximum pay level for her position. *See* Lovett Dep. 45:9-15.

On December 15, 2022, Ms. Lovett sent an email to Mr. McNally and Ms. McMullan with the subject line "Equality with Rich [Pence] and My current position." McMullan Dep. Ex. 12 at 2. In that email, Ms. Lovett asked "when Rich and I will

even out with management pay." *Id.* "At some point," she wrote, "there should be equality with current pay structure." *Id.* Ms. Lovett also emphasized that the "inequality" between her and Mr. Pence "affect[ed] [her] pension." *Id.* at 3. Ms. McMullan interpreted the email as a complaint that "Mr. Pence was being paid more than Ms. Lovett for the same work." McMullan Dep. 118:22-119:3.

Mayo's internal correspondence reveals frustration with Ms. Lovett's inquiries. Ms. McMullan forwarded Ms. Lovett's email to Mr. McNally, asking, "What's the plan for her?" McMullan Dep. Ex. 12 at 2. Mr. McNally expressed annoyance that Ms. Lovett "continues to bring this topic up during discussions where [Mr. Pence] is present[,] which is inappropriate." *Id.* at 1. He also bemoaned "the culture in the department, that I feel [Ms. Lovett and Mr. Pence] have supported," in which "they are open about compensation as well as other items." *Id.* Ms. McMullan did not challenge Mr. McNally's attitude. McMullan Dep. 123:8-12, 123:21-25.

### Mayo's Investigation and Dr. Waldorf's Termination

Before June 23, 2023, Mayo had never received a report of Dr. Waldorf misusing any medication. *See* Waldorf Dep. 38:19-23. Yet even before that date, Mayo was already monitoring him. Notes from an interview with Maral Artin, the cosmetic center's office manager, reflect that on a previous occasion, after Ms. Lovett was seen leaving the cosmetic center, Ms. Artin "went to [the] mixing room to see if anything was missing"—despite the absence of any report of wrongdoing—and found that "nothing was missing." Clower Dep. Ex. 2. Mayo's monitoring of Dr. Waldorf and Ms. Lovett finally bore fruit on June 23, 2023, when the front desk staff at the cosmetic

center reported to Ms. Artin that Ms. Lovett had just walked out with "dots on her forehead" and appeared to have received Botox. Clower Dep. Ex. 1.

Mayo's DDiRT leapt into action, with Wayne Hester leading the investigation. Voils Dep. 15:22-25, 19:19-23. Ms. McMullan—who was aware of Ms. Lovett's pay equity claims—also joined DDiRT's investigation. McMullan Dep. 33:2-6, 115:22-25, 116:9-22; Minch Dep. 179:23-180:3; Minch Dep. Exs. 22-23. This was the first and only time in her fifteen years at Mayo that Ms. McMullan participated in a DDiRT investigation. McMullan Dep. 5:14-16, 32:21-33:1.

Nurse Carter was interviewed twice. Minch Dep. Exs. 21, 24. She admitted she did not log the Botox she drew up for Dr. Waldorf and "cannot explain why." Minch Dep. Ex. 24 at 1. She did *not* say Dr. Waldorf had asked her not to log the Botox. *See* Minch Dep. Exs. 21, 24. Nor did she forget to log it; instead, "knowingly, she just drew [the Botox] up, then left." Minch Dep. Ex. 24 at 2. Nurse Carter also admitted she did not "fill[] out the sheets for patients to be charged," though nurses normally did so. *Id.* According to a report prepared by Mr. Hester, Nurse Carter "acknowledged she was aware there was no way for the medication to be billed or tracked without logging the removal." Minch Dep. Ex. 25 at 3. Despite her involvement, Nurse Carter was not investigated or disciplined for drug diversion. *See* ECF No. 53-9 at 19-21.

Mayo invented a false rationale for targeting Dr. Waldorf and Ms. Lovett and sparing Nurse Carter. Mr. Hester wrote in his report that Nurse Carter "was not comfortable questioning a physician," purportedly excusing her conduct. Minch Dep. Ex. 25 at 3. Nurse Carter had said no such thing. Minch Dep. 178:15-22. She had even

insisted during her second interview that "[s]he would *never* feel uncomfortable questioning the doctors in any circumstance" and that she "could have questioned" Dr. Waldorf.[2] Minch Dep. Ex. 24 at 2 (emphasis added).

On July 7, 2023, DDiRT met and decided there was a "reasonable suspicion of drug diversion." Voils Dep. 101:15-102:2; Voils Dep. Ex. 8 at 3-4. Mr. Hester, Dr. Alissa Voils (Mayo's director of medication diversion prevention), Ms. McMullan, and others attended the meeting. Voils Dep. 102:10-13; Voils Dep. Ex. 8 at 3-4. Mayo's corporate representative says no decision regarding discipline was made at that meeting, and that only after interviewing Dr. Waldorf and Ms. Lovett on July 10, 2023, did DDiRT formulate a recommendation. Voils Dep. 107:11-14, 110:13-19.

The testimony of Dr. Waldorf's supervisor, Dr. Rinker, contradicts that assertion. On July 9, 2023, Dr. Rinker received a call from Ms. Kainz, the operations administrator, who told him that "Dr. Waldorf and Pam had been involved in a diversion incident involving Botox, it had been already investigated, and the likely result was going to be termination." Rinker Dep. 35:3-12, 35:18-24. In "*all* the communications [Dr. Rinker] received," including the July 9, 2023 phone call, "it was sort of flatly stated that this is going to be the outcome." *Id.* at 36:25-37:3 (emphasis

---

[2] Mayo ignores this critical evidence in its motion. *See* ECF No. 53 at 5.

Notably, another nurse, Laura Gundian, admitted in an interview with Mr. Hester, Ms. McMullan, and Ms. Minch that she had once received "free fillers" (not from Dr. Waldorf). Minch Dep. 184:20-185:6, 185:22-186:1; Minch Dep. Ex. 23 at 1. Like Botox, FDA-approved fillers require a prescription. U.S. Food & Drug Admin., *Dermal Filler Do's and Don'ts for Wrinkles, Lips and More*, https://www.fda.gov/consumers/consumer-updates/dermal-filler-dos-and-donts-wrinkles-lips-and-more (last visited July 21, 2025). Ms. Gundian was not investigated or disciplined for drug diversion. *See* ECF No. 53-9 at 19-21.

added); *see also id.* at 37:21-22 ("[I]t was presented to me as an accomplished fact.").

The next day, on July 10, 2023, Mayo's drug diversion investigators, led by Mr. Hester, interviewed Dr. Waldorf and Ms. Lovett separately. Waldorf Dep. 69:17-23; Lovett Dep. 71:23-25, 72:12-18; Voils Dep. 131:20-23. Both acknowledged the June 23, 2023 incident. Voils Dep. 110:13-19. Ms. Lovett also disclosed a few previous occasions on which Dr. Waldorf had injected her with Botox. *Id.* at 114:6-11. She was not given a chance, however, to explain that on those occasions she had provided her own Botox, which did not belong to Mayo. Lovett Dep. 96:5-8. Dr. Waldorf and Ms. Lovett were put on administrative leave. Waldorf Dep. 74:2-3; Lovett Dep. 75:20-22.

The testimony of Dr. Meschia, who attended the interview of Dr. Waldorf, *see* Meschia Dep. 36:13-17, confirms Dr. Waldorf's impression that the investigators "were trying to confirm an agenda"—"[t]ermination"—rather than to discover "the full circumstances and the truth of what happened," Waldorf Dep. 165:25-166:17. According to Dr. Meschia, Mr. Hester asked "pointed" questions about "concrete matters" of what he already "knew to be fact" from evidence such as "videotapes and so forth"—evidently trying to catch Dr. Waldorf in a lie to justify firing him, rather than to learn anything about what had happened. Meschia Dep. 37:18-38:1.

Two days later, Ms. Lovett requested an opportunity to give more information to DDiRT. Lovett Dep. 96:9-19. Her request was denied. *Id.* at 96:25-97:5.

On July 11, 2023, the morning after the interviews, DDiRT met again. Voils Dep. 119:9-21, 121:25-122:2. Though Mayo's corporate representative testified that there "should have been" notes from any additional DDiRT meeting after July 7,

9

2023, no such notes have been produced. *Id.* at 108:14-21. Mayo's corporate representative also claimed to have no memory of anything that occurred at the July 11, 2023 meeting. *Id.* at 121:11-13, 122:7-9. Despite that unexplained gap in the record, Mayo asserts that DDiRT recommended termination of Dr. Waldorf and Ms. Lovett "based on the interviews" taken on July 10, 2023—specifically, Dr. Waldorf's and Ms. Lovett's admission "to using Botox waste without documenting the administration, without a patient encounter, and without a charge." *Id.* at 110:13-19, 111:3-7.

On July 12, 2023, the executive team convened to review the allegations against Dr. Waldorf. Meschia Dep. Ex. 13. The executive team comprised Dr. Meschia, its chair; Ms. McMullan, who claims she did not attend the meeting; Ms. Kuenzinger; Dr. Fred Kusumoto; and an in-house attorney named Katie Thranhardt. McMullan Dep. 74:3-22, 81:7-10; Meschia Dep. Ex. 13. Minutes from the meeting memorialize a decision (or recommendation) to give Dr. Waldorf the option to resign or face termination. Meschia Dep. Ex. 13. The minutes also reflect that Dr. Thielen would "give an overview with" Dr. Gianrico Farrugia, the CEO responsible for the entire Mayo enterprise (in other words, all campuses), and Christina Zorn, the chief administrative officer for the Mayo enterprise, before "scheduling [a] follow-up meeting." Meschia Dep. Ex. 13; *see also* Meschia Dep. 62:20-25.

On July 17, 2023, Dr. Waldorf was told he was "going to be terminated" but he "could choose to label it retirement." Waldorf Dep. 76:21-24. Forced to "decide on the spot," Dr. Waldorf chose the "retirement" label. *Id.* at 77:12-14, 79:1-3. Ms. Lovett's employment was terminated the same day, purportedly for "drug diversion."

Lovett Dep. 78:17-23.

According to a previous chair of the executive team, firing a physician usually took "maybe six months." Cangemi Dep. 23:11-20. Yet, according to Mayo, the decision to fire Dr. Waldorf was made less than three weeks after the initial complaint. *See* ECF No. 53-13 ¶ 3; Meschia Dep. Ex. 13. If Dr. Waldorf's supervisor, Dr. Rinker, is to be believed, the decision was made even earlier, before the executive team had even met and before Dr. Waldorf was interviewed or informed of the allegations against him. *See* Rinker Dep. 35:3-12, 35:18-24, 36:25-37:3, 37:21-22.

### Post-Termination Events

Shortly after his termination, Mayo awarded Dr. Waldorf emeritus status, Meschia Dep. Ex. 8, which honors retired physicians who served with "appropriate distinction," Meschia Dep. 10:14-18. A physician who "committed drug diversion" cannot be "in good standing," as emeritus status requires. Kuenzinger Dep. 29:13-16, 30:1-4; *see also* Meschia Dep. 59:4-13. Nevertheless, on August 3, 2023, less than three weeks after Dr. Waldorf's termination, Mayo Jacksonville's personnel committee—which included Dr. Meschia, Ms. McMullan, and Ms. Kuenzinger—voted unanimously to award Dr. Waldorf emeritus status. Meschia Dep. 14:4-6, 16:8-14; Kuenzinger Dep. 21:13-22; Meschia Dep. Ex. 4. Dr. Thielen also endorsed the decision. Thielen Dep. 51:21-25. The meeting minutes do not reflect that any exception to the "good standing" requirement was made. *See* Meschia Dep. Ex. 4.

Mayo's internal policies require drug diversion to be reported to law

enforcement.[3] *See* Voils Dep. 44:3-9, 60:25-61:5. Yet Mayo did not report Dr. Waldorf or Ms. Lovett to law enforcement. *Id.* at 58:22-24. Mayo's corporate representative admitted she did not know why. *Id.* at 62:7-11.

After Dr. Waldorf's termination, cosmetic center staff requested "clarif[ication]" of "expectation[s]" related to handling and documentation of Botox. *Id.* at 83:25-84:17; *see also id.* at 85:21-86:13. In response, Mayo's assistant director of pharmacy made a presentation to cosmetic center staff using slides reviewed beforehand by Dr. Voils. Voils Dep. Ex. 6; Voils Dep. 86:14-17, 86:25-87:2, 87:21-25.

One of those slides defined drug diversion as "the misdirection of drugs, especially controlled substances, from the pharmacy or patient care areas to substance abuse, illegal sales, or both." Voils Dep. Ex. 6 at 10; Voils Dep. Ex. 7; Voils Dep. 89:13-24, 90:5-9. That definition appeared not only in the presentation but also on "the home for the drug diversion page" within Mayo's internal "intranet" system, even as late as November 2023. Voils Dep. 89:1-12, 91:10-14. As Dr. Voils admitted, Dr. Waldorf's conduct—which did not involve substance abuse or illegal sales—did not meet that definition of "drug diversion." *Id.* at 92:11-16.

### Mayo's Decision Making

Mayo has never been able to give a consistent answer to the question of who

---

[3] Specifically, Mayo's Medication Diversion Investigation User Guide provides: "If a Mayo Clinic employee . . . is determined to have committed drug diversion, law enforcement will be notified." Exhibit 2 at 11. Similarly, Mayo's Drug Diversion Reporting and Response Procedure instructs: "If a Mayo Clinic employee . . . is determined to have committed drug diversion, report the diversion to local law enforcement." Voils Dep. Ex. 3 at 4.

decided to fire Dr. Waldorf. Dr. Meschia testified that it was Dr. Thielen's "executive decision." Meschia Dep. 88:8-13. Now he says the executive team made the decision. ECF No. 53-13 ¶ 3. Dr. Thielen, on the other hand, at first said it was "the decision of the personnel committee," Thielen Dep. 46:19-25, before testifying that the committee "does make the *recommendation*," subject to his "verbal approval," *id.* at 87:25-88:2 (emphasis added). Ms. McMullan initially said the executive team makes termination "[r]ecommendations," McMullan Dep. 25:17-19, before saying the executive team, through its chair, "make[s] termination *decisions*," *id.* at 25:20-26:10 (emphasis added). And Dr. Rinker's testimony suggests the decision was made before the executive team had even met. *See* Rinker Dep. 35:3-12, 35:18-24, 36:25-37:3, 37:21-22.

Ms. McMullan—who, again, was aware of Ms. Lovett's pay equity claims, *see, e.g.*, McMullan Dep. 115:22-25, 116:9-22—"[a]bsolutely" denied participating in the executive team's decision-making, though she acknowledged speaking with Dr. Meschia and Ms. Kuenzinger the day before it met. *Id.* at 37:18-38:18, 81:4-5. Dr. Meschia testified, however, that he deferred to Ms. McMullan and Ms. Kuenzinger on the question of "whether . . . diversion of noncontrolled substances was considered sufficient grounds for recommending termination." Meschia Dep. 54:14-55:4, 55:21-56:8. Dr. Meschia also said his "impression was that Rosemary McMullan always supported" giving Dr Waldorf the option to resign or face termination. *Id.* at 88:1-5.

Mayo's statements have also been inconsistent about Dr. Farrugia's and Ms. Zorn's role in the decision to fire Dr. Waldorf. Minutes from the executive team's July 12, 2023 meeting suggest they were to provide input to Dr. Thielen, to be relayed to

the executive team at a "follow-up meeting" before Dr. Waldorf was fired. Meschia Dep. Ex. 13; *see also* Meschia Dep. 64:22-65:2, 65:23-66:8. Dr. Thielen downplayed their role, however, testifying that, contrary to the plan set forth in the minutes, he informed them of the decision at a meeting that took place at the same time as, or even after, the meeting in which Dr. Waldorf was fired. Thielen Dep. 26:8-27:23, 62:7-16. Dr. Thielen admitted, however, that he would not "be able to testify under oath that [he] did not communicate with [Dr. Farrugia] before" the day Dr. Waldorf was fired. *Id.* at 63:24-64:2. Dr. Meschia testified, incredibly, that—despite being the chair of the executive team that Mayo says made the decision, *see* ECF No. 53-13 ¶ 3—he somehow did not know whether Dr. Farrugia was involved. Meschia Dep. 30:15-20.

### Dr. Waldorf's Purported Dishonesty

Mayo has sometimes cited—and sometimes declined to cite—Dr. Waldorf's supposed dishonesty in failing to disclose during his interview that he had injected Ms. Lovett with Botox on previous occasions. *Compare* Answers to Pl.'s 1st Set of Interrog. 5, attached as Exhibit 3, *with* ECF No. 53-9 at 5. The evidence contradicts Mayo's current position that the interview played a role in Dr. Waldorf's termination. By the time of the interview, the decision had been made. *See* Rinker Dep. 35:3-12, 35:18-24, 36:25-37:3, 37:21-22. The claim that dishonesty played a role also contradicts Ms. McMullan's testimony that she believed—incorrectly, *see* Voils Dep. 40:23-24—that a finding of drug diversion *mandated* termination. *See* McMullan Dep. 30:8-11.[4]

---

[4] Similarly, Dr. Thielen testified that Dr. Waldorf "concealed" his conduct, Thielen Dep. 38:19-39:17, though Mayo's investigation revealed, among other things, that Dr. Waldorf received the

### Mayo's Treatment of Dr. Alison Bruce

Mayo dealt much more favorably with worse conduct by Dr. Bruce, who was fifty-one at the time and had never made, or had her spouse make, a claim of sex-based pay discrimination. Bruce Dep. 5:12-17; McMullan Dep. 124:9-12, 124:23-125:1. The investigation of Dr. Bruce began in 2017 when twenty vials of Botox were reported missing. Minch Dep. 40:11-15. Under Mayo's policies, those missing vials should have triggered an investigation by DDiRT. *See* Voils Dep. 75:5-17. No such investigation occurred. Minch Dep. 28:12-13. Instead, Mayo ignored the obvious evidence of what it now insists is drug diversion (at least when Dr. Waldorf does it) and investigated only the improper acceptance of medication samples. *See id.* at 28:12-17, 29:21-30:7.

The initial complaint reported that Dr. Bruce had been "accepting samples of Botox" "for about a year" and had "let the residents use the samples to inject each other and staff." Minch Dep. Ex. 2 at 2. Another nurse reported that "the samples were used for employee training and . . . the residents and Dr. Bruce would inject on each other." Minch Dep. Ex. 7 at 1. The same nurse reported that "patients were injected with the samples at no cost" at "touch up visit[s]." *Id.* Nurses also reported— and Dr. Bruce has confirmed—that Dr. Bruce gave her daughter Botox without charging for it. Minch Dep. 130:2-8; Minch Dep. Exs. 2, 7; Bruce Dep. 130:21-25.

Ms. Zorn, who was then the chief administrative officer of Mayo Jacksonville, was kept apprised of the investigation from the beginning. *See* Minch Dep. 60:2-7,

---

Botox "in the workroom visible to other employees," Minch Dep. Ex. 24 at 1; *see also* Lovett Dep. 91:10-20; Clower Dep. 18:4-6, 18:15-21, 19:24-20:19.

60:13-60:25, 61:8-12, 134:3-14, 136:23-137:5; Minch Dep. Ex. 3. According to Mayo's

corporate representative, Ms. Zorn also was "perhaps" informed in advance of the

recommended outcome. Minch Dep. 137:10-13; *see also* Minch Dep. Ex. 5 at 3.

Witnesses reported that Dr. Bruce claimed she had approval from Mayo's

pharmacy to accept samples. Minch Dep. Ex. 7; Minch Dep. 74:13-20, 81:17-19. Dr.

Bruce's representation, as Mayo's investigation revealed, was false. *See* Minch Dep.

Ex. 6 at 2 ("According to pharmacy leadership, there are currently no Botox samples

authorized by Mayo Clinic . . . ."); *see also* Minch Dep. 59:8-11; Bruce Dep. 131:6-13.

Mayo's investigation confirmed that Dr. Bruce ordered Botox samples and had

them shipped to her attention instead of to Mayo's pharmacy, the proper recipient. *See*

Minch Dep. 100:7-10, 102:2-8, 118:14-17, 129:4-11. It also confirmed that the Botox

was administered to Mayo employees. *Id.* at 129:23-130:1. Mayo found no evidence

that the use of the Botox was properly documented. *Id.* at 79:18-25, 80:20-25.

Even though she had diverted Botox for as long as a year and had administered

Botox to Mayo staff and a family member, and received Botox herself, without

documenting or charging for it, Dr. Bruce received no discipline other than

"coaching." Minch Dep. 40:24-41:3. That coaching consisted of a phone call from the

chair of the personnel committee urging her to "just be careful." Bruce Dep. 54:3-14.

Mayo has attempted to manufacture a rationale explaining why Dr. Waldorf

was fired but Dr. Bruce was not. Mayo asserts that Dr. Bruce's conduct did not violate

the drug diversion policy because she "ordered . . . samples for the purpose of

training," rather than taking Botox "from Mayo's supply." Minch Dep. 152:9-18,

16

155:24-25. The evidence suggests this rationale is not genuine.

As Mayo's corporate representative acknowledged, the drug diversion policy has never made an exception for medication samples or for the use of medication in training. Voils Dep. 72:4-9. Nor does the policy require that the medication be taken "from Mayo's supply." Minch Dep. 155:24. Dr. Thielen, Mayo Jacksonville's CEO, flatly denied that "drug diversion require[s] that Mayo Clinic's drug be used." Thielen Dep. 40:12-14; *see also id.* at 41:14-42:14.[5] The policy also says that "[u]sing or taking possession of a medication without a valid order or prescription" constitutes drug diversion. Minch Dep. Ex. 17 at 1; Voils Dep. Ex. 2 at 2. As Mayo's corporate representative admitted, Dr. Bruce used or took possession of a medication without a valid order or prescription. Minch Dep. 27:2-6, 155:1-4, 157:5-8.

Finally, when asked to explain why Dr. Waldorf's termination was warranted, Dr. Meschia, who testified as Mayo's corporate representative, emphasized the risks of giving treatment without properly documenting it. Meschia Dep. 78:3-22. That concern applies equally to Dr. Bruce's conduct. *See* Minch Dep. at 79:18-25, 80:20-25.

### Mayo's Treatment of Dr. Brian King

In 2018, Mayo received a report that Dr. Brian King, a thirty-year-old physician at its Minnesota campus, had taken Botox home to inject a family member. Voils Dep. 139:6-9; Voils Dep. Ex. 11; *see also* ECF No. 53-9 at 19. For reasons Mayo cannot explain, DDiRT never investigated that allegation. Voils Dep. 139:14-17. Like Dr.

---

[5] *See also* Minch Dep. Ex. 17 at 1 (defining "drug diversion" to apply to medication taken "from Mayo supplies[] . . . *or*" procured in certain other ways (emphasis added)).

Bruce, Dr. King received no discipline except "[c]oaching." ECF No. 53-9 at 19.

### Mayo's Treatment of Other Substantially Younger Physicians

Mayo has also tolerated conduct much worse than Dr. Waldorf's by Dr. Rinker, Dr. Emmanuel Gabriel, and Dr. Juan-Carlos Martinez, who are substantially younger than he is. *See* Fosko Dep. 16:5-7, 58:21-24; Cangemi Dep. 58:18-23; Rinker Dep. 5:12-13; Exhibit 4. Neither Dr. Rinker nor Dr. Martinez, nor their spouses, have made a claim of sex-based pay discrimination. *See* McMullan Dep. 124:13-20, 125:2-9.[6]

Discovery regarding these physicians is incomplete. Judge Richardson ordered Mayo to produce documents relating to these physicians, ECF No. 45, but Mayo has refused to do so while its objection to that order (ECF No. 46) is pending. Currently available evidence reveals, however, that in 2022, Dr. Gabriel removed the wrong breast of a patient and that Dr. Rinker performed reconstructive surgery to correct the error without the patient's consent to the reconstruction. Rinker Dep. 47:18-48:8; ECF No. 40-6 ¶¶ 7-13. Neither physician was fired. *See* Rinker Dep. 56:17-20; Exhibit 5 (showing Dr. Gabriel's current staff privileges at Mayo).

In 2020, in violation of Mayo policy, Dr. Rinker had a sexual relationship with a medical student who was visiting Mayo as an observer within the plastic surgery division and who was entrusted to his supervisory authority. ECF No. 40-6 ¶¶ 3-6; Waldorf Dep. 126:16-25, 127:12-128:13, 129:4-11, 129:18-130:1, 130:9-15; Rinker Dep. 60:15-61:7. After an investigation led by Ms. McMullan, *see* McMullan Dep.

---

[6] The record reveals no such claim by Dr. Gabriel or his spouse either.

50:6-24, 51:4-19, including an interview in which he acknowledged the relationship, Dr. Rinker was not disciplined. Rinker Dep. 59:8-60:14, 63:1-16, 65:1-4, 66:5-21.

In 2017, Mayo received repeated complaints that Dr. Martinez had engaged in reckless and intimidating behavior, including throwing surgical instruments across the room, forcing other Mayo employees to duck. Fosko Dep. 19:12-20:16, 30:9-31:21; Bruce Dep. 33:10-20, 33:25-34:6, 35:23-36:4. These complaints were conveyed to Dr. John Cangemi (then the head of the executive team) and Dr. Farrugia (then Mayo Jacksonville's CEO). Fosko Dep. 17:19-18:20, 44:8-11, 69:11-13; Cangemi Dep. 49:5-8, 50:23-51:1, 51:14-52:1, 53:2-18, 54:3-15. Despite his violations of Mayo's code of conduct, Dr. Martinez was not fired, an outcome Dr. Cangemi characterized as a "team decision." Cangemi Dep. 52:2-8, 58:9-17. Ms. McMullan was aware of the complaints about Dr. Martinez and likely participated in the decision not to fire him. *See* McMullan Dep. 43:23-44:8, 45:4-6, 45:10-12.[7]

## ARGUMENT

### I.    Dr. Waldorf has presented sufficient evidence of age discrimination.

To show age discrimination, a plaintiff must prove that an employer took adverse employment action against him "because of" his age, 29 U.S.C. § 623(a)(1), or, in other words, that "age was the 'but-for' cause of the employer's adverse

---

[7] Ms. McMullan joined the executive team in July 2017, *see id.* at 14:15-20, 20:3-21, while the behavior problems were ongoing, *see, e.g.,* Cangemi Dep. Ex. 10. She also discussed concerns about Dr. Martinez with Dr. Bruce (then his supervisor) and participated in a meeting with Dr. Martinez, Dr. Bruce, and Dr. Ken DeVault, who was then the chair of the executive team. McMullan Dep. 46:22-47:12, 48:10-49:9.

decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).[8] "Often, events have multiple but-for causes." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020). Consequently, "a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision." *Id.* Thus, "a plaintiff need not prove that the reasons offered by the defendant are false if he proves that age was also a reason, and that age was the factor that made a difference." *O'Donnell v. Ga. Osteopathic Hosp., Inc.*, 748 F.2d 1543, 1550 (11th Cir. 1984), *overruling in part on other grounds recognized by Lindsey v. Am. Cast Iron Pipe Co.*, 810 F.2d 1094 (11th Cir. 1987).

A plaintiff who relies on circumstantial evidence to prove discrimination may proceed under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework. *See, e.g.*, *McCreight v. AuburnBank*, 117 F.4th 1322, 1326 (11th Cir. 2024). But "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944-45 (11th Cir. 2023) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)), *cert. denied mem.*, 145 S. Ct. 154 (2024). Thus, "failure to produce a [*McDonnell Douglas*] comparator does not necessarily doom the plaintiff's case." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Smith*, 644 F.3d at 1328). Instead, "[a] plaintiff who cannot satisfy this framework may still be able to prove her case with what we have sometimes called a 'convincing mosaic of circumstantial evidence.'" *Tynes*, 88 F.4th

---

[8] Age discrimination claims "under the FCRA are analyzed under the same framework[] as the . . . ADEA . . . ." *Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1266 (11th Cir. 2014).

at 946 (quoting *Smith*, 644 F.3d at 1327-28). A "convincing mosaic" "is simply enough

evidence for a reasonable factfinder to infer intentional discrimination." *Id.*

In evaluating whether a plaintiff has presented a convincing mosaic, the Court

"consider[s] all relevant evidence," *id.* at 947, which may include "(1) suspicious

timing, ambiguous statements, or other information from which discriminatory intent

may be inferred, (2) 'systematically better treatment of similarly situated employees,'

and (3) pretext." *Jenkins v. Nell*, 26 F.4th 1243, 1240 (11th Cir. 2022) (quoting *Lewis*,

934 F.3d at 1185). Employees who enjoyed "systematically better treatment" need not

be similar enough to the plaintiff to qualify as comparators under *McDonnell Douglas*.

*See id.* at 1246, 1249-51 (reversing summary judgment for an employer on a

convincing-mosaic theory based partly on treatment of employees who were not

similar enough to the plaintiff to be *McDonnell Douglas* comparators); *Lewis*, 934 F.3d

at 1187-89, 1191 (same); *see also Tynes*, 88 F.4th at 947 ("[I]t is possible that [the]

comparators were insufficient to establish a prima facie case [under *McDonnell Douglas*]

yet still relevant to the ultimate question of intentional discrimination.").

Here, Dr. Waldorf has presented a convincing mosaic of circumstantial

evidence sufficient to support an inference of age discrimination. Mayo has

systematically favored substantially younger physicians with more lenient treatment,

despite similar (or much worse) conduct. At least five physicians employed by Mayo—

Drs. Bruce, King, Perdikis, TerKonda, and Waldorf—have administered Botox

without documenting it or charging for it. Only Dr. Waldorf—by far the oldest—was

fired. No Mayo physician other than Dr. Waldorf has received any discipline beyond

"coaching" for purported drug diversion. *See* ECF No. 53-9 at 19-21.[9]

With respect to Dr. Bruce, Mayo does itself no favors by concocting purported justifications for firing Dr. Waldorf but not her. Those justifications—which a jury could reasonably disbelieve—themselves suggest that Mayo is "dissembling to cover up a discriminatory purpose." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1194-95 (11th Cir. 2004). Mayo insists Dr. Bruce did not violate its drug diversion policy because she "ordered . . . samples for the purpose of training" and did not take Botox "from Mayo's supply." Minch Dep. 152:9-18, 155:24-25. But Dr. Thielen, Mayo Jacksonville's CEO, testified that it does not matter whether a medication came from Mayo's supply. Thielen Dep. 40:12-14. Nor has Mayo's policy ever made an exception for samples or training. Voils Dep. 72:4-9. And Dr. Meschia's main concern about Dr. Waldorf's conduct—the risk of undocumented treatment—applies equally to Dr. Bruce's conduct. *See* Meschia Dep. 78:3-22.

Further, Mayo's toleration of *worse* misconduct by Drs. Gabriel, Rinker, and Martinez strengthens the inference of discrimination.[10] Though Mayo says DDiRT would not have investigated those incidents, ECF No. 53 at 19, it does not contend that DDiRT was the decision-maker here, *see* ECF No. 53-13 ¶ 3. And both Dr.

---

[9] Mayo says these younger physicians are not *McDonnell Douglas* comparators. ECF No. 53 at 11-15. But they do not have to be. *See Jenkins*, 26 F.4th at 1249-51; *Lewis*, 934 F.3d at 1187-89.

[10] Mayo attempts to dismiss this evidence based on *McCray v. Florida Gypsum, LLC*, No. 6:23-cv-1567-JSS-RMN, 2025 WL 1489826 (M.D. Fla. May 23, 2025), in which the court concluded that "Plaintiff's conclusory statements that all his Hispanic coworkers were treated better than he was" was insufficient. *Id.* at *9. Unlike the plaintiff in *McCray*, however, Dr. Waldorf has presented not "conclusory statements" about unspecified "coworkers" but detailed evidence that specific substantially younger physicians were treated more favorably despite specific, serious misconduct. *Id.*

Farrugia and Ms. McMullan—who a jury could find participated in the decision to fire Dr. Waldorf, *see* Meschia Dep. Ex. 13; Meschia Dep. 54:14-55:4, 55:21-56:8, 87:14-18, 88:1-5—were at least aware of Dr. Martinez's conduct. *See* Fosko Dep. 17:19-18:20, 44:8-11, 69:11-13; McMullan Dep. 43:23-44:8, 45:4-6, 45:10-12, 46:22-47:12, 48:10-49:9. Ms. McMullan also investigated Dr. Rinker's inappropriate relationship. *See* McMullan Dep. 50:6-24, 51:4-19.[11]

Additional circumstantial evidence of discrimination—which Mayo largely ignores—abounds. The evidence suggests Mayo was already looking for an excuse to fire Dr. Waldorf before the Botox allegations came to light. It had already hired his replacement—suspiciously, shortly after Dr. Waldorf asked to reduce his hours and stop taking call. *See* Rinker Dep. 13:15-17, 21:11-14, 23:20-22, 42:25-43:3, 43:12-14; Thielen Dep. 56:3-7; Thielen Dep. Ex. 1. And Mayo's attempt to catch him in misconduct before any report of wrongdoing, *see* Clower Dep. Ex. 2, "strongly suggests the possibility of a search for a pretextual basis for discipline," *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 921 (11th Cir. 1993). The same is true of the attempt to catch Dr. Waldorf in a lie during the interview. *See* Meschia Dep. 37:18-38:1.

Perhaps even more telling is Mayo's invention of Nurse Carter's supposed unwillingness to question a physician—which she had expressly denied—as a false justification for singling out Dr. Waldorf and Ms. Lovett for punishment. *See* Minch Dep. Ex. 25 at 3; Minch Dep. Ex. 24 at 2. The haste with which Dr. Waldorf was fired

---

[11] If Mayo eventually complies with Judge Richardson's discovery order (ECF No. 45), it may reveal additional involvement by individuals who participated in the decision to fire Dr. Waldorf.

(just over three weeks), compared to the typical "six months" to fire a physician, Cangemi Dep. 23:11-20, suggests a predetermined outcome, as does the rejection of Ms. Lovett's offer of additional information, *see* Lovett Dep. 96:9-19, 96:25-97:5.

Mayo's obfuscation about who participated in the decision to fire Dr. Waldorf also strongly suggests an effort to "cover up a discriminatory purpose." *Cleveland*, 369 F.3d at 1194-95. Was the decision made by the executive team? By Dr. Thielen? Did Ms. McMullan participate? Did Dr. Farrugia? Did Ms. Zorn? Was the decision made before Dr. Waldorf was interviewed? Afterward? Mayo has answered both "yes" and "no" to each of these questions. *See* ECF No. 53-13 ¶ 3; Meschia Dep. 30:15-20, 54:14-55:4, 55:21-56:8, 87:14-18, 88:1-5, 88:8-13; Thielen Dep. 26:8-27:23, 46:19-25, 62:7-16, 87:25-88:2; McMullan Dep. 25:17-19, 81:4-6; Voils Dep. 107:11-14, 110:13-19; Rinker Dep. 35:3-12, 35:18-24, 36:25-37:3, 37:21-22.

A jury could also disbelieve Mayo's assertion that it fired Dr. Waldorf in part because of dishonesty in his interview.[12] According to Dr. Rinker's testimony, the decision was made before the interview. *See* Rinker Dep. 35:3-12, 35:18-24, 36:25-37:3, 37:21-22. And Ms. McMullan—on whom Dr. Meschia relied for advice about whether Dr. Waldorf's conduct was sufficient to warrant termination, *see* Meschia Dep. 54:11-20; *see also id.* at 73:21-24—believed the drug diversion policy required Dr. Waldorf to be fired regardless of whether he was dishonest. *See* McMullan Dep. 30:8-11.

---

[12] A similar conclusion applies to Dr. Thielen's assertion that Dr. Waldorf "concealed" his conduct, Thielen Dep. 38:19-39:17, despite receiving the Botox in front of other employees and injecting it in an ordinary procedure room, Minch Dep. Ex. 24 at 1; Lovett Dep. 91:10-20.

Mayo's conduct immediately after firing Dr. Waldorf also suggests it did not genuinely believe he had committed drug diversion. With the support of Dr. Thielen, Dr. Meschia, Ms. McMullan, and Ms. Kuenzinger, Mayo awarded Dr. Waldorf emeritus status, an honor that required him *not* to have committed drug diversion. Meschia Dep. 14:4-6, 16:8-14, 59:4-13; Kuenzinger Dep. 21:13-22, 29:13-16, 30:1-4; Thielen Dep. 51:21-25; Meschia Dep. Exs. 4, 8. Mayo also declined to report Dr. Waldorf to law enforcement, which its own policies required it to do if it believed he had committed drug diversion. Voils Dep. 58:22-24; Exhibit 2 at 11; Voils Dep. Ex. 3 at 4; *see also Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1353 (11th Cir. 2022) ("[A]n employer's deviation from its own standard procedures may serve as evidence of pretext." (alteration in original)). Mayo also continued to broadcast a definition of "drug diversion" that did not cover Dr. Waldorf's conduct. Voils Dep. Ex. 6 at 10; Voils Dep. Ex. 7; Voils Dep. 86:14-17, 86:25-87:2, 87:21-25, 90:5-14, 92:11-16. This evidence could persuade a reasonable jury Dr. Waldorf was fired because of his age.

## II.    Dr. Waldorf has presented sufficient evidence of retaliation.

The EPA prohibits "retaliat[ing] against an employee for filing a complaint or instituting proceedings related to" the EPA. *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1314 (11th Cir. 2018) (citing 29 U.S.C. § 215(a)(3)). That anti-retaliation provision is given a "broad construction"; it includes "unofficial complaints expressed . . . to [an] employer about unequal pay." *EEOC v. White & Son Enters.*, 881 F.2d 1006, 1011 (11th Cir. 1989). "[A] plaintiff may survive summary judgment on a retaliation claim by coming forward with a 'convincing mosaic' of circumstantial evidence supporting an

inference of retaliation." *Gray v. Bd. of Tr. of Ga. Military Coll.*, No. 23-13444, 2025 WL 560736, at *6 (11th Cir. Feb. 20, 2025) (per curiam). Dr. Waldorf has done so here.

A jury could reasonably find that Ms. Lovett engaged in protected activity. She sent an email asking for "[e]quality with" her male counterpart, emphasizing that "there should be equality" of pay and asking "when Rich [Pence] and I will even out." McMullan Dep. Ex. 12 at 2. Ms. McMullan understood the email as a complaint that "Mr. Pence was being paid more than Ms. Lovett for the same work," McMullan Dep. 118:22-119:3, the very definition of an EPA violation, *see* 29 U.S.C. § 206(d)(1) (making it unlawful to "pay[] wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work"). That is sufficient; no "magic words" are required. *Saridakis v. S. Broward Hosp. Dist.*, 681 F. Supp. 2d 1338, 1353 (S.D. Fla. 2009). Ms. Lovett "need not have pointed out the obvious fact that she was comparing herself to a male employee to demonstrate her complaint concerned a pay disparity between a male and a female employee." *Id.* at 1354; *see also Prosser v. Thiele Kaolin Co.*, 135 F. Supp. 3d 1342, 1357-58 (M.D. Ga. 2015) (finding sufficient plaintiff's statement that "her 'pay is lower than the guys' is'").

A reasonable jury could also find that Dr. Waldorf, along with Ms. Lovett, was fired because of Ms. Lovett's protected activity. The evidence set forth above is sufficient to support a finding of a retaliatory motive for Dr. Waldorf's termination. Neither Drs. Bruce, Rinker, and Martinez—whom Mayo treated more favorably—nor their spouses have made claims of sex-based pay discrimination. *See* McMullan Dep. 124:9-125:9. Nor is there any evidence of such claims by Drs. King, Perdikis,

26

TerKonda, and Gabriel or their spouses.

Further, the evidence that Mayo was already looking for a reason to fire Dr. Waldorf suggests it wanted a pretext to fire *both* Dr. Waldorf *and* Ms. Lovett, supporting an inference that Ms. Lovett's equal pay claim was the motive. For example, before Mayo had received any report of wrongdoing, Ms. Artin checked "to see if anything was missing" after Ms. Lovett exited the plastic surgery division, apparently hoping to catch both Dr. Waldorf and Ms. Lovett in misconduct. Clower Dep. Ex. 2. Mayo also hired Dr. Waldorf's replacement shortly after Ms. Lovett's December 15, 2022 email seeking "Equality with Rich [Pence]." McMullan Dep. Ex. 12 at 2; Thielen Dep. 56:3-7; Thielen Dep. Ex. 1.

The evidence of Mayo's "dissembling" discussed above also strongly suggests an effort to "cover up" a retaliatory purpose. *Cleveland*, 369 F.3d at 1194-95. Significantly, Mayo has not just failed to consistently answer the question of who participated in the decision to fire Dr. Waldorf; it has attempted to conceal the role of Ms. McMullan—a recipient of Ms. Lovett's complaints—in particular. *See* McMullan Dep. 81:4-6. *But see* Meschia Dep. 54:14-55:4, 55:21-56:8, 88:1-5. It has done so despite her participation—for the only time in her fifteen years at Mayo—in the DDiRT investigation. *See* McMullan Dep. 5:14-16, 32:21-33:6. The evidence could lead a reasonable jury to find that Mayo fired Dr. Waldorf, along with Ms. Lovett, in retaliation for Ms. Lovett's EPA-protected activity.

## CONCLUSION

Mayo's motion should be denied.

Dated: July 21, 2025.

BEDELL, DITTMAR, DeVAULT, PILLANS & COXE
Professional Association

By: s/John G. Woodlee
        Michael E. Lockamy
        Florida Bar No. 69626
        Email: mel@bedellfirm.com
        John G. Woodlee
        Florida Bar No. 0100990
        Email: jgw@bedellfirm.com
        The Bedell Building
        101 East Adams Street
        Jacksonville, Florida 32202
        Telephone: (904) 353-0211
        Facsimile: (904) 353-9307

                -and-

FORTUNE LAW OFFICES, P.A.
        Scott Thomas Fortune
        Florida Bar No. 342815
        Primary Email: sfortune@fortunelegal.com
        814 1st Street North, Suite 100
        Jacksonville Beach, Florida 32250
        Telephone: (904) 246-2125
        Facsimile: (904) 246-1551

Counsel for Plaintiff James C. Waldorf, M.D.