# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


JAMES C. WALDORF, M.D.,

      Plaintiff,

v.                                    Case No.:
                                    3:24-cv-00657-MMH-MCR

MAYO CLINIC, a Minnesota
non-profit corporation;
MAYO CLINIC OF JACKSONVILLE,
a Florida non-profit
corporation; and MAYO CLINIC
FLORIDA, a Florida non-profit
corporation,

      Defendants.
_____/



VIDEO-RECORDED DEPOSITION OF

JASON SLUZEVICH, M.D.

Taken on behalf of the Plaintiff


DATE TAKEN:            Friday, February 28, 2025

TIME:                 10:03 a.m. - 11:13 a.m.

PLACE:                One Independent Drive
                      Suite 1300
                      Jacksonville, Florida  32202

REPORTED BY:          Marianne Branson, RPR



- - -

Page 2

```
 1            APPEARANCES FOR THE PLAINTIFF
 2            SCOTT THOMAS FORTUNE, Esquire
              Fortune Law Offices, P.A.
 3             814 1st Street North
                    Suite 100
 4          Jacksonville Beach, Florida  32250
               sfortune@fortunelegal.com
 5
                        and
 6
               JOHN G. WOODLEE, Esquire
 7      Bedell, Dittmar, DeVault, Pillans & Coxe, P.A.
               101 East Adams Street
 8           Jacksonville, Florida  32202
                jgw@bedellfirm.com
 9
10
11           APPEARANCES FOR THE DEFENDANTS
12          MARY CAROLINE CRAVATTA, Esquire
                 Foley & Lardner, LLP
13             301 East Pine Street
                    Suite 1200
14           Orlando, Florida  32801
                mcravatta@foley.com
15
                        and
16
             CHARLES S. BIERMAN, Esquire
17                 Mayo Clinic
               200 First Street SW
18           Rochester, Minnesota 55905
19
20
                   ALSO PRESENT:
21
                   James Waldorf
22
         Jon Krol, Advantage Video Productions
23
                     —   —   —
24
25
```

Certified Court Reporters, Inc.
(904) 356-4467

Page 3

1                       EXAMINATION INDEX

2    JASON SLUZEVICH, M.D.

3         DIRECT BY MR. FORTUNE                           5

4         CROSS BY MS. CRAVATTA                          62

5                          —  —  —

6

7

8

9            PLAINTIFF'S EXHIBITS FOR IDENTIFICATION

10    1     4-19-17 Fosko email                          11

11    2     4-21-17 Fosko email                          30

12    3     Notes to personnel file 6-26-17              31

13    4     7-18-17 Fosko email                          43

14    5     7-26-17 Fosko email                          44

15    6     Professional/Peer Reference                  46

16    7     8-24-17 Swigart email                        49

17

18                          —  —  —

19

20

21

22

23

24

25

Page 4

1           VIDEOGRAPHER:  We're on the record at

2    10:03 a.m. on February 28, 2025.

3           This is the video-recorded proceeding of

4    Jason Sluzevich, M.D., taken by counsel for the

5    plaintiff in the matter of James Waldorf, M.D.,

6    versus Mayo Clinic Minnesota, et al., filed in the

7    United States District Court, Middle District of

8    Florida, Jacksonville Division.

9           This proceeding is being held at the offices

10   of Foley & Lardner in Jacksonville, Florida.

11          My name is Jon Krol, with Advantage Video.

12   The court reporter is Mari Branson, with Certified

13   Court Reporters.

14          Counsel will now state their appearances for

15   the record, after which the court reporter will

16   swear in the witness.

17          MR. FORTUNE:  Thank you.  Scott Fortune on

18   behalf of the plaintiff, Dr. Waldorf.

19          MR. WOODLEE:  John Woodlee also on behalf of

20   Dr. Waldorf.

21          MS. CRAVATTA:  M.C. Cravatta on behalf of

22   defendants.

23          MR. BIERMAN:  Charlie Bierman, in-house

24   counsel at Mayo.

25

```
                                                        Page 5
 1                  JASON SLUZEVICH, M.D.,
 2    having been produced and first duly sworn as a witness,
 3    testified as follows:
 4                  THE WITNESS:  I do.
 5                     DIRECT EXAMINATION
 6    BY MR. FORTUNE:
 7         Q    Good morning, Dr. Sluzevich.
 8         A    Good morning.  How are you?
 9         Q    Good, sir.  My name is Scott Fortune.
10         A    Okay.
11         Q    I represent Dr. Waldorf.
12         A    Understand.
13         Q    And have you seen the complaint that was
14    filed in this case?
15         A    No.
16         Q    Okay.  Do you have any understanding of what
17    that complaint alleges?
18         A    I do not.
19         Q    Okay.  Let me ask you first, what month and
20    year were you born?
21         A    ███████████  1974.
22         Q    Thank you.  And who is your employer?
23         A    Mayo Clinic.
24         Q    And is it Mayo Clinic Florida or Jacksonville
25    or --
```

Page 6

1       A    I honestly wouldn't know.  I just know it's

2   Mayo.

3       Q    Okay.  And do you work in Jacksonville?

4       A    I work at the -- the Florida branch, correct.

5       Q    Okay.

6       A    The main site in Florida, yes.

7       Q    It's on San Pablo, I believe?

8       A    Correct, yes.

9       Q    And what department do you work in?

10      A    I'm in dermatology.

11      Q    And what's your position there?

12      A    I do medical dermatology and

13  dermatopathology.

14      Q    Have you ever been a chair, or a leader,

15  supervisor, manager in any position with Mayo Clinic?

16      A    Not -- no.

17      Q    Okay.  When did you first start working with

18  Mayo Clinic?

19      A    Let's see.  It was in 2007.

20      Q    Okay.  Was that in Jacksonville?

21      A    Correct.  I've always been in Jacksonville.

22      Q    Thank you.  Where did you obtain your college

23  education and your medical degree?

24      A    I went to Colorado College, and then I went

25  to Yale for medical school.

Page 7

1       Q    And what year did you graduate from Yale

2    medical school?

3       A    That would have been 2000.

4       Q    And did you do your internship at Mayo?

5       A    No.

6       Q    Where did you --

7       A    It was in Cincinnati.

8       Q    Cincinnati.  Where in Cincinnati?

9       A    Cincinnati, Ohio.  So there's the --

10   essentially it's the University of Cincinnati.

11      Q    Okay, got you.

12      A    Correct.

13      Q    And did you do a residency at the same place?

14      A    I did residency, and fellowship was there.

15      Q    Okay.  And was your fellowship in

16   dermatology?

17      A    It was a -- I did a residency in dermatology,

18   and then I did a dermatopathology fellowship there as

19   well, so it was a combined.

20      Q    Can you spell dermatopathology?

21      A    D-E-R-M-A-T-O-P-A-T-H-O-L-O-G-Y.

22      Q    Thank you.  And that involves looking at

23   specimens on --

24      A    Essentially skin biopsies, so I read the skin

25   biopsies that are collected from dermatology.

Page 8

1        Q    Okay.  Let me just jump in for a minute.
2    You're answering questions beautifully, you're clear
3    and I can --
4        A    Yeah.
5        Q    -- understand.  Can you please let me finish
6    my question.
7        A    Sure.  I didn't mean to cut you off.
8        Q    No, no, that's okay.  I wanted to ask that
9    you let me finish, because the court reporter has to
10   type down what I'm saying and you.
11       A    Sure.  Sorry.
12       Q    And it's difficult if we're both talking
13   at --
14       A    Of course.
15       Q    -- the same time.  You're still doing it.
16            What do you know about Jim Waldorf's
17   termination?
18       A    I just thought he retired.
19       Q    Okay.  You and Dr. Waldorf were on friendly
20   terms when --
21       A    Yeah.  We were colleagues, yes.
22       Q    Let me finish my question.
23            You and Dr. Waldorf were on friendly terms
24   when he was still employed at Mayo Clinic; correct?
25       A    Correct.

Page 9

```
 1      Q    Okay.  And did you do any work in the
 2  cosmetic center?
 3      A    No.  I don't do any cosmetic dermatology.
 4      Q    Okay.  And how did you learn that Dr. Waldorf
 5  had retired?
 6      A    I hadn't seen him around for a while, and so
 7  I just -- and we used to see each other in the lunch --
 8  break room, and so I just thought -- I know there had
 9  been a lot of new staff that was added to plastic
10  surgery, and so I just, you know, thought he had
11  retired.  That was my impression.
12      Q    Okay.  Did you go to his retirement party at
13  Mayo Clinic?
14      A    I did not.  I didn't know that he had one,
15  honestly.
16      Q    Okay.  Did that surprise you, that he would
17  retire after 30 years without a retirement party?
18      A    No.
19      Q    Okay.  Who else has done that that you know
20  of?
21      A    I don't know who gets retirement parties when
22  they retire.  I know it's not for every staff, so --
23      Q    Okay.
24      A    And I'm not in plastic surgery.  I'm in a
25  different department, so I would not necessarily be
```

Page 10

1    included in that.

2        Q    Okay.  Do you know of any other doctors at

3    Mayo Clinic who have retired without giving anyone

4    notice?

5        A    Not to the top of my mind, no.

6        Q    If you think of anyone while we're doing this

7    today, will you let me know?

8        A    Of course.

9        Q    Thank you.  Did you find it suspicious or

10   funny that you had been told he retired when he just

11   disappeared one day?

12       A    It was my impression that he retired.  No one

13   told me he retired.  I just thought that.  That was my

14   operational assumption, but no one told me that he

15   retired.

16       Q    I see.

17       A    I just thought that that was -- you know,

18   that's what I thought happened.

19       Q    Okay.  Did you ask anyone what happened to

20   him?

21       A    No.

22       Q    Were you curious to know?

23       A    Not really, honestly.  I'm -- not to be mean

24   to Dr. Waldorf or anything.

25       Q    Okay.  Did you hear any rumors that he'd been

Page 11

1   fired?

2       A    No.

3       Q    So I take it you had nothing to do with his

4   termination?

5       A    I had no idea.  I had no -- I didn't even

6   know that he was terminated.  Like I said, I thought he

7   had just retired.

8       Q    Okay.  And you weren't like questioned about

9   him in the context of whether we should terminate him

10  or not?

11      A    No.  I had no -- nothing with that, no.

12      Q    You had no input?

13      A    Correct.

14      Q    Okay.  Have you ever discussed why Jim left

15  with anyone?

16      A    Only --

17      Q    And I don't mean the lawyers.

18      A    Oh, no.

19      Q    Anyone other than the lawyers?

20      A    No.

21           (Plaintiff's Exhibit Number 1 was marked for

22           identification.)

23  BY MR. FORTUNE:

24      Q    Let me show you what I've marked as

25  Exhibit 1.

```
                                                        Page 12

 1        A    Sure.

 2        Q    Exhibit 1 is Bates marked Fosko, with four

 3   zeros, 69, four leading zeros.

 4             And just for the court reporter, I'm not

 5   going to keep repeating that they're all with leading

 6   zeros.

 7             And this is an email from Scott Fosko dated

 8   April 19th, 2017, to John Cangemi and Daniel Tomlinson

 9   asking for guidance with respect to Dr. Juan-Carlos

10   Martinez.

11             Do you know who Scott Fosko is?

12        A    Yes.

13        Q    Do you know why Scott Fosko is no longer with

14   Mayo Clinic?

15        A    He left.  That's all I know.  And he was

16   terminated as the chair.

17        Q    Okay.  So he was terminated as the chair and

18   then he left; is that what you heard?

19        A    Correct.  It was, I think, a two-stage --

20   two-stage event.

21        Q    Did anyone at Mayo Clinic tell you what

22   happened to Dr. Fosko?

23        A    No.  Only that he had left.

24        Q    Okay.

25        A    We all knew that he was demoted as chair,
```

Page 13

1    because that was a departmental thing.

2         Q    Okay.  Were you friends with Scott Fosko?

3         A    No.

4         Q    Were you guys a little antagonistic with each

5    other?

6         A    I would say that he -- I was certainly not

7    his biggest fan.

8         Q    Okay.  And why is that?

9         A    He was a terrible chair and a terrible

10   clinician, and that's why he's no longer at Mayo.

11        Q    Okay.  Do you know why he was brought to Mayo

12   Clinic?

13        A    He had a reputation that far exceeded his

14   actual clinical acumen, unfortunately for us.

15        Q    What facts would you offer to support that he

16   was a terrible clinician?

17        A    Basically multiple members in the department

18   would not send surgical cases to him because the

19   outcomes were so terrible.

20        Q    And who are those other doctors?

21        A    Well, was certainly me.

22        Q    And --

23        A    I don't know anybody else.  I know for myself

24   that that's -- I would not send any cases to him

25   because of his poor clinical ability.

Page 14

1      Q    Okay.  Can you name one other physician who

2   you know wouldn't send their cases to Dr. Fosko because

3   of his poor clinical ability?

4      A    I can't.

5      Q    Okay.  And give me some facts that led you to

6   conclude that Dr. Fosko had poor clinical ability.

7      A    There was a follow-up patient that really

8   stuck into my mind.  She was in her mid 40s.  And it

9   was a simple basal cell removal, and when she came back

10  in the postoperative period, I mean to me it looked

11  like it was like a Frankensteinian outcome.  I had

12  never seen anything like this.  I was like this is just

13  terrible.

14             And so at that point I said I'm not going to

15  send any of my patients to him, because that's not an

16  outcome -- you know, I can't live with myself sending

17  patients to him with that outcome.

18             And then it became -- and so that's basically

19  where I just said that's it for me in sending patients

20  to him.

21     Q    What do you mean by "a Frankensteinian

22  outcome"?

23     A    Meaning that generally, a good Mohs surgeon,

24  you'll have a minimal scar.  If you have bad

25  reconstruction or bad planning, you'll have a very

Page 15

1    exaggerated scar, so like, you know, Frankenstein has

2    all the crazy scars.

3         Q    And where was this woman's scar?

4         A    It was a facial, which is worse.

5         Q    And where on her face?

6         A    Somewhere on the cheek area.

7         Q    And you're indicating left cheek?

8         A    Yeah.

9         Q    Near the base of your nose?

10        A    Yeah, in this kind of general anatomic

11   region, correct.

12        Q    And how large was the scar that you're

13   talking --

14        A    It was larger than I would have expected.  So

15   my clinical impression was like this is not a good

16   outcome for what clinically -- I'd seen that tumor

17   before.  It was a relatively small tumor, so typically

18   the repair and the excision should have been easy.  The

19   procedure should have gone well.

20             And when I saw this result, I was like this

21   is really atypical, like this is way not what I've

22   expected, not what I've seen from any other Mayo

23   surgeon.

24        Q    Okay.  How big was the tumor?

25        A    I don't recall the specifics.  I only

Page 16

1   remember that when I saw her it just made such an

2   indelible impression on me, like this is such a

3   terrible outcome, like how -- how could this even

4   happen.

5        Q    Sure.  And for me to try to distinguish

6   between what you may have a faulty memory of --

7        A    Right.

8        Q    -- I'm trying to ask for facts.

9        A    Well, I mean this was a long --

10       Q    Was this tumor, Doctor, was it the size of a

11   BB or the size of a silver dollar?

12       A    I don't remember at this point.  I only

13   remember the aftereffects of the tumor removal and how

14   poor it was done.

15       Q    Okay.  Do you remember how large the scar

16   was?

17       A    But I do know that it wasn't a, you know --

18   it wasn't someone who presented with like a fungating

19   mass that we know the reconstruction is going to be

20   very difficult.

21            This seemed to be just sort of an average of

22   the mill, maybe 5- to 6-millimeter basic tumor that you

23   would expect the result would be very good.  And so

24   that is when my certainly -- I certainly had a lot of

25   concerns about him once we saw that result and -- yeah.

Page 17

1          Q    How big was the scar?

2          A    I don't recall.  Only that it was like not

3    clinically acceptable in my view as a clinician.

4          Q    To your knowledge, did the patient complain?

5          A    I don't know that.

6          Q    Okay.

7          A    And I certainly -- yeah, I don't know that.

8          Q    Okay.  And did you talk to Dr. Fosko about

9    the outcome?

10         A    No.  He wasn't someone who was interested in

11   feedback.

12         Q    And why do you say that?

13         A    Because he would tend to target people who he

14   disagreed with, or if anyone damaged his ego, he would

15   become punitive.

16         Q    And why do you say that he didn't take

17   feedback well?

18         A    Well, that was -- a lot of the interactions

19   between him and Dr. Martinez I think related to some of

20   this Mohs technique and outcomes.  And certainly when,

21   you know, people are favoring the junior -- you know,

22   junior surgeon over, you know, the senior surgeon, I

23   think that was a big ego blow to him.

24              And then so he very much did target

25   Dr. Martinez, because they didn't get along, and that

Page 18

1   was acknowledged.  But I think it also had -- due to

2   the relationship with -- there was such a perceived

3   competency difference between him and what Dr. Martinez

4   was able to do.

5        Q    And when you refer to the "junior" doctor,

6   you're talking about Martinez in that --

7        A    Correct.  There was only two at that time,

8   yeah.

9        Q    Okay.  And what cases can you remember where

10  a patient didn't want to be treated by Dr. Fosko?

11       A    Well, I would just -- started to send my

12  patients to --

13       Q    Martinez?

14       A    To Martinez, correct.

15       Q    Okay.  And Dr. Martinez is no longer there;

16  correct?

17       A    Correct.

18       Q    Why did he leave?

19       A    He had some changes in his personal life, and

20  he wanted to work less in terms of the number of days,

21  and so he took an opportunity where he could spend more

22  time with his kids and also have more flexibility, you

23  know, in scheduling.

24       Q    Okay.  What are the changes in his personal

25  life?

Page 19

1        A     He went through a divorce.

2        Q     Okay.  Was he married to a physician?

3        A     He was, yes.

4        Q     Are you still friends with him?

5        A     Yeah, I do occasionally talk to him, yes.

6        Q     Okay.  How long has it been since you talked

7   to him?  What was the last time?

8        A     Probably a little before -- we text each

9   other on Christmas.  I wished him a Merry Christmas

10  through text.

11       Q     Okay.  Have you been to his home in Atlantic

12  Beach?

13       A     Yes, once.  After he purchased it, so it must

14  have been, I don't know, May of last year.

15       Q     Okay.  And did any patient ever tell you that

16  they did not want to be treated by Dr. Fosko?

17       A     No.

18       Q     And did Dr. Martinez tell you that any

19  patient ever told him that the patient did not want to

20  be treated by Fosko?

21       A     That I don't know.

22       Q     Did any doctor at Mayo Clinic ever tell you

23  that they had heard a patient did not want to be

24  treated by Dr. Fosko?

25       A     I know there were concerns on some of the

Page 20

1    patients where the length of repairs were taking a lot

2    longer, and there was concerns about that.

3        Q    Okay.  Are you aware that there were patient

4    complaints about Dr. Martinez?

5        A    I was aware, yes.

6        Q    And you're aware there were patients that

7    wrote letters to the hospital about his --

8        A    Correct.

9        Q    -- volatile behavior?

10       A    I don't know if I would describe it as

11   volatile, but there were patients that -- no

12   physician -- no -- you know, not everyone likes every

13   physician, so ...

14       Q    Okay.  Including Dr. Fosko, I guess?

15       A    Correct, including Dr. Fosko, yeah.

16       Q    Okay.  Well, can you give any example of

17   Dr. Fosko not taking feedback well from you?

18       A    Yes.  I mean he wasn't someone that you --

19   you know, if you were not toeing his party line, you

20   would be basically targeted and targeted for punitive

21   behavior, so no one was interested in ultimately

22   interacting with him.

23                    And he was removed as chair.  That's all I

24   have to say.  I mean that's it.  Those were the facts,

25   and that's what happened.

Page 21

1      Q    Okay.  Let me make sure you understand my

2   question.  I'm asking if you can give me an example of

3   Dr. Fosko not taking feedback well.

4      A    Correct.  I told him that I didn't think we

5   should expand the PA practice, and he was like, well,

6   I've decided that, and that's the way it's going to be.

7      Q    Okay.

8      A    So there was no -- so that came -- made it

9   very clear to me that he really wasn't interested in

10  any sort of input, you know, from staff.

11     Q    Okay.  He was the chair at the time you said

12  that to him; right?

13     A    Correct.

14     Q    And it was his responsibility to decide

15  whether to expand the PA practice?

16     A    Well, it would be within his purview,

17  correct, and we had -- people had concerns.  And some

18  of those we voiced to him, and the reaction was not the

19  reaction that we typically get from other Mayo Clinic

20  chairs.

21     Q    Did he hurt your feelings when he didn't

22  accept your suggestion?

23     A    No.  I mean it just confirmed to me that, you

24  know, he was narcissistic and an egomaniac.

25     Q    Because he didn't agree with you about the PA

Page 22

1    practice?

2        A    No.  Because of his entire clinical ability

3    and the way he ran the department.

4        Q    Okay.  Give me some examples of that, his

5    narcissistic personality.

6        A    So basically the way that he interacted

7    with -- with basically the consultants, we would go to

8    the personnel committee and, you know -- I don't

9    remember all of the specific events.  This has been a

10   very long time ago.  But nearly everyone went to the

11   personnel committee and said, you know, this person is

12   not suitable for leadership.  And then he was removed

13   as chair.

14       Q    Okay.

15       A    But all of this is such a long time ago, so I

16   don't necessarily remember every specific instance.

17            But my general impression at the time, it was

18   a very difficult time for the department, and then

19   ultimately his removal is what allowed us to all move

20   forward.  And I think everyone was glad that that

21   happened.

22       Q    Who are the people that everyone went to the

23   personnel committee to complain about Dr. Fosko?

24       A    So basically it was -- Dr. Martinez went, I

25   went, Dr. Cappel, Dr. Keeling went, and then ultimately

Page 23

1    Dr. Bruce, who was the vice chair.  So it was

2    essentially 90 percent of the department --

3          Q    Okay.

4          A    -- ultimately engaged with them.

5          Q    Were you present when the other doctors went

6    to the personnel committee?

7          A    With one event two of us went together, but

8    otherwise it was independent.

9          Q    And who is the -- what is the occasions when

10   two of you went together?  Who was -- who was the other

11   doctor?

12         A    It was Dr. Cappel.

13         Q    Okay.  And what was that event?

14         A    That was when we would meet with Dr. Cangemi.

15         Q    All right.  John Cangemi?

16         A    Whoever was the head of the personnel

17   committee at the time.

18         Q    Right.  That was him -- he was the chair of

19   the personnel committee?

20         A    Yeah.

21         Q    Okay.  And so you and Dr. Cappel went to

22   Dr. Cangemi?

23         A    So, yeah, myself, and then some people went

24   independently, like Dr. Martinez I think went

25   independently, and then we would outline our concerns.

Certified Court Reporters, Inc.
(904) 356-4467

Page 24

1                    And, then, based on those concerns it was

2     recognized that there was a severe problem in the

3     department.  And, then, ultimately Dr. Davis came from

4     Rochester, and he interviewed all of us.  And, then, I

5     think a week later Dr. Fosko was removed.

6          Q    Okay.  And how long was Dr. Fosko the chair

7     before you complained about him?

8          A    That's a good question.  I don't remember,

9     honestly, the timeline, it's been so long ago.

10                   I think it must have been about a year,

11    possibly.  I don't even remember how long he was the

12    chair, to be frank.  But it probably was -- was about a

13    year or so.

14         Q    Okay.  And was he fired as the chair shortly

15    after that?

16         A    Pretty much so.  I think it kind of

17    snowballed very quickly, if I recall.

18         Q    Okay.  And you said you don't know how long

19    he was the chair?

20         A    It wasn't for a long time, right.

21         Q    Was it five years?

22         A    I don't think so.

23         Q    Okay.  Three years?

24         A    I would say two, maybe, two to three.  I

25    don't remember.

Page 25

1      Q    They can't really help you when you look that

2   way.

3      A    Or two to three.  I mean I don't know -- what

4   does this have to do with anything, honestly?

5      Q    Well, it has a lot to do with it.

6      A    Okay.  Because I don't see how it has to do

7   with anything, honestly.  Are we litigating Dr. Fosko

8   or are we talking about Dr. Waldorf?

9      Q    Take a look at Exhibit 1, please.

10     A    Yeah.

11     Q    It's addressed to Dr. Cangemi, who was the

12  head of the personnel committee.

13     A    Right.

14     Q    And who is Daniel Tomlinson?

15     A    I don't know.

16     Q    Okay.

17     A    Maybe the secretary, but I don't know.

18     Q    Did Dr. Fosko ask you to do a self-evaluation

19  on a provided form?

20     A    No.

21     Q    So he wrote to them, "I have asked each

22  Consultant to do a self-evaluation on the provided

23  form."

24          But you're telling me that didn't happen?

25     A    No.  I think Dr. Martinez asked me to do an

Page 26

1    evaluation from some -- from -- something from

2    Dr. Otley, if I recall.  But I don't remember getting

3    one specifically from Dr. Fosko.

4         Q    Okay.  It says, "For Dr. Martinez we

5    discussed his performance relative to Resident

6    Education" -- I'm skipping a parenthetical -- and it

7    says, "and his lack of explicit interest for academic

8    promotion."

9              Let me ask you, do you know whether or not

10   Dr. Martinez had expressed an explicit lack of interest

11   in academic promotion?

12        A    No.

13        Q    Is academic promotion one of the three Mayo

14   shields?

15        A    Yes.

16        Q    Would you expect a physician at Mayo Clinic

17   to adhere to the three Mayo shields?

18        A    Some clinicians emphasize one shield more

19   than others, so it's not unusual for some people to

20   just have a low academic rank and focus on just

21   clinical activity.

22        Q    Okay.  And it continues and says also

23   concerns about professionalism, and it says "speaking

24   negatively about other Residents and Consultants."

25              Do you have any knowledge of Dr. Martinez

Page 27

1    speaking negatively about residents or consultants?

2        A    Only his interactions with Dr. Fosko.  I know

3    he wasn't a fan of him.

4        Q    Okay.  And Dr. Fosko says, "For his

5    performance, I will be giving him 'Below

6    Expectations.'"

7                And he's asking what form he ought to use and

8    so forth.

9                Were you aware that Dr. Fosko wanted to rate

10   Dr. Martinez with "Below Expectations"?

11       A    I was not aware.  But it doesn't surprise me

12   because it's consistent with his pattern of targeting

13   people.

14       Q    Okay.  Who else was targeted by Dr. Fosko?

15       A    Basically the entire department.

16       Q    So you were targeted?

17       A    I would feel so, yes, for sure.

18       Q    And what does that mean?  How were you

19   targeted?

20       A    Basically, you know, dismissive.  He canceled

21   trips that I was invited and substituted himself, tried

22   to sabotage a couple of talks that I was giving at the

23   academy.

24                So I mean it was very clear this guy had an

25   alternative agenda.  He was using a stethoscope to

Page 28

1    listen to conversations in my office through the wall

2    that the nurses caught him doing.

3              I mean the behavior was just -- it's just

4    hard to describe, honestly, how bizarre it was, but it

5    is what it is.

6        Q    What nurse told you that they caught

7    Dr. Fosko using a stethoscope?

8        A    I don't remember what nurse it was, but it

9    was -- some of the nursing staff said that they had

10   seen him taking a stethoscope and putting it on the

11   wall to listen to conversations that I was having,

12   either with another staff member or it even might have

13   been a patient, because he was trying to hear what

14   people were talking -- he thought people were talking

15   about him or something.

16       Q    Your tone is very animated and aggressive,

17   demonstrating that you really did not like Dr. Fosko;

18   correct?

19       A    No, I was not Dr. Fosko's fan for sure.

20       Q    So I'm trying to discriminate between your

21   imagination and facts.

22              So tell me who one of the nurses was that --

23       A    I don't recall who they were.  I mean this

24   was several years ago.

25              But I know that this occurred, because I know

Page 29

1    that they did report it to administration.

2         Q    And who told -- who reported it to

3    administration?

4         A    It was the nursing staff --

5         Q    How do you know that?

6         A    -- is my understanding.

7              Because the nurses are the ones who observed

8    it.

9         Q    How do you know they reported it?

10        A    Because they told me.

11        Q    Who told you?

12        A    It was one of the nurses.  I don't think

13   she's even at Mayo any longer.  She -- she transferred.

14   Her husband worked for the Jags, so I don't even

15   remember her name.  But it was -- like I said, this is

16   several years ago.

17        Q    Okay.  Who told you that Dr. Fosko thought

18   that you were talking about him?

19        A    That was my impression, because why would you

20   take a stethoscope to listen to other people's

21   conversations.

22        Q    Okay.  Did you ever see him using a

23   stethoscope to listen to other people's conversations?

24        A    No.

25        Q    And other than the unnamed nurse or nurses,

Page 30

1    did anyone else ever tell you they saw Dr. Fosko doing

2    that?

3         A    Just the nursing staff.

4         Q    Okay.  Did I give you Exhibit 2?

5         A    No.

6              (Plaintiff's Exhibit Number 2 was marked for

7         identification.)

8    BY MR. FORTUNE:

9         Q    Take a look at Exhibit 2, please.  It's Bates

10   marked -- it's Bates marked 71, and it's dated April

11   21st, 2017, from Scott Fosko to Gianrico Farrugia, John

12   Cangemi, and Daniel Tomlinson, and it says "Escalating

13   concerns with Dr. Martinez."

14              It starts off saying, "Since my Annual

15   Evaluation with Dr. Martinez last Thursday, April 13th,

16   2017, serious unsolicited concerns have been brought to

17   my attention from Consultants and Residents, speaking

18   on behalf of the Residents group."

19              Let me ask you that:  Did you have knowledge

20   that the Resident group --

21        A    No.

22        Q    -- had complained about Dr. Martinez?

23        A    No.

24        Q    Did you have knowledge that residents were

25   leaving Mayo Clinic because of Dr. Martinez?

Page 31

1        A    No.  I never heard that, no.

2        Q    And it says, "They have shared overall fear

3   of Dr. Martinez and describe intimidation, verbal

4   abuse, bullying and violent behaviors."

5             Do you know anything about Dr. Martinez using

6   verbal abuse?

7        A    No.

8        Q    You never heard him speaking aggressively

9   inappropriately?

10       A    Not -- not to me.

11       Q    Okay.  "I truly feel the need to inform you

12   of this today.  I am acutely concerned about his

13   presence and potential violence in the workplace based

14   on their comments."

15             Were you aware that Dr. Fosko was concerned

16   about Dr. Martinez's potential for violence?

17       A    No.

18       Q    Okay.

19       A    But I would take that this is all part of his

20   targeting campaign.

21       Q    Okay.  Have you seen these exhibits before

22   today?

23       A    No.

24            (Plaintiff's Exhibit Number 3 was marked for

25            identification.)

Page 32

1    BY MR. FORTUNE:

2        Q    Let me show you Exhibit Number 3.  It's Bates

3    marked 58 through 61, and it's a note to Dr. Martinez's

4    personnel file dated June 26, 2017.

5                It says, "I met with Dr. John Cangemi to

6    discuss Dr. Martinez's performance issues and will

7    summarize several of them here."

8                It says, "For additional information, refer

9    to his annual review."

10               And I won't purport to read this word for

11   word -- the best evidence of what it says is the

12   document itself -- but I want to direct your attention

13   to certain portions of it.

14               Paragraph 1 says "Intimidating Behaviors/

15   hostile and antagonistic environment with Resident

16   trainees and Consultants."  And it says, among other

17   things, that the residents have shared that he creates

18   an intimidating environment, and it says "(see recent

19   Resident surveys) in the Mohs surgery unit."

20               Your testimony is you have no idea that

21   Dr. Martinez created an intimidating environment;

22   correct?

23       A    Correct.  I didn't hear any of this.  I

24   wasn't aware of any resident feedback in this manner.

25       Q    Okay.  It says, "It is reported that he will

Page 33

1   throw surgical instruments that he finds not to his

2   liking, and, he will also throw local anesthesia

3   syringes once used and emptied, across the room to the

4   sink.  Residents have reported that if they did not

5   move or duck, they would be hit in the Mohs area."

6                Is that something you're aware of?

7        A    I know that was alleged.

8        Q    Okay.

9        A    But I didn't -- I have never witnessed that

10  or -- I just had heard about that.

11       Q    Who did you hear about that from?

12       A    I don't remember.

13       Q    Okay.  Do you dispute that that happened?

14       A    I don't have any knowledge whether it

15  happened or not.

16       Q    Okay.  Did you ever ask Dr. Martinez?

17       A    No.

18       Q    All right.  I'm skipping a bit, but it says,

19  further down on the same page, same paragraph:  When

20  Dr. Martinez entered the lab, he told the Resident, "do

21  not fuck with my shit."  The Resident feedback also

22  includes that he brought to tears -- he brought to

23  tears (sic) as a result of the interactions with

24  Dr. Martinez.

25                Do you -- did you ever hear Dr. Martinez use

```
                                                           Page  34
 1    language like that with residents or consultants?

 2         A    I have not, no.

 3         Q    Does it surprise you to see that allegation?

 4         A    Does it surprise me to see that allegation?

 5         Q    Yes.

 6         A    No.

 7         Q    Okay.  It says that:  Resident feedback to me

 8    included statements like, "I avoid Dr. Martinez."

 9    "Dr. Martinez intimidates me."  "I am afraid of

10    Dr. Martinez."  And "Dr. Martinez flipped off another

11    Resident in front of the 1st floor Davis elevators,

12    when asking whether he had attended an evening lecture

13    and dinner."

14              Let me stop there.  Do you know any of that

15    stuff?  Have you ever heard that?

16         A    Like these are all new things to me.  Like I

17    was not privy to any of this information.

18         Q    It says, "Dr. Martinez displays violent

19    behaviors, punches the wall or desk in the patient

20    room."

21              Were you aware of that?

22         A    No.

23         Q    Does that surprise you?

24         A    That does surprise me.  I've never seen any

25    type of -- him exhibit any type of behavior in that.
```

Page 35

1       Q     Okay.

2       A     Punching walls or -- so that does surprise

3    me.

4       Q     Okay.  It says, "'All Residents are afraid of

5    him, most will take it, but some will not.'  The latter

6    comment refers to a Resident who chose to leave the

7    program and complete his senior year of training at

8    another institution."

9                 Were you aware of that?

10      A     There -- I was aware that there was a

11   resident who transferred.

12      Q     Okay.  Did you know that he transferred

13   because he didn't want to be with Dr. Martinez?

14      A     That was not my understanding as to why he

15   transferred.

16      Q     What was your understanding?

17      A     He was Jewish and there was some issues

18   with -- religion issues and things that he had felt

19   from some of the support staff, and that, I think,

20   was -- that was my understanding.

21      Q     Okay.  Where did you get that understanding?

22      A     Well, that's what he had told me.  We had had

23   a conversation.

24      Q     The resident told you that?

25      A     He told me that about his -- how he had

Page 36

1    his -- you know, he was Jewish, and there was a -- like

2    there was an editorial -- I think he had authored an

3    editorial about a high school in Jacksonville that was

4    named after a Confederate general, and he sort of made

5    the analogy that -- you know, this high school is

6    mainly African American, and so he made the analogy how

7    would you feel like if you were a Jewish person and it

8    was named after like a Nazi general.

9                    So he was just pointing out that -- he wrote

10   a letter to the editorial, and then once -- I guess a

11   lot of people had read that, and then after that I

12   think he had some unpleasant interactions with people.

13                   But I think there was also some family issues

14   that were related to that.  But I was not aware, nor do

15   I believe, that the motivating emphasis from him

16   transferring was related to his interactions with

17   Dr. Martinez.  This was a multifaceted thing regarding

18   his family, his faith, and maybe potentially some

19   interactions with Dr. Martinez.  But this was not

20   Dr. Martinez forced him out of the program, from my

21   perspective.

22        Q    Okay.  Did -- this resident that you're

23   describing, did he tell you, I'm leaving the program

24   because I feel I've heard anti-Semitic remarks or

25   because I'm Jewish?

Page 37

1      A    We had a discussion, because I wrote him the

2   letter to allow him to transfer, and I'm pretty sure

3   that came up.  That's my recollection of it.

4                   And, you know, I encouraged him to stay.  I

5   thought he was a great resident.

6                   And he still sends us patients.  He practices

7   in Florida.  We published several papers together.  So

8   I think he's a good person.

9      Q    Read that last paragraph on page number 58,

10  the first page.  And it's a consultant who gave

11  feedback to Dr. Fosko on April 18, 2017, that when

12  working with a resident who had to discuss a patient-

13  care-related matter with Dr. Martinez, and it was

14  regarding a patient that Dr. Martinez was involved

15  with.

16                  When you're done reading that, would you let

17  me know?

18     A    I mean which paragraph do you want?

19     Q    It starts off saying:  During one afternoon.

20  On the first page.

21     A    Oh, first page.

22     Q    And, basically, really I want you to look at

23  the fourth line from the bottom.

24                  It says, "The patient stated that

25  Dr. Martinez advised him that the melanoma did not

Page 38

1    require treatment.  Dr. Reed required clarification of

2    the recommendation as the patient's reported

3    recollection of the consultation and the documentation

4    of the recommendations made by Dr. Martinez differed.

5    Dr. Reed was reluctant to approach Dr. Martinez to gain

6    clarification.  I accompanied Dr. Reed in her

7    discussion with Dr. Martinez.  Dr. Reed attempted to

8    present the patient case to Dr. Martinez.  He appeared

9    frustrated.  He would interrupt her presentation.  He

10   stated that he, quote, could 'not understand her --

11   could not understand' her presentation although

12   Dr. Reed is skilled at patient presentations.  He also

13   asked her 'why are you yelling at me?' as he felt that

14   she was speaking too loudly.  Finally, I intervened and

15   gave a brief synopsis.  He reviewed the record and

16   provided clarification.  I felt that he intimidated

17   Dr. Reed during this encounter.  I did not feel that

18   this interaction was professional."

19               Do you know anything at all about that

20   incident with Dr. Reed?

21        A    I don't.

22        Q    Okay.  It also goes on to say, "Consultants

23   have shared that they too have been intimidated by

24   him."

25               And "consultants," at Mayo Clinic in

Page 39

1    Jacksonville that means doctors; correct?

2         A    That would be doctors, correct.

3         Q    Okay.  And that would be doctors in the

4    dermatology department?

5         A    I would -- presumably so.

6         Q    And how many docs did you have in the

7    dermatology department?

8         A    Let's see.  Let see, it would be myself, and

9    Cappel -- I guess it would have been five or six at

10   that time.

11        Q    Okay.  And so if consultants have shared that

12   they too have been intimidated by him, I guess that

13   would mean at least two; correct?

14        A    It is plural, so yes.

15        Q    Okay.  It says, "One Consultant shared that

16   they knocked on the surgery door and that Dr. Martinez

17   went ballistic.  The same Consultant shared that

18   Dr. Martinez criticized their biopsy technique."

19              And the consultant shared with Dr. Martinez,

20   quote, "You are difficult to work with."

21              Do you know anything about that?

22        A    I don't.

23        Q    Okay.  On the page that's marked 60, 6-0, at

24   the bottom --

25        A    60.  Yes, I see that.

```
                                                        Page 40

 1        Q     Near the top it says, Dear Drs. Fosko and --

 2   is it Cappel?

 3        A     Cappel, yes.

 4        Q     Cappel.  "I attended surgery lecture with

 5   Dr. Martinez.  I was punctual, interested and attempted

 6   to be engaged, asking a few questions (the only

 7   resident to ask any).  Dr. Martinez was fairly brisk

 8   and overall dismissive in his responses.  He certainly

 9   wasn't inviting.

10             "At the end of the lecture he confronted me

11   in the hallway and stated he was not trying to pick on

12   me but that he noted that I had yawned three times

13   during the lecture and that this was very rude."

14             Does that surprise you that Dr. Martinez

15   would do that?

16        A     I mean I really can't offer -- I mean I can't

17   read his mind.  I don't know.

18        Q     Okay.  Do you know if this is the resident

19   that you described as a Jewish resident?

20        A     I have no idea.

21        Q     Okay.  On the last page, 61, number 4 says

22   that -- "Resistance to change."  It says, "Dr. Martinez

23   made it clear that when I arrived here that,

24   'everything is perfect for me, do not change one

25   thing.'"
```

Page 41

1                  Do you know if that's true?

2        A    That would surprise me, because I didn't

3    think he was, you know, happy, so ...

4        Q    Okay.  Number 5 says "Lack of interest in

5    investigative scholarly pursuits.  Dr. Martinez was

6    invited to participate in clinical research trials, one

7    a treatment for advanced basal cell carcinoma, another,

8    regarding quality of life impact of facial surgery.  He

9    declined both opportunities.  He has made it explicitly

10   clear he does not desire to pursue academic promotion

11   or engage in related activities."

12                  And I think you said that you knew that about

13   him; correct?

14       A    Yeah.  His view was that his academic things

15   were giving talks nationally, so he frequently did

16   talks.

17                  So that was always his contention:  I'm doing

18   a lot of talks, I'm getting invited to do these talks,

19   why do I have to, you know, do these other papers.

20                  So from his perspective, he was doing

21   academic things with the talks, which he really liked.

22       Q    Okay.  Have you ever thrown an empty syringe

23   across the room --

24       A    No.

25       Q    -- in an operating room?

Page 42

1       A     No.

2       Q     You're laughing.  Why?

3       A     No.  I mean no one generally would do that,

4   correct.

5       Q     Is there a rule against doing that?

6       A     I would presume it's an unwritten rule.

7       Q     Okay.  Why?

8       A     Well, there would be a potentially -- for any

9   obvious reasons.

10      Q     Like what?

11      A     It would be a safety issue, contamination of

12  the surgical field.

13            Yeah, correct, I mean it wouldn't be

14  considered normal behavior.

15      Q     Do you think that would affect an intern or a

16  resident adversely if they were in the room and had to

17  duck because an attending physician threw a syringe

18  across the room?

19      A     Maybe if it was directly at them.  I don't

20  know if it was at them or what -- the circumstances of

21  that.

22      Q     Okay.  And have you ever thrown bloody

23  scissors across the room?

24      A     No.

25      Q     Have you --

Page 43

1      A    I don't do surgery, just to be frank, so --

2      Q    Okay.

3      A    I don't do anything surgical, so I don't know

4    anything about -- I mean I know very rudimentary

5    things.

6           (Plaintiff's Exhibit Number 4 was marked for

7           identification.)

8    BY MR. FORTUNE:

9      Q    Let me show you Exhibit Number 4.

10     A    Sure.

11     Q    It's Bates marked 50.  It's from Scott Fosko,

12    July 18, 2017, to Dr. Cangemi.  And it's regarding a

13    patient letter, and it names the patient -- which we

14    can redact that later, M.C.

15           It says:  John, Fyi.  Please see the attached

16    patient letter.  It's a piece of feedback I did not

17    provide in my summary to you regarding JC -- and that

18    means Juan-Carlos Martinez -- is that a Resident

19    witnessed his interactions with a patient that led to

20    the patient crying.  I do not recall all of the

21    details.

22           I have not pursued this with Dr. Martinez.

23    He has left for the day, et cetera.

24           And then it says -- the letter is from

25    Dorothy McDaniel.  It's forwarded by Dorothy McDaniel

Page 44

1    to Dr. Martinez, Dr. Fosko, Dr. Gruber -- I'm sorry,

2    Dr. Fosko, Paul Gruber, who I think was the operations

3    administrator, and it says:  I received this letter in

4    the Office of Patient Experience this morning from the

5    patient, spouse of a Mayo employee, and wanted to pass

6    it along to you.  There doesn't appear to be any care

7    concern associated with this encounter.  Please let me

8    know how you'd like for me to respond, et cetera.

9              Look at the second page -- or did I not

10   include that?  I might have that on a different

11   exhibit.

12        A    Sure.

13             (Plaintiff's Exhibit Number 5 was marked for

14        identification.)

15   BY MR. FORTUNE:

16        Q    Let me show you exhibit 5.  There is no

17   second page of Exhibit 4.

18        A    Okay.  No worries.

19        Q    Sorry about that.

20             And Exhibit 5 is dated July 26, 2017.  It's

21   Bates marked 74.  And it's from Dr. Fosko to

22   Dr. Farrugia.

23             And it says, "Gianrico, I want to keep you in

24   the loop regarding the continuing concerns with

25   Dr. Martinez's behavior.  His pattern of bullying

Page 45

1   continues, with touching our patients as shared in this

2   patient letter.  I have shared this with Dr. Cangemi

3   along with my concerns and other feedback provided me

4   from Consultants and Residents.

5                   And the second page of the exhibit, it's

6   from -- I'm sorry, it's -- yes, it's from a patient,

7   TSM is the patient's initials.  It's dated July 16,

8   2017.

9                   And this patient wrote to Ms. McDaniel at

10  Mayo Clinic, "I have been very upset for several days

11  regarding an experience I had in the Dermatology Clinic

12  at Mayo Hospital, and my wife suggested I let you know

13  of the issue so that hopefully it does not continue to

14  happen with other patients."

15                  And basically -- you can read the whole

16  thing -- but this patient said that he tried to lighten

17  the humor -- or lighten the mood in the room before the

18  surgery commenced, and Dr. Martinez reprimanded him and

19  told him, This is not a time for joking.

20                  And when the patient was asked, Do you have

21  any questions, the patient said, I don't -- I'm not

22  sure what questions to ask, Dr. Martinez responded by

23  saying, Then just tell me you don't have any questions.

24                  Do you talk to patients that way?

25       A    No.

Page 46

1        Q    Does that seem inappropriate to you?

2        A    Certainly wouldn't be the way I would handle

3   the situation.

4        Q    Okay.  To your knowledge, have you ever had

5   patients write to the hospital to complain about you?

6        A    I mean we get patient complaint letters.  I

7   mean it's part of the job, but --

8        Q    How many times has that happened with you?

9        A    I don't know.  Maybe two, three.  I don't

10   know.

11        Q    Okay.

12        A    It's very low.

13             (Plaintiff's Exhibit Number 6 was marked for

14             identification.)

15   BY MR. FORTUNE:

16        Q    Let me show you Exhibit Number 6.  It is

17   Bates marked 46.

18        A    Yep.

19        Q    And it's a professional/peer reference.  At

20   the bottom it is dated August 23, 2017, and it's also

21   date stamped received on that date.

22                  And it's your evaluation of Dr. Martinez;

23   correct?

24        A    Correct.

25        Q    And in every category under Performance and

Page 47

1  Competence Evaluation you rated him as "Exceeds

2  Expectations"; correct?

3      A    Correct.

4      Q    And at the bottom, for instance, of

5  paragraph 9, it says Clinical Judgment, "Exceeds";

6  Technical and Clinical/Procedural Skills, "Exceeds";

7  Medical Record Documentation, "Exceeds"; Teaching,

8  Preceptoring and/or Mentoring Skills, "Exceeds."

9              What did you base that on?

10      A    Well, we had people who wanted to do Mohs

11  fellowships, and he wrote them letters of

12  recommendation and they matched.

13      Q    Okay.

14      A    So, you know, certainly people who wanted to

15  do some specialty things he -- that were interested in

16  Mohs, and so we had, you know, residents that he was

17  the director of surgery.  He also made a surgical

18  curriculum binder when he first got here that had

19  all -- this is all the core things like that you should

20  know.  And so that was the basis on which I made that

21  ranking.

22      Q    When did a fellow -- or a physician ask to do

23  a fellowship with Dr. Martinez?

24      A    Well, he basically was applying for a Mohs

25  fellowship, so basically Dr. Martinez wrote letters in

```
                                                        Page 48
 1    support of his application, and then that -- we don't

 2    have a Mohs fellowship at Mayo.  But he, as a Mohs

 3    physician -- you have to get recommendations from Mohs

 4    doctors, and he supported this resident's application

 5    and that person did match into a Mohs program.

 6         Q    What year did that happen?

 7         A    So let's see.  That was when Dr. Mitkov was

 8    here, so probably -- I don't know the year, but we can

 9    look it up.  It's when Dr. Mitkov -- so it might have

10    been the year -- and I don't know if Dr. Fosko was the

11    chair at that time.  I don't know.  It might have been

12    the year before.  I think it was -- but it was when --

13    it was -- Dr. Mitkov was the resident, because

14    Dr. Martinez had been here for a while.

15         Q    Okay.  And you -- under number 10 you rated

16    Dr. Martinez "Recommend without reservation"; correct?

17         A    Correct.

18         Q    And under the box number 11, Additional

19    Comments, you wrote, "He is an outstanding surgeon."

20              And what did you base that on?  You don't do

21    surgery; right?

22         A    Well, I see the follow-up.  So like that was

23    the problem I had with Fosko, when they come back I see

24    the results of their work.

25         Q    Okay.
```

Page 49

1        A    And so patients would come back, the results

2    looked great.  It was exactly what you expected.  I had

3    patients tell me they really liked him, they only

4    wanted Dr. Martinez to do the procedure.  And that's

5    basically what I put.

6                    So, you know, my interactions with him, I

7    didn't have problems interacting with him.  And so this

8    is based on my interactions with him.  And, like I

9    said, I don't do any surgery, so I would only see, you

10    know, the results of the surgeries in terms of Mohs.

11    And that's basically what I put, because that's what

12    they told me.

13                    (Plaintiff's Exhibit Number 7 was marked for

14            identification.)

15    BY MR. FORTUNE:

16        Q    Okay.  Let me show you Exhibit Number 7.

17                    If you start at the bottom, it's from Scott

18    Fosko to Pat Swigart, and it says:  Thank you.  For

19    your information, Dr. Martinez provided Dr. Sluzevich's

20    peer reference.

21                    Is that true, that Dr. -- that you

22    provided -- I'm sorry.

23                    Is it true that Dr. Martinez provided your

24    peer reference?

25        A    I think so, yes.

Page 50

```
 1        Q    Is that appropriate, for him to be doing

 2   yours and you to be doing his?

 3        A    Yes.  That's what we do when we basically --

 4   basically, we have to get recertified for our hospital

 5   privileges.  So then we'll just tell the person, Be on

 6   the lookout, I'm going to do the review, or I'm going

 7   to, you know, choose you as my peer reviewer.  And then

 8   basically we just sort of fill it out.

 9        Q    Do you see any conflict of interest of doing

10   each other's peer review?

11        A    No.  It happens all the time.

12        Q    Okay.

13        A    I mean the department is very small, and so

14   there's only a certain number of peers.

15             Like I just did one for Dr. Hall, like his

16   hospital privileges were coming up.  We work together.

17   Who else is going to evaluate them?  It's only the

18   people who work there.

19        Q    And has Dr. Hall done a peer review of you?

20        A    Yes.

21        Q    Same year?

22        A    Probably so, yes.  I think he actually does

23   mine, because now Dr. Martinez isn't here, so I think I

24   usually ask Dr. Hall.

25        Q    Okay.  And in the middle of Exhibit 7 it
```

Page 51

1    says:  Dr. Sluzevich copied Dr. Martinez on his

2    response with the Peer Evaluation.  This is something

3    not normally done since these are supposed to be

4    confidential.

5                    And that's from Pat Swigart to Dr. Fosko.

6                    Do you know who Pat Swigart is?

7        A    I think she was the -- I don't know if she's

8    still there.  I think isn't she like the -- like the

9    credentialing person?

10       Q    Okay.

11       A    But I'll have to say, it's news to me that

12   these are supposed to be confidential, because no one's

13   told me, and I've been there almost 20 years.  So, you

14   know -- so that's news to me.

15       Q    Okay.  Nobody still has ever told you that

16   the peer reviews are confidential?

17       A    Correct.  I mean the only time we have a peer

18   review that's confidential is it goes to a medical

19   board.  A lot of times the medical boards will

20   explicitly say:  Do not share this with the reviewer.

21                    I'm sure he probably sent it as a PDF

22   attachment, and I sent it to her and I probably just

23   cc'd him too, is probably what happened.

24       Q    Okay.  Have you told me everything negative

25   that you can think of about Dr. Fosko?

Page 52

1          A     I could probably tell you even more negative

2     things, but they're probably not relevant to anything

3     that we're talking about here.

4                     But, you know, clearly, you know, I think he

5     was removed from the chair for a reason, and clearly,

6     in my estimation, was related to his clinical ability

7     and his mismanagement of the department.

8          Q     Did anyone tell you that?

9          A     That's my conclusion.

10         Q     Did anyone tell you that?

11         A     No.  That's what I believe to be true.

12         Q     Okay.  You didn't remove him, though, did

13     you?

14         A     No, I didn't remove him.

15         Q     Okay.  Did anyone who removed him tell you

16     any of that stuff?

17         A     No.  This is my conclusion, which --

18         Q     Okay.

19         A     -- I think is true.  And I'm entitled to my

20     opinion.

21                MR. FORTUNE:  Okay, thank you.

22                Let's take a little break and I'll talk with

23         my co-counsel.

24                VIDEOGRAPHER:  Off the record at 10:55.

25                (Recess from 10:55 a.m. to 11:03 a.m.)

Page 53

1          VIDEOGRAPHER:  Back on the record at 11:03.

2    BY MR. FORTUNE:

3          Q    Dr. Sluzevich --

4          A    Yes.

5          Q    -- did you ever know Scott Fosko to lie?

6          A    He lied to me.

7          Q    How so?

8          A    When he -- when I was invited to do a

9    conference -- I was invited to participate in a

10   conference in Arizona related to cutaneous oncology,

11   and then he basically kicked me off and put himself in

12   there and then told me that, oh, they wanted a

13   different person, and that was not the case.

14         Q    He said who told -- who told him that?

15         A    I communicated with, you know, the Arizona

16   staff.

17         Q    Okay.

18         A    And they were like no, we intended -- because

19   I got an email.  They were like, well, we were

20   surprised that you weren't there.

21              And basically -- he basically substituted

22   himself for me because he wanted to go instead.  And

23   that was probably, I would say, the beginning of when

24   our relationship began to break down.

25         Q    And he told you words to the effect of that

Page 54

1    Arizona asked for someone other than you?

2        A    He basically said, I'm going now, basically,

3    and sort of -- and basically I was like, Well, where is

4    this coming from?

5                  And my recollection, it was that, Yeah, I'm

6    going instead because we need like -- he was new, and

7    like he wanted to get -- meet all the staff, and they

8    wanted him -- they wanted to meet him.  And so that's

9    my recollection.

10       Q    Okay.

11       A    But that clearly wasn't the case from the

12   Arizona people.

13       Q    Okay.

14       A    That was -- but he had control as chair who

15   goes on trips.

16       Q    Sure.

17       A    So he could certainly cancel my trip and then

18   substitute himself, which is what he did.

19       Q    Okay.  And what I'm having a little trouble

20   distinguishing is -- I can certainly understand why you

21   might be offended if he replaced you.

22       A    Right.

23       Q    You said he lied.  What was the lie?

24       A    Well, the lie was that they wanted someone

25   different.

Page 55

1          Q    Did he say that -- Scott Fosko said that to

2    you?

3          A    That's my recollection, correct, is that he

4    wanted someone different.

5               And then when I got the email from the

6    Arizona people, they're like, We don't -- why weren't

7    you there?

8               And so I was like, Hmm.  So that's when I

9    knew there was something not on the up-and-up with that

10   guy.

11         Q    Okay.  And the email you got from the Arizona

12   people, do you mean consultants at the Mayo Arizona?

13         A    It probably would have come from them, I

14   think.  Yeah, I mean it would have been from -- or it

15   might have been through a text.  I mean I don't

16   remember, because sometimes we would text.  It might

17   have been a text, actually, in recollection.

18               Because I remember getting a text and they're

19   like, oh, are you coming, or are you going to come to

20   this dinner.  It was -- actually, I remember it now.

21   It was more regarding like who's going to be at the

22   dinner.  Sometimes there'll be a faculty dinner.

23               And it was like, Oh, I'm not going, you know,

24   Dr. Fosko is going instead.

25               And he's like, Oh, that's weird.

Page 56

 1              So actually I think it was a text.  It could

 2   have been an email.  I mean this is so long ago,

 3   honestly, sir, I just -- but I think it could have been

 4   a text or email.

 5              But that was basically -- I had heard from

 6   patients -- heard from the Arizona staff that they were

 7   expecting me to be there and they were surprised that

 8   he went instead.  And his impression to me was that

 9   they wanted someone different, or he was going in my

10   place, so --

11       Q    Well, those are two different things; right?

12       A    I don't think so.

13       Q    If he says he's going in your place --

14       A    Because he wanted someone -- because he -- he

15   was conveying to me the idea that they wanted someone

16   else and he was going --

17       Q    Ah.

18       A    -- in my place.

19       Q    He was conveying the idea to you?

20       A    Correct.

21       Q    But he didn't say those words?

22       A    I don't remember at this point.  He might

23   have.  I don't know.  My perception was that it was a

24   deception, that he was giving a false impression, and

25   then that was confirmed with my interaction with my

Page 57

1    Arizona colleagues.

2         Q    Okay.  Were you aware that Dr. Farrugia, who

3    was the CEO in Jacksonville at the time, Jacksonville

4    Mayo, asked Scott Fosko to try to make Juan Martinez

5    leave Mayo Clinic?

6         A    No.

7         Q    Does that surprise you?

8         A    It does.

9         Q    Okay.  Did anyone tell you why Juan-Carlos

10   left?

11        A    Why he left?

12        Q    Yes.

13        A    Well, he resigned mainly because of his work

14   issue, is what he --

15        Q    Did he tell you that?

16        A    Well, because of work-life balance, that's

17   what he told me, with the divorce and wanting to spend

18   more time with his children, and wanting to have a

19   different sort of work week.  And then he was splitting

20   custody with his wife, so he needed certain days to

21   take his kids to school.  And so this new job gave him

22   the opportunity to, like, do that.

23              And some of the Mohs staff that was there

24   went with him, because it also offered better pay, I

25   think, and some more flexible hours.

Page 58

1       Q    Okay.  Did he tell you that the leadership at

2   Mayo told him he was not a good fit at Mayo?

3       A    He did not tell me that, no.

4       Q    Okay.  Did anybody tell you that?

5       A    I think other people probably thought that --

6       Q    Why?

7       A    -- would be my expectation.

8            Just because I think he's a very direct

9   person, and Mayo, generally, we try to be more

10  collegial.  You know, we try to -- if there are

11  disagreements we try to -- I wouldn't say paper them

12  over, but let's say Mayo is not run like Tesla, okay,

13  where you just sort of like get to the bottom of it and

14  be more direct with people.

15           So I think his -- he was a much more direct

16  person and he felt very strongly in certain things and

17  the way things should be done, and I think sometimes

18  that conflicted with the institution.  And I think

19  ultimately he probably has a better fit now where he

20  is.  I think he's probably much happier.

21      Q    Okay.  What do you know, if anything, about

22  Jim Waldorf's reputation as a physician and plastic

23  surgeon at Mayo Clinic?

24      A    I always felt he's a great guy.  I mean I

25  always -- I was very happy with, you know, his

Page 59

1   performance.

2            His secretary was catty-corner to mine, so if

3   I'd get a patient, let's say, had a cyst and we had no

4   capacity, I would just ask his secretary and, you know,

5   he always worked them in or, yeah, we could get -- he

6   had this little, you know, outpatient procedure clinic.

7        Q    Right.

8        A    So I had always a very good working

9   relationship with him.

10       Q    Was -- to your knowledge, was he a man of

11  high character?

12       A    Yeah, I believe so.

13       Q    Okay.  Did you ever know him to be dishonest

14  about anything?

15       A    No.

16       Q    Have you ever read a drug diversion policy at

17  Mayo Clinic?

18       A    No.

19       Q    Did you know they had one?

20       A    Yes.

21       Q    And what -- what did you -- what do you know

22  about the drug diversion policy?

23       A    I mean I do mostly outpatient things, so

24  usually I think it's like an inpatient issue, with like

25  wasting narcotics, is sort of my general thing.

Page 60

          1                    So I know there are training modules.  I'm

          2     not sure -- I might have taken something, but I don't

          3     really think about it.  There's nothing that we really

          4     divert in dermatology, or that I use.

          5          Q    Okay.  Apart from -- I'm not permitted and I

          6     don't want to know what you spoke with your lawyers

          7     about.

          8          A    Sure, yeah.

          9          Q    So exclude that.

         10          A    Yes.

         11          Q    Before you spoke with the attorneys, did

         12     anyone ever tell you that Botox was included on the

         13     drug diversion policy?

         14          A    No.

         15          Q    Would you expect it to be?

         16          A    Definitely.

         17          Q    Why?

         18          A    Because it's expensive.

         19          Q    Okay.  And why would expense be a factor?

         20          A    Because -- well, for two reasons.  For the

         21     Botox, what it's -- it's expensive, so it's not like

         22     it's, you know, Kenalog that costs 20 cents to replace

         23     a vial.  It's -- I mean they're hundreds of dollars a

         24     vial, and they have to account for all of that, I

         25     think, for like billing, and so usually you're billing

Page 61

1    by unit, where like with a syringe it's just like one

2    thing.

3                    And then there's also like a safety issue,

4    like you're not allowed to like reuse some of these.

5    So the combination of the expense and the reusability,

6    I would say that that would be something, you know, my

7    generic impression, would be under high scrutiny.

8           Q    Okay.  And you said you do not do surgery?

9           A    I do not do surgery.

10          Q    I'm not sure if this question makes sense,

11   then.

12          A    Sure.

13          Q    But do you administer Botox?

14          A    I do not.  I don't do anything cosmetic.  I

15   don't do fillers or injectables.

16                   I do only like biopsy procedures.  I haven't

17   done any excisional procedures in like four or five

18   years, even though that is a part of dermatology.  I

19   just do strictly medical.

20          Q    Right, okay.  Why haven't you read the drug

21   diversion policy?

22          A    Huh?

23          Q    Why haven't you read the drug diversion

24   policy?

25          A    I mean I'm not saying that I haven't read

Page 62

1    one.  I know we do training modules.  But generally

2    it's an issue that I think is related to the inpatient.

3              So there might have been -- we have assigned

4    curriculum for training, so maybe I looked at

5    something.  But it's nothing I think about or know

6    any -- like I couldn't recite, you know, any specifics

7    about it.

8         Q    Okay.  And, to your knowledge, does Mayo use

9    any drug waste on patients?

10        A    I don't know.  I don't think we reuse -- my

11   understanding is you don't -- you don't reuse waste, is

12   my understanding, just as a doctor.  But I don't know

13   the specific Mayo policy.

14             MR. FORTUNE:  Okay.  Thank you.  I don't have

15        any other questions.

16             THE WITNESS:  Okay.

17             MS. CRAVATTA:  I have just a few, maybe just

18        one.  Famous last words.

19             THE WITNESS:  Okay.

20                   CROSS EXAMINATION

21   BY MS. CRAVATTA:

22        Q    Previously you testified that you preferred

23   Dr. Martinez to Dr. Fosko for Mohs surgery; correct?

24        A    Correct.

25        Q    What was the reason that you preferred

Page 63

1    Dr. Martinez?

2         A     Basically it was, you know, the longitudinal

3    surgical outcomes I had seen.

4                   So, you know, Dr. Martinez had been there

5    for, you know, over, at that point, five to six years.

6    I had the positive patient feedback.  And then, as I

7    described, this horrific case that really left an

8    indelible impression on my mind, that there was clearly

9    a delta difference in clinical acumen.

10                   And so I wanted to make sure that -- you

11   know, you feel like you have a responsibility for your

12   patients, and so I felt that Martinez would in general

13   give them the better outcome.

14        Q     Did either Dr. Fosko's or Dr. Martinez's age

15   play any role in your preference?

16        A     No.

17             MS. CRAVATTA:  No further questions.

18             MR. FORTUNE:  Thank you.  We'd like -- do you

19        want to read it?

20             MS. CRAVATTA:  Yes.

21             MR. FORTUNE:  Okay.  Thank you.  We'll order

22        the -- both.

23             VIDEOGRAPHER:  End of deposition at 11:13.

24             (Whereupon, at 11:13 a.m., the deposition was

25        concluded.)

Page 64

1                 CERTIFICATE OF OATH

2    STATE OF FLORIDA  )
     COUNTY OF DUVAL   )

3

4           I, the undersigned authority, certify that

5    JASON SLUZEVICH, M.D. personally appeared before me and

6    was duly sworn on February 28, 2025.

7           WITNESS my hand and official seal this 10th

8    day of March, 2025.

9

10

11    _____
      MARIANNE BRANSON, RPR

12    Notary Public, State of Florida
      My Commission No.: HH 206130

13    Expires:  January 25, 2026

14

15                    Personally Known _____
              OR Produce Identification _X__

16    Type of Identification Produced FL DL

17

18

19

20

21

22

23

24

25

Page 65

```
 1              C E R T I F I C A T E

 2   STATE OF FLORIDA  )

 3   COUNTY OF DUVAL   )

 4              I, Marianne Branson, RPR-CP, certify that I

 5   was authorized to and did stenographically report the

 6   deposition of JASON SLUZEVICH, M.D.; that a review of

 7   the transcript was requested; and that the transcript

 8   is a true and complete record of my stenographic notes.

 9              I further certify that I am not a relative,

10   employee, attorney, or counsel of any of the parties,

11   nor am I a relative or employee of any of the parties'

12   attorney or counsel connected with the action, nor am I

13   financially interested in the action.

14              Dated this 10th day of March, 2025.

15

16

17

18

19                         Marianne Branson, RPR-CP
                           Court Reporter

20

21

22

23

24

25
```

Certified Court Reporters, Inc.
(904) 356-4467

Page 66

1                  E R R A T A   S H E E T

2         DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

3    IN RE:  WALDORF, M.D. VS. MAYO CLINIC, ET AL.

4            CASE NO.:  3:24-cv-00657-MMH-MCR

5

6      PAGE NO.       LINE NO.       CHANGE           REASON

7    _____    _____    _____

8    _____    _____    _____

9    _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17

     Under penalties of perjury, I declare that I have read
18   my deposition and that it is true and correct subject
     to any changes in form or substance entered here.

19

     _____        _____
20     DATE                      JASON SLUZEVICH, M.D.

21   mb

22

23

24

25

**Fosko, Scott W., M.D.**

| | |
|---|---|
| **From:** | Fosko, Scott W., M.D. |
| **Sent:** | Wednesday, April 19, 2017 2:03 PM |
| **To:** | Cangemi, John R., M.D.; Tomlinson, Daniel L. (Dan) |
| **Subject:** | Guidance needed |
| **Attachments:** | Personnel Committee JCM Annual Evaluation April 2017.pdf; 2017 Derm Photo.jpg |

John and Dan,

I wanted to get your guidance on a procedural matter, specifically how and where to best summarize my evaluation for each Consultant. As part of the process, I have asked each Consultant to do a self-evaluation on the provided form from Denise Baldwin (see attachment). We review many materials during the review process and I can send you a completed packet if you would like.

For Dr. Martinez we discussed his performance relative to Resident Education (see GME Resident evaluation) and his lack of explicit interest for academic promotion (see his provided feedback in the attachment) and Professionalism concerns (speaking negatively about other Residents and Consultants, see GME evaluation) and always wearing scrubs for all occasions (see recent Department photo, memo sent out in advance, no scrubs/white coats). I have received additional negative feedback with regard to interactions with Consultant colleagues, and continued negative interactions with our Resident trainees.

For his performance, I will be giving him "Below Expectations". Can I just use the form where he provided his self-assessment, recognize that in my comments, then provide my assessment of "Below Expectations" and provide my comments? I have reviewed these materials (not the photo) with Dr. Farrugia.

I appreciate your guidance with this.

Thanks,

Scott

Scott W. Fosko, M.D.
Chair, Department of Dermatology
Mayo Clinic Florida
4500 San Pablo Road
Jacksonville, Florida 32224
Fosko.scott@mayo.edu
Latoya Ashley



1

**CONFIDENTIAL**

FOSKO 000069

**Fosko, Scott W., M.D.**

| | |
|---|---|
| **From:** | Fosko, Scott W., M.D. |
| **Sent:** | Friday, April 21, 2017 8:33 AM |
| **To:** | Farrugia, Gianrico, M.D.; Cangemi, John R., M.D.; Tomlinson, Daniel L. (Dan) |
| **Subject:** | Escalating concerns with Dr. Martinez |

Gianrico, John and Dan,

Since my Annual Evaluation with Dr. Martinez last Thursday, April 13, 2017, serious unsolicited concerns have been brought to my attention from Consultants and a Resident, speaking on behalf of the Resident group. They have shared overall fear of Dr. Martinez and describe intimidation, verbal abuse, bullying and violent behaviors. I truly feel the need to inform you of this today. I am acutely concerned about his presence and potential violence in the work place based on their comments.

Scott

Scott W. Fosko, M.D.
Chair, Department of Dermatology
Mayo Clinic Florida
4500 San Pablo Road
Jacksonville, Florida 32224
Fosko.scott@mayo.edu
Latoya Ashley
Medical Secretary:
Phone: 904-953-2303
Fax: 904-953-2590
Muir.melissa@mayo.edu
Mayo Clinic| 4500 San Pablo | Jacksonville, FL 32224  | mayoclinic.org



**CONFIDENTIAL**

FOSKO 000071

Submitted 6/20/17.

Notes to Personnel File for Dr. J.C. Martinez                                      June 26, 2017

I met with Dr. John Cangemi do discuss Dr. Martinez's performance issues and will summarize several of them here.

For additional information, please refer to his 2016 Annual Review, done on April 13, 2017 with Dr. Alison Bruce and Paul Gruber present, with my comments summarized on June 11, 2017, and then provided to Dr. Martinez on June 13, 2017.

His performance concerns can be categorized as follows:

1.  **Intimidating behaviors/hostile and antagonistic environment with Resident trainees and Consultants.** Residents have shared that he creates an intimidating environment (see recent Resident surveys) in the Mohs surgery unit. It is reported that he will throw surgical instruments that he finds not to his liking, and, he will also throw local anesthesia syringes once used and emptied, across the room to the sink. Residents have reported that if they did not move or duck, they would be hit. In the Mohs area, histopathology slides are prepared then examined under the microscope. One Resident reported that he was previewing the slides in advance of Dr. Martinez's review. When Dr. Martinez entered the lab, he told the Resident, "do not Fuc_ with my shi_" ("F" bomb used). Resident feedback also includes be brought to tears as a result of their interactions with Dr. Martinez. Resident feedback to me has included statements like, "I avoid Dr. Martinez." "Dr. Martinez intimidates me". "I am afraid of Dr. Martinez." "Dr. Martinez "flipped off" another Resident in front of the 1st floor Davis elevators, when asking whether he attended an evening lecture and dinner". "Dr. Martinez displays violent behaviors, punches the wall or desk in the patient room". "All Residents are afraid of him, most will take it, but some will not." The latter comment refers to a Resident who chose to leave the program and complete his senior year of training at another institution.

    This has been shared with the Residency Program Director, Dr. Mark Cappel, and Associate Program Director, Dr. Matt Hall.

One Consultant provided the below feedback to me on April 18, 2017, when working with a Resident who had to discuss a patient care related matter with Dr. Martinez, regarding a patient that Dr. Martinez was involved with.

    "During one afternoon of supervising resident clinic, Dr. Koriann Reed (a first-year dermatology resident) presented a patient who had melanoma treatment consultation with Dr. Martinez previously. Dr. Reed reported that the patient had a melanoma in-situ on the cheek that was not treated. She did review in the chart documentation of Dr. Martinez's consultation with the patient in which he reviewed various treatment options with the patient including observation. The patient stated that Dr. Martinez advised him that the melanoma did not require treatment. Dr. Reed required clarification of the recommendations as the patient's reported recollection of the consultation and the documentation of the recommendations by Dr. Martinez differed. Dr. Reed was reluctant to approach Dr. Martinez to gain clarification. I accompanied Dr. Reed in her



PLAINTIFF'S EXHIBIT
3
SLUZEVICH
PENGAD 800-631-6989

**CONFIDENTIAL**                                                        FOSKO 000058

discussion with Dr. Martinez. Dr. Reed attempted to present the patient case to Dr. Martinez. He appeared frustrated. He would interrupt her presentation. He stated that he could "not understand" her presentation although Dr. Reed is a skilled at patient presentations. He also asked her "why are you yelling at me?" as he felt that she was speaking too loudly. Finally, I intervened and gave a brief synopsis. He reviewed the record and provided clarification. I felt that he intimidated Dr. Reed during this encounter. I did not feel that this interaction was professional."

Consultants have shared that they too have been intimidated by him, some would say, " I am afraid of him". Some Consultants have had unpleasant interactions with him as a result of patient care issues where they needed his involvement. One Consultant shared that they knocked on the surgery door and that Dr. Martinez went ballistic." The same Consultant shared that Dr. Martinez criticized their biopsy technique. That Consultant shared with Dr. Martinez, "You are difficult to work with."

2. **Referring physician feedback**. A former MCF Dermatology graduate, while in practice with 3 other MCF Dermatology graduates, shared that they had uncomfortable interactions with Dr. Martinez over patients they referred, such as how biopsies were done or what treatments were being recommended. The graduate shared (see below) that as a practice they chose to not refer to MCF Dermatology and chose to rather refer to a community Mohs surgeon as a result of these interactions.

"I am writing you regarding our conversation yesterday. I have summarized my observations and perceptions of Juan Carlos Martinez, M.D. below.   When I was in private practice, I would refer some Mohs cases to Mayo Clinic. Dr. Martinez did contact me over the phone about 2-3 times to critique my biopsy technique or lesion map measurements. I had many patients who enjoyed their experience at Mayo Clinic, but I also had many patients who did not care for Dr. Martinez's bedside manner. These various interactions and feedback made me feel reluctant to refer Mohs cases to Mayo Clinic. I felt that there were private practice Mohs surgeons who built better rapport with myself, my staff and, most importantly, my patients."

3. **Resident Education**. Dr. Martinez has shared that he has rigid expectations as to what a Dermatology Resident should do surgically in their training.  He openly shared that he was not enthusiastic to have Residents working with him.  It was shared with me by a Consultant that the "word on the street" is if you want to train at a Mayo Dermatology program, and want good surgical training, that you do not want to come to MCF. That was shared with Dr. Martinez. A current Resident who is applying for a Mohs surgery Fellowship, requested to do an away rotation at MCR with their Mohs surgeons, and shared, that he does not want any association with Dr. Martinez to be attached with his application. The Residency Program's recent Resident surveys have consistently identified Faculty interest in their education as a problem. Resident survey feedback include, "at times seems to busy or bothered by questions or resident education…".

3

FOSKO 000059

A Residents feedback is provided below from January 15, 2016, detailing their interaction with Dr. Martinez in a surgery lecture.

Dear Drs. Fosko and Cappel,

"I attended surgery lecture with Dr. Martinez. I was punctual, interested and attempted to be engaged, asking a few questions (the only resident to ask any). Dr. Martinez was fairly brisk and overall dismissive in his responses. He certainly wasn't inviting.

At the end of lecture he confronted me in the hallway and stated that he was not trying to pick on me but that he had noted I yawned three times during the lecture and that this was very rude. I was seated directly in front of Dr. Martinez the entirety of the lecture (with my back to him). I do not recall yawning but did stretch a few times. I asked the other residents if they recalled me yawning and they laughed and said they had not (nor had they been particularly attentive to me). Even if I did yawn, this is a physiological reflex and not something I did intentionally (like a cough).

There seems little prospect that I will be able to work with Dr. Martinez in a constructive and supportive way. His disclaimer aside, I do view his conduct today as a further example of his singling me out and harassing me. This encounter was fairly unnerving. Again, there is an enormous power differential between us. I have spent nearly a decade and hundreds of thousands of dollars to reach this point in my career. It is not like other fields where a person is free to find a more suitable employment arrangement. Therefore, at a minimum, there is an implicit covenant and responsibility of the Mayo Clinic that I should be proactively protected from continual harassment.

Perhaps it would be most helpful for the three of us to sit down with the head of graduate medical education. "

Sincerely,


Another example of his lack of full engagement in Resident Education is provided below:

August 2, 2016

"Today, Dr. Martinez was absent from our Department Grand Rounds conference. I discussed with him later that morning, about 8:50 a.m. if he was aware of the Conference and he said "yes". I asked him if he chose not to attend, and he replied "yes" and when asked why, "to dig myself out and catch up on things". I reminded him that we discussed as a group that this is a Conference where his attendance was expected, as was of all Consultants. I reminded him that one complaint/piece of feedback from the Residents regarded the Faculty not invested in their education. I reminded him that our planned attendance at important conferences was in part to address this, as well, what was discussed and agreed upon as a group. I asked him how he would manage such activities, if all Consultants could come and go as they would like, choosing which conferences to attend when they wanted to. He did not have

a response. Attendance at Grand Rounds was once again emphasized as an expectation of all
Consultants."

4. **Resistance to change.** Dr. Martinez made it clear that when I arrived here, that "everything is
perfect for me, do not change one thing". With our Department's financial performance
needing to improve, he did not see a sense of understanding or urgency to change that. We
began to develop an approach to capture same day Mohs surgeries for patients, which I piloted
over last year's Christmas and New Year's Holidays. When I updated Dr. Martinez on this, he
replied, "Why are we willy nilly adding on surgery cases". He also was not readily willing to add
general dermatology patients to his schedule to support Department clinical volume growth.

5. **Lack of interest in investigative scholarly pursuits.** Dr. Martinez was invited to participate in
clinical research trials, one a treatment for advanced basal cell carcinoma, another, regarding
quality of life impact of facial surgery. He declined both opportunities. He has made it explicitly
clear he does not desire to pursue academic promotion or engage in related activities.

6. **Professionalism.** Dr. Martinez has been observed to speak negatively about other Consultants
and Residents in front of other Residents and nursing staff. He also was informed to wear
professional dress for the Department Annual Photo (Consultants and Residents) and arrived in
surgical scrubs (see attached photo).

Additionally, a patient provided me their feedback with an interaction with Dr. Martinez on July 1, 2016,
where they stated how surprised they were with how Dr. Martinez talked to them. "He was really upset
with me, as it was his "day off" and he was called back in". "I have been a patient of Mayo Clinic for 26
years, as is my daughter, who is a cancer patient at Mayo.

7. **Not supporting the Mayo 3 Shields**. I have repeatedly discussed with Dr. Martinez as well as all
Consultants that for those individuals not interested in engaging and supporting the 3 Shields,
that this environment is probably not the right one for them. At his Annual Review, Dr.
Martinez shared "I feel like this is the 4th time you have asked me to leave". This statement
supports the feedback I have been providing him over the past 18 months, and reinforcing what
the Mayo Clinic expects of its Consultant staff. His behaviors are more aligned with a private
practice environment, and I provided that feedback to Dr. Martinez. I also verbally shared with
him the feedback provided by his Consultant colleagues where they have stated, "why is he
even here?".

Scott W. Fosko, M.D.

**Fosko, Scott W., M.D.**

| | |
|---|---|
| **From:** | Fosko, Scott W., M.D. |
| **Sent:** | Tuesday, July 18, 2017 4:05 PM |
| **To:** | Cangemi, John R., M.D. |
| **Subject:** | FW: Patient Letter - ███████ |
| **Attachments:** | RCVD ███████ 07182017.pdf |

John,

Fyi. Please see the attached patient letter. A piece of feedback I did not provide in my summary to you regarding JC, is that a Resident witnessed his interactions with a patient that led to the patient crying. I do not recall all of the details.

I have not pursued this with Dr. Martinez; he has left for the day. He did provide some clarification in emails which I can forward if you would like.

Scott

**From:** McDaniel, Dorothy D.
**Sent:** Tuesday, July 18, 2017 10:26 AM
**To:** Martinez, Juan C., M.D.; Fosko, Scott W., M.D.; Gruber, Paul E.; Gruber, Paul E.
**Subject:** Patient Letter - ███████

Hello Drs. Martinez, Fosko and Paul,

I received this letter in Office of Patient Experience this morning from ███████ spouse of a Mayo employee, and wanted to pass along to you. There doesn't appear to be any care concern associated with this encounter.

Please let me know how you would like for me to respond, or if you would prefer to call ███████

Thanks for your assistance.

Dot McDaniel
Office of Patient Experience
Phone (904) 953-6827 Pager (904) 953-8136



1

FOSKO 000050

## Fosko, Scott W., M.D.

**From:** Fosko, Scott W., M.D.
**Sent:** Wednesday, July 26, 2017 8:34 AM
**To:** Farrugia, Gianrico, M.D.
**Subject:** FW: Patient Letter - █████████████
**Attachments:** RCVD █████████ 07182017.pdf

Gianrico,

I want to keep you in the loop regarding the continued concerns with Dr. Martinez's behavior. His pattern of bullying continues, with touching our patients as shared in this patient letter. I have shared this with Dr. Cangemi, along with my concerns and other feedback provided me from Consultants and Residents.

Scott


**From:** McDaniel, Dorothy D.
**Sent:** Tuesday, July 18, 2017 10:26 AM
**To:** Martinez, Juan C., M.D.; Fosko, Scott W., M.D.; Gruber, Paul E.; Gruber, Paul E.
**Subject:** Patient Letter - █████████████████

Hello Drs. Martinez, Fosko and Paul,

I received this letter in Office of Patient Experience this morning from █████████ spouse of a Mayo employee, and wanted to pass along to you. There doesn't appear to be any care concern associated with this encounter.

Please let me know how you would like for me to respond, or if you would prefer to call █████████

Thanks for your assistance.

Dot McDaniel
Office of Patient Experience
Phone (904) 953-6827 Pager (904) 953-8136

1

**CONFIDENTIAL**



July 16, 2017

Dorothy McDaniel
Office of Patient Experience
Mayo Clinic
4500 San Pablo Rd
Jacksonville, FL 32244

Dear Mrs. McDaniel,

I have been very upset for several days regarding an experience I had in the Dermatology Clinic at Mayo
Hospital, and my wife suggested I let you know of the issue so that hopefully it does not continue to
happen with other patients.

I had a Mohs procedure to excise a skin cancer on my nose on Wednesday, July 12th, by Dr. Martinez. He
handed me a mirror to see the mark he made prior to the excision. I was silly for a moment and
pretended to check out my hair, and he started scolding me like a school child. In front of two other
staff members in the room, he told me "joking is for parties" and this was not the time or place. He said
he had a knife he would be using on me and it was a time to be serious. I am aware there are situations
where a joke is not appropriate, but I was only trying to relieve the tension in the room and my own
nervousness. Dr. Martinez asked if I had any questions, and I told him I wasn't sure what questions I
should ask – he then said rather arrogantly "all you have to say is that you have no questions". It is one
thing to inform me as an adult of the situation, but it is a completely different issue to talk at me or
down to me as if I was a child. I did not feel comfortable after that. I wanted to leave immediately and
reschedule with a different doctor, but I stayed and although angry I did not say anything, because after
all, he did have a knife and was about to cut on me. I was only trying to interject a moment of humor
before the procedure, but ended up being embarrassed and humiliated by this physician in front of
everyone else who watched and said nothing. I am sure this doctor's attitude has probably negatively
impacted other patients and his staff also based on their (non)reaction, and I hope this will be addressed
because no one should be talked to like that.

I would like to add that every other Mayo Clinic provider, nurse and staff member I have encountered
has been wonderful. In particular - the entire Davis 8E Hem/Onc unit, Dr. Tina Ardon and the Gate
Parkway staff, Dr. Colibaseanu and the colorectal staff, Dr. Thiel and the urology staff have all been
outstanding!

Please feel free to contact me at ▮▮▮▮▮▮ if you need any further information; if no answer, leave a
message and I will promptly call you back.

Sincerely,

**Fosko, Scott W., M.D.**

| | |
|---|---|
| **From:** | Fosko, Scott W., M.D. |
| **Sent:** | Tuesday, August 22, 2017 11:59 AM |
| **To:** | Cangemi, John R., M.D. |
| **Subject:** | Update on Dr. Martinez |

John,

Please call me when you can regarding Dr. Martinez, to get an update on what his status is, PIP etc. Dr. Farrugia asked about this today, and specifically, planning for our Consultant raises.

Thanks,

Scott
Pager 3-3339

Scott W. Fosko, M.D.
Chair, Department of Dermatology
Mayo Clinic Florida
4500 San Pablo Road
Jacksonville, Florida 32224
Fosko.scott@mayo.edu
Latoya Ashley
Medical Secretary:
Phone: 904-953-2303
Fax: 904-953-2590
Ashley.LaToya@mayo.edu
Mayo Clinic| 4500 San Pablo | Jacksonville, FL 32224 | mayoclinic.org

1

**CONFIDENTIAL**

FOSKO 000076



PLAINTIFF'S
EXHIBIT
6
2/25/25
SLUZEVICH   mb

## MAYO CLINIC

**Professional/Peer Reference**
*Confidential*

**Applicant Name: Juan-Carlos Martinez, MD**

Please complete the entire form.

| | | | |
|---|---|---|---|
| 1. | Nature of your professional interaction with the applicant:     Colleague | | |
| 2. | How long have you known this applicant (number of years)?     9 years | | |
| 3. | Have you observed in the past 12 months (directly or indirectly) the clinical practice of this applicant? | ☒ Yes | ☐ No |
| 4. | The applicant has applied for privileges. Do you know of any procedures that should be excluded or limited for this practitioner in this specialty? *(If yes, please explain in Item 11.)* | ☐ Yes ✱ | ☒ No |
| 5. | Do you have any reservations regarding the practitioner's competency to perform the privileges requested? *(If yes, please explain in item 11.)* | ☐ Yes ✱ | ☒ No |
| 6. | Do you have any concerns regarding the quality of the applicant's performance? *(If yes, please explain in Item 11.)* | ☐ Yes ✱ | ☒ No |
| 7. | To your knowledge, has the applicant's license, clinical privileges, hospital staff membership or other professional status ever been denied, challenged, suspended, revoked, modified or voluntarily or involuntarily surrendered? *(If yes, please explain in item 11.)* | ☐ Yes ✱ | ☒ No |
| 8. | Have you ever observed, or are you aware of any physical/mental, health/drug or alcohol dependencies or other problems with the applicant which may potentially affect/impair his/her ability to perform professional or medical staff duties or exercise clinical privileges in his/her specialty, or would require an accommodation to exercise those privileges safely and competently? *(If yes, please explain in item 11.)* | ☐ Yes ✱ | ☒ No |

**9. Performance and Competence Evaluation** - based on demonstrated performance and competence. *(Note: If you have not observed this practitioner's practice, skills, and competence within the past two years, please indicate below in comments section in item 11.)*

| | Needs Improvement | Met/Meets Expectations | | | Exceeds Expectations | Unable to Assess | COMMENTS |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | NA | |
| **Patient Care:** Provides patient care that is compassionate, appropriate and effective in the promotion of health, prevention of illness, treatment of disease, and end of life care. | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | |
| **Medical/Clinical Knowledge:** Has knowledge of established and evolving biomedical, clinical and social sciences, and applies knowledge to patient care and education of others. | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | |
| **Practice-Based Learning & Improvement:** Uses scientific evidence and methods to investigate, evaluate, and improve patient care practices. | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | |
| **Interpersonal and Communication Skills:** Demonstrates interpersonal and communication skills enabling him/her to establish and maintain professional relationships with patients, families, and members of health care teams. | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | |
| **Professionalism:** Behavior reflects a commitment to continuous professional development, ethical practice and understanding. Is sensitive to diversity. Demonstrates a responsible attitude toward their patients, their profession, and society. | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | |
| **Systems-Based Practice:** Understands the context and systems in which health care is provided and applies this knowledge to improve and optimize health care. | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | |
| **Clinical Judgment** | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | |
| **Technical and Clinical/Procedural Skills** | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | |
| **Medical Record Documentation** | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | |
| **Teaching, Preceptoring and/or Mentoring Skills** | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | |
| **Participation of medical staff activities, quality, review programs, committee attendance, medico-administrative duties** | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | |

RECEIVED

10. **Recommendation:**
☒ Recommend without reservation
☐ Recommend with the following reservations *(please provide details in item 11)*
☐ Do not recommend *(please explain in item 11)*

AUG 23 2017
Per..........

11. **Additional Comments.** Use this section and/or another sheet of paper for explanation of any "✱" responses and any additional information or recommendations which you believe would be relevant to a decision in the appointment/credentialing/privileging process.

He is an outstanding surgeon.
I share many patients with him and the surgical outcomes are always excellent. Patients routinely tell me how pleased they are with results and they request him specifically for subsequent procedures.

| Professional/Peer Signature *(original signature required)* | Title MD | Date 8/23/2017 |
|---|---|---|
| Name (printed) Jason C. Sluzevich, MD | Facility Mayo Clinic Florida | Phone Number |
| Email (optional) Sluzevich.jason@mayo.edu | | Fax Number |

**CONFIDENTIAL**

**Fosko, Scott W., M.D.**

**To:**                    Cangemi, John R., M.D.
**Subject:**           FW: Confidential

John, Just an fyi on the below. Pat Swigart had shared that the first Peer Evaluation Dr. Martinez requested was from Dr. Otley, who is at MCR. Since he had not observed Dr. Martinez in practice over the past 12 months, Pat had to request a second Peer Evaluation, which came from Dr. Sluzevich, whom JC provided a Peer Evaluation for.

**From:** Swigart, Beate (Pat)
**Sent:** Thursday, August 24, 2017 9:44 AM
**To:** Fosko, Scott W., M.D.
**Subject:** RE: Confidential

Dr. Sluzevich copied Dr. Martinez on his response with the Peer Evaluation. That is something that is not normally done since these are supposed to be confidential.

**Pat Swigart**
Credentialing
Phone: 904-953-6093 Fax: 904-953-6350
E-mail: swigart.beate@mayo.edu

**Mayo Clinic**
4500 San Pablo Road
Jacksonville, FL 32224
www.mayoclinic.org

**From:** Fosko, Scott W., M.D.
**Sent:** Wednesday, August 23, 2017 3:55 PM
**To:** Swigart, Beate (Pat)
**Subject:** RE: Confidential

Thank you. Fyi, Dr. Martinez provided Dr. Sluzevich's peer reference.

**From:** Swigart, Beate (Pat)
**Sent:** Wednesday, August 23, 2017 3:48 PM

1



PLAINTIFF'S EXHIBIT
4/28/25  7
SLUZEVICH  MB
PENGAD 800-631-6989

**CONFIDENTIAL**

FOSKO 000056