## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

|  |  |
|---|---|
| **JAMES C. WALDORF, M.D.,** |  |
| **Plaintiff,** |  |
| **v.** |  |
| **MAYO CLINIC,** *a Minnesota non-profit corporation*; | **3:24-cv-00657-CRK-MCR** |
| **MAYO CLINIC JACKSONVILLE**, *a Florida non-profit corporation*; and |  |
| **MAYO CLINIC FLORIDA**, a *Florida non-profit corporation,* |  |
| **Defendants.** |  |

## INTRODUCTION

Before the court is Defendants Mayo Clinic Jacksonville ("MCJ"), Mayo Clinic Minnesota, and Mayo Clinic Florida's (collectively, "Mayo" or "Defendants") motion for summary judgment on the suit brought against them by Plaintiff Dr. James C. Waldorf ("Plaintiff," "Waldorf," or "Dr. Waldorf") for (1) age discrimination under the Age Discrimination in Employment Act ("ADEA") and the Florida Civil Rights Act ("FCRA"), and (2) third-party retaliation under the Federal Labor Standards Act ("FLSA").[1]

---

[1] The ADEA requires exhaustion of administrative remedies by filing a charge with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the

3:24-cv-00657-CRK-MCR

## UNCONTESTED MATERIAL FACTS[2]

Dr. James C. Waldorf began working for MCJ in 1993. Defendants' Mot. Summ. J., 2, June 30, 2025, ECF No. 53 ("Defs. Mot.") (citing Deposition of Dr. James Waldorf, 17–18, March 20, 2025, ECF No. 63 Ex. 1 ("Waldorf Dep.")). He served as a full-time Physician Consultant in MCJ's Plastic Surgery Department, working in the Cosmetic Center, where he had an excellent reputation and was frequently recognized for both his performance and congeniality. Plaintiff's Complaint, ¶ 5, June 28, 2024, ECF No. 1 ("Compl."); Plaintiff's Resp. Opp'n Mot. Summ. J., 2, July 21, 2025, ECF No. 64 ("Pl. Resp."); Defs. Mot., 2; see also Deposition of Dr. Brian Rinker, 16, Mar. 5, 2025, ECF No. 40-5 ("Rinker Dep."); Deposition of Dr. James Meschia, 51, Apr. 28, 2025, ECF No. 53-6 ("Meschia Dep."); Deposition of Dr. John Cangemi, 157–

---

challenged action. 29 U.S.C. § 626(d)(1)(A)–(B). The FCRA likewise requires filing a complaint with the FCHR before suit, which must be filed within 365 days of the alleged violation. Fla. Stat. § 760.11(1). Dr. Waldorf dual-filed with the EEOC and the FCHR on March 1, 2024. Ex. 2, ECF No. 53-1.

[2] The facts which the court accepts as uncontested for the purposes of this motion are (i) facts the nonmovant supports with record citations, with all reasonable inferences drawn in that party's favor, and (ii) the movant's assertion of facts, if not properly controverted by the nonmovant. Fed. R. Civ. P. 56(a), 56(c)(1), 56(e)(2); Reese v. Herbert, 527 F.3d 1253, 1268–69 (11th Cir. 2008). A party's assertion is not itself evidence of a fact, and the parties must include citations to admissible evidence on the record to support the assertion of fact. The court must review the cited materials and may rely only on facts actually supported by admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), 56(e)(2); see Reese, 527 F.3d at 1268–69. Thus, to create a genuine dispute that precludes summary judgment, the nonmovant must both respond to the movant's asserted facts and identify specific record support. See Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2), 56(e)(2); Reese, 527 F.3d at 1268–69. A dispute is genuine and material only if a reasonable jury could return a verdict for the nonmovant on the evidence. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918–19 (11th Cir. 1993).

**OPINION - 2**

3:24-cv-00657-CRK-MCR

58, Mar. 27, 2025, ECF No. 53-12 ("Cangemi Dep."). At the time of his discharge in 2023, Dr. Waldorf was 71 years old, had worked at MCJ for 30 years, and was the oldest practicing plastic surgeon there. Pl. Resp. 1; Waldorf Dep. 118, 139; Def. Mot. at 2. Until his termination in 2023, he had not been disciplined or counseled for his conduct as a physician. Compl. ¶ 9; Pl. Resp. 2 (citing Waldorf Dep. 17, 38).

In 2012, Dr. Waldorf began a romantic relationship with Pamela Lovett, a Certified Registered Nurse Anesthetist Manager ("CRNA") at MCJ, and their relationship was "widely known" at MCJ. Compl. ¶ 10; Pl. Resp. 3, 5 (citing Deposition of Dr. Kent Thielen, 55, May 2, 2025, ECF No. 53-7 ("Thielen Dep."); Deposition of Rosemary McMullan, 74 Apr. 3, 2025, ECF No. 53-10 ("McMullan Dep.")); Defs. Mot. 2. Beginning in 2021, Ms. Lovett "persistently" asked MCJ's human resources ("HR") representative Matthew McNally about her pay level. Compl. ¶ 59; Pl. Resp. 5 (citing Deposition of Pamela Lovett, 89, 153, Mar. 21, 2025, ECF No. 63-2 ("Lovett Dep."); McMullan Dep.). On December 15, 2022, she emailed Mr. McNally and HR representative Rosemary McMullan with the subject "Equality with Rich and My current position," asking when she would be paid at the same level as the other CRNA Manager, Richard Pence, and noting that the "inequality" affected her pension. Pl. Resp. 5–6 (citing McMullan Dep. Ex. 12 at 3); Defs. Mot. 8. MCJ did not provide an explanation for any pay differential. Pl. Resp. 5 (citing Lovett Dep. 45).

In January 2023, six months before Dr. Waldorf's termination, MCJ interviewed and hired Dr. Kunle Elegbede a plastic surgeon thirty years younger

**OPINION – 3**

3:24-cv-00657-CRK-MCR

than Dr. Waldorf, to work at the MCJ Cosmetic Center.  Pl. Resp. 2 (citing Rinker Dep. 42–43; Thielen Dep. 56); Defs. Mot. 11 (citing Thielen Dep. 56).

On Friday, June 23, 2023, Dr. Waldorf asked a nurse in the Cosmetic Center whether there was any "leftover" Botox that would be discarded over the weekend. Pl. Resp. 3 (citing Waldorf Dep. 59; 65); see Defs. Mot. 16–17.  After confirming there was, he had a nurse prepare the Botox in the main procedure room, in view of other employees, and called Ms. Lovett to the Cosmetic Center.  Pl. Resp. 3 (citing Waldorf Dep. 56, 58–60); Defs. Mot. 3 (citing Clower Dep.).  He then administered Botox from MCJ's supply to Ms. Lovett without charge and without documenting the procedure. Pl. Resp. 3 (citing Waldorf Dep. 56, 58–60), 5–7 (citing Minch Dep. 1–3); Defs. Mot. 4, 6 n.3 (citing Voils Dep. 169; Meschia Dep. 79; Thielen Dep. 39).  Ms. Lovett entered and exited through the front door, passing by the front desk staff, who immediately reported to a manager that she had visible signs of Botox injections.  Pl. Resp. 3, 7 (citing Deposition of Cheryl Minch, 1, Apr. 2, 2025, ECF No. 53-5 ("Minch Dep."); Deposition of Valerie Clower, 18–20, May 2, 2025, ECF No. 53-4 ("Clower Dep."); Defs. Mot. 4 (citing Clower Dep. 20).

Mayo Clinic's Drug Diversion Response Team ("DDiRT") opened an investigation into Dr. Waldorf's conduct.  Pl. Resp. 7; Defs. Mot. 5–6 (citing Deposition of Alissa Voils, 111, 169, Apr. 21, 2025, ECF No. 53-3 ("Voils Dep.")).  Lead investigator Wayne Hester first interviewed the nurse, Ms. Carter, whom Dr. Waldorf had asked to draw up the Botox.  Pl. Resp. 7 (citing Minch Dep. 1–2).  Ms. Carter reported the usual documentation was not completed.  Pl. Resp. 7 (citing Minch Dep.

OPINION - 4

161).  On July 10, 2023, after Dr. Waldorf and Ms. Lovett returned from vacation, Hester interviewed them separately.  Compl. ¶ 23; Pl. Resp. 9 (citing Waldorf Dep. 69; Lovett Dep. 71–72; Voils Dep., 131); Defs. Mot. 5–6 (citing Waldorf Dep., 69; Voils Dep.).  Both acknowledged that Dr. Waldorf injected Ms. Lovett with Botox at the Cosmetic Center on June 23, 2023, and Ms. Lovett further disclosed that Dr. Waldorf had injected her on several prior occasions.  Pl. Resp. 8–9 (citing Voils Dep., 110); Defs. Mot. 5–6 (citing Voils Dep.).

Mayo Clinic's Drug Diversion Policy ("DDP") prohibits employees from "intentionally and without proper authorization using or taking possession of a prescription medication or medical gas from Mayo supplies" and provides that "drug diversion by a Mayo employee is grounds for corrective action."  Defs. Mot. 3 (citing Voils Dep. 157); see also DDP 1–2, Aug. 4, 2025, ECF No. 68-3, Ex. B ("DDP").  In most instances, "the expected outcome will be termination of employment or dismissal from the applicable school or training program." DDP, 2.  Consistent with that policy, in the two years preceding Dr. Waldorf's misconduct, the Executive Team[3] terminated at least four MCJ staff members, each younger than Dr. Waldorf, for diverting noncontrolled substances.  Defs. Mot. 7 (citing Defendant Mayo Clinic Jacksonville's Verified Second Amended Answers and Objections to Plaintiff's First Set of Interrogatories, 19–21, Mar. 31, 2025, ECF No. 41, Ex. 5 ("Defs. Resp. to Pl. Interrogs.")).

---

[3]  The "Executive Team" refers to the "executive committee" members of Mayo Clinic Florida's Personnel Committee.  Pl. Resp. 5; Defs. Mot. 7.

**OPINION - 5**

3:24-cv-00657-CRK-MCR

After DDiRT concluded that both Dr. Waldorf and Ms. Lovett violated the DDP, it recommended their termination to the Executive Team. Pl. Resp. 10 (citing Meschia Dep.); Defs. Mot. 7 (citing Voils Dep. 111). The members of the Executive Team at the time of Dr. Waldorf's misconduct and termination were Dr. Meschia, Dr. Fred Kusumoto, Connie Kuenzinger, Rosemary McMullan and Katie Thranhardt. Pl. Resp. 7 n.4 (citing Deposition of Connie Kuenzinger 22, ECF No. 53 Ex. 8 ("Kuenzinger Dep."). The Executive Team accepted the recommendation for termination. Pl. Resp. 10 (citing Meschia Dep. 76); Defs. Mot. 8 (citing Meschia Dep. 76). The Executive Team's decision was communicated to MCJ CEO Dr. Kent Thielen, who approved giving Dr. Waldorf the option of termination or resignation. Defs. Mot. 8 (citing Meschia Dep., 76); Pl. Resp. 13 (citing Thielen Dep. 55). The Executive Team then presented Dr. Waldorf with the options, and he resigned on July 18, 2023. Pl. Resp. 10 (citing Waldorf Dep. 76–77, 79); Defs. Mot. 8 (citing Kuenzinger Dep.); Waldorf Dep. 79). Ms. Lovett received the same options and also resigned on July 18, 2023. Pl. Resp. 10–11 (citing Lovett Dep. 78); Defs. Mot. 8 n.5 (citing Lovett Dep. 79).

Mayo's internal protocol, whose language is not disputed, requires that drug-diversion violations be "reported to all appropriate government, licensing, regulatory and law enforcement agencies." Pl. Resp. 11–12 (citing Voils Dep. 44, 58, 60–62; DDP 2). It is undisputed that Dr. Waldorf's conduct was not reported to any government agency. Pl. Resp. 11–12 (citing Voils Dep. 44, 58, 60–61); Defs. Reply at 12. It is also

OPINION - 6

undisputed that Florida law did not require reporting in this instance.  Defs. Reply 12 (citing Voils Dep. 43, 58).

Several Mayo physicians understood the DDP not to cover noncontrolled substances.  Pl. Resp. 4 (citing Cangemi Dep. 101; Fosko Dep. 73–74; Meschia Dep. 54).  Dr. Waldorf shared that view and believed the policy only applied to controlled substances and narcotics.  Pl. Resp. 4 (citing Lovett Dep. 51; Waldorf Dep. 48–49).  Ms. Lovett, who served on DDiRT for five years, held the same understanding.  Pl. Resp. 4 (citing Lovett Dep. 52).

After his resignation, the Executive Team and Dr. Thielen awarded Dr. Waldorf emeritus status, at his request, based on his years of service and contributions.  Pl. Resp. 11, 25 (citing Meschia Dep. 14, 16, 59; Kuenzinger Dep. 21–22, 29–30); Defs. Reply 12 (citing Meschia Dep. 54).  Mayo's emeritus policy requires that a physician be in "good standing."  Pl. Resp. 25 (citing Meschia Dep. 59; Thielen Dep. 29).  As a general matter, a drug-diversion violation would preclude "good standing" for emeritus status.  Pl. Resp. 11 (citing Meschia Dep. 59; Kuenzinger Dep. 29).

In 2017, MCJ investigated Dr. Bruce, then age 51, for administering Botox to staff and a family member without charge or documentation and for shipping Botox samples to her herself rather than to the Mayo pharmacy.  Pl. Resp. 15–16 (citing Minch Dep. 130; Bruce Dep. 5, 130); Defs. Mot. 13–14 (citing Minch Dep. 9–21, 27,

Ex. 5.) MCJ concluded she violated Mayo's Drug Sample Policy.[4] Pl. Resp. 16 (citing Minch. Dep. 16); Defs. Mot. 13–14. She was not formally disciplined and received "coaching" to "be careful." Pl. Resp. 16 (citing Minch Dep. 40, Bruce Dep. 54); Defs. Mot. 14 (citing Cangemi Dep. 107, 112–113).

In 2018, Dr. King, then age 30, was reported for taking Botox from Mayo's Minnesota campus to inject a family member. Pl. Resp. 17 (citing Voils Dep. 139); Defendants' Reply to Pl. Resp. Opp'n Mot. Summ. J., 9, Aug. 4, 2025, ECF No. 68 ("Defs. Reply"). Mayo's investigation determined he had received soft-tissue filler samples from a "non-Mayo-sponsored private practice session." Defs. Reply 9–10. He received coaching and no further discipline. Pl. Resp. 17; Defs. Reply 10 (citing Defs. Resp. to Pl. First Set of Interrogs 21).

Dr. Perdikis, then chair of MCJ's plastic surgery division, Dr. Waldorf's supervisor, and "substantially younger" than Dr. Waldorf, twice injected Dr. Waldorf with Botox without charge. Pl. Resp. 3 (citing Waldorf Dep. 103–105, 162–163). Dr. TerKonda, also significantly younger than Dr. Waldorf, "openly" administered Botox to patients without charge or documentation. Pl. Resp. 3 (citing Waldorf Dep. 106, 163). Neither physician was terminated for this conduct. Pl. Resp. 4 (citing Waldorf Dep. 113–15); Defs. Mot. 11–12. Plaintiff does not allege, and the record does not contain evidence that any relevant Mayo decisionmaker knew about these incidents. See generally Pl. Resp.; Defs. Mot.

---

[4] Although Dr. Waldorf asserts that Dr. Bruce's conduct fell under the Drug Diversion Policy, he cites no record evidence to support that assertion. See Pl. Resp. 15.

**OPINION - 8**

3:24-cv-00657-CRK-MCR

Plaintiff also claims that other MCJ physicians engaged in non-drug-related misconduct but were not disciplined.  Pl. Resp. 18 (citing Fosko Dep. 16, 58; Cangemi Dep. 58; Rinker Dep. 5, Ex. 4); <u>see also</u> Waldorf Dep. 126–129, 133–135.  In 2022, Dr. Emmanuel Gabriel removed the wrong breast from a patient, and to address the error, Dr. Brian Rinker performed reconstructive surgery without the patient's consent.  Pl. Resp. 18 (citing Rinker Dep. 47–48).  Dr. Rinker had a sexual relationship with a student observer under his supervisory authority.  Pl. Resp. 18 (citing Rinker Dep. 61–63).  Ms. McMullan, a member of the Executive Team that decided on Waldorf's termination, led the investigation into Dr. Rinker's relationship, which did not result in any disciplinary action.  Pl. Resp. 18–19 (citing McMullan Dep. 50–51).  Neither Dr. Gabriel nor Dr. Rinker was terminated.  Pl. Resp. 18 (citing Rinker Dep. 56).

Similarly, Dr. Juan Carlos Martinez, a substantially younger MCJ physician, engaged in "intimidating and reckless" conduct, including throwing bloody surgical instruments in the Cosmetic Center.  Pl. Resp. 19 (citing Fosko Dep. 19, 30; Bruce Dep. 33–35).  Those incidents were reported to MCJ CEO, Dr. Gianrico Farrugia, and to the Executive Team chair at the time, Dr. John Cangemi.  Pl. Resp. 19 (citing Cangemi Dep. 52, 58).  Drs. Farrugia and Cangemi decided not to terminate Dr. Martinez.  Pl. Resp. 19 (citing Cangemi Dep. 52, 58).  Ms. McMullan, who was on the

**OPINION - 9**

3:24-cv-00657-CRK-MCR

Executive Team reviewing Dr. Waldorf's incident, was aware of the complaints about Dr. Martinez.[5]  Pl. Resp. 19 (citing McMullan Dep. 43–45).

## JURISDICTION AND STANDARD OF REVIEW

This court has federal question jurisdiction over Plaintiff's claim under the ADEA, 29 U.S.C. § 623(a)(1), and retaliation claim under the FLSA, 29 U.S.C. § 215(a)(3).  28 U.S.C. § 1331.  The court has supplemental jurisdiction over Plaintiff's related FCRA claim, Fla. Stat. § 760.10(1)(a).  28 U.S.C. § 1367(a).

Summary judgment is appropriate where no genuine dispute of material fact exists and viewing the record in the nonmovant's favor, the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it could affect the outcome under the governing law.  Anderson, 477 U.S. at 248.  A dispute is genuine only if the evidence would permit a reasonable jury to return a verdict for the nonmovant.  Id. at 248.  Speculation does not create a genuine issue of fact. Stardust, 3007 LLC v. City of Brookhaven, 899 F.3d 1164, 1170 (11th Cir. 2018) (quotation omitted).  The nonmovant must do more than raise a "metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Speculative, conclusory, or unsupported assertions do not create a genuine dispute.  Bazemore v. Jefferson Capital Systems, LLC., 827 F.3d 1325, 1333 (11th Cir. 2016).  The court therefore asks whether the nonmovant has cited

---

[5]  Plaintiff asserts that Ms. McMullan "likely participated in the decision not to fire [Dr. Martinez]," but points to no evidence on the record that reflects she was involved in any decision-making process in regard to Dr. Martinez's conduct.  See Pl. Resp. 19.

**OPINION – 10**

3:24-cv-00657-CRK-MCR

competent, admissible, and nonconclusory evidence as Rule 56 requires. Fed. R. Civ.

P. 56(c)(1)–(2).

## DISCUSSION

Plaintiff contends he was wrongfully terminated because of (1) age discrimination, and (2) third-party retaliation for his association with Ms. Lovett, in light of her equal pay complaint. Compl. ¶ 1. Defendants move for summary judgment on both claims. The record does not raise a triable issue on either claim; accordingly, Defendants' motion is granted.

## I.    ADEA Age Discrimination Claim

Defendants contend Plaintiff's age discrimination claim fails as a matter of law. They argue Plaintiff cannot point to evidence on the record from which a reasonable factfinder could infer that age was the but-for cause of his termination, or that MCJ's stated reason—violation of the Drug Diversion Policy—was pretextual, and the real reason was illegitimate or discriminatory. Defs. Mot. 9–16. Plaintiff responds that a convincing mosaic of circumstantial evidence is sufficient for a reasonable jury to infer discriminatory intent, but the record does not support that assertion. For the reasons that follow, Plaintiff fails to present evidence from which a reasonable jury could infer Defendants intentionally discriminated against him, either under the McDonnell Douglas framework or through a convincing mosaic of circumstantial evidence.

**OPINION - 11**

3:24-cv-00657-CRK-MCR

### A.    McDonnell Douglas

The ADEA makes it unlawful for an employer to discriminate because of an individual's age. 29 U.S.C. § 623(a)(1). The statute protects "individuals who are at least 40 years of age." Id. A plaintiff must put forth evidence from which a reasonable jury could infer that age was the "but-for" cause of the adverse action, meaning the employer would not have taken the same action absent the age-based motive and that the proscribed animus had a determinative influence on the decision. See Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176–78 (2009); Sims v. MVM, Inc., 704 F.3d 1327, 1332, 1335–36 (11th Cir. 2013).

A plaintiff may create a reasonable inference of age discrimination by pointing to circumstantial or direct evidence on the record that age discrimination was the "but-for" cause of his termination. Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1270 (11th Cir. 2014); Gross, 557 U.S. at 176–78. Circumstantial evidence requires the factfinder to draw reasonable inferences from the surrounding facts. Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). When relying on circumstantial evidence, a plaintiff may (1) proceed under the McDonnell Douglas burden-shifting framework, or (2) present a "convincing mosaic" of evidence from which a reasonable jury could infer intentional discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973); Tynes v. Fla. Dep't of Juv. Just., 88 F.4th 939, 946–47 (11th Cir. 2023).

OPINION - 12

Under McDonnell Douglas, an ADEA plaintiff must provide sufficient evidence that he is (1) at least forty years old, (2) suffered an adverse employment action,[6] (3) is qualified, and (4) was either replaced by a substantially younger individual, or treated less favorably than a similarly situated, substantially younger comparator who is similarly situated to the plaintiff in "all material respects."[7] Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc); Lewis v. City of Union City, Ga., 918 F.3d 1213, 1226 ("Lewis I"). Employees are similarly situated in all material respects when they engaged in the same basic conduct, were subject to the same policy, answered to the same supervisor or decisionmaker, and had a comparable employment history.[8] Lewis I, 918 F.3d at 1227–28; Rioux v. City of Atlanta, 520 F.3d 1269, 1281–82 (11th Cir. 2008). The relevant "decisionmaker" is the official with authority to actually discharge the employee. Lewis v. City of Union City, Ga., 934 F.3d 1169, 1196 (11th Cir. 2019) ("Lewis II") (Tjoflat, J., concurring)

---

[6] Termination is an adverse employment action. Davis v. Town of Lake Park, 245 F.3d 1232, 1238–39 (11th Cir. 2001). A resignation qualifies as constructive discharge only if a reasonable person in the employee's position would have felt compelled to resign. Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1559 (11th Cir. 1988).

[7] Once the plaintiff has identified evidence to infer a prima facie case under McDonnell Douglas, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged action. Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981). If the employer does so, the burden shifts back to the plaintiff to produce evidence from which a reasonable factfinder could conclude that the reason for termination was age and not the proffered reason. Burdine, 450 U.S. at 253. Under the ADEA, the plaintiff must present evidence of but-for causation. Gross, 557 U.S. at 176–78.

[8] In Lewis I, the court clarified that a plaintiff making out a claim for discrimination under the McDonnell Douglas approach, does not need to present evidence that a comparator be "nearly identical," but rather, that comparator must be "similarly situated in all material respects." Lewis I, 918 F.3d at 1218.

**OPINION - 13**

3:24-cv-00657-CRK-MCR

(citing <u>Stimpson v. City of Tuscaloosa</u>, 186 F.3d 1328, 1331 (11th Cir. 1999) (per curiam)).

To create a reasonable inference that he was replaced by a substantially younger employee, the plaintiff must present evidence that the purported replacement was substantially younger and actually performed the plaintiff's duties. <u>Hawkins v. Ceco Corp.</u> 883 F.2d 977, 982 (11th Cir. 1989) (citing <u>Jones v. W. Geophysical Co. of Am.</u>, 669 F.2d 280, 282–84 (5th Cir. 1982)). The court considers what responsibilities the new hire assumed, whether those responsibilities matched the plaintiff's role, and when the new employee was hired. <u>Hawkins</u>, 883 F.2d at 983; <u>Rollins v. TechSouth, Inc.</u>, 833 F.2d 1525, 1529 (11th Cir. 1987). For example, an employer replaces a plaintiff when it hires younger employees shortly before termination, has the plaintiff train them, then assigns them to perform the plaintiff's duties at her site, and frequent age-related remarks by the manager further support pretext. <u>See</u> <u>Kilgore v. Trussville Development, LLC</u>, 646 F. App'x 765, 771–74 (11th Cir. 2016) (per curiam).

Here, Plaintiff does not present evidence that creates a reasonable inference of discrimination under <u>McDonnell Douglas</u>.[9] He identifies no substantially younger comparator who is similarly situated in all material respects, and he has not pointed to evidence on the record that could lead a jury to infer that he was replaced by

---

[9] Dr. Waldorf does not present direct evidence of animus in MCJ's decision to terminate his employment. Defs. Mot. 9, n.7 (citing Waldorf Dep. at 117:25–18:14); Pl. Resp. 20–21.

**OPINION - 14**

someone substantially younger.[10]  See generally Pl. Resp.; see also Lewis I, 918 F.3d at 1224–28; Chapman, 229 F.3d at 1024.  Plaintiff concedes that his proposed Mayo physician comparators do not satisfy the strict McDonnell Douglas standard.  See Pl. Resp. 22 n.9 ("Mayo says these younger physicians are not McDonnell Douglas comparators . . . [b]ut they do not have to be.") (citing Defs. Mot. 11–15; Jenkins v. Nell, 26 F.4th 1243, 1249–51 (11th Cir. 2022); Lewis II, 934 F.3d at 1187–89); see also Pl. Resp. 21, 20.  Plaintiff also fails to present facts from which a reasonable jury could conclude that Mayo replaced him with a substantially younger physician.  Pl. Resp. 1; see also Chapman, 229 F.3d at 1024; Lewis I, 918 F.3d at 1218.  He argues that Kunle Elegbede, M.D., a physician in his forties who began at MCJ in August 2023, was his replacement.[11]    Compl. ¶ 34.  Undisputed evidence on the record indicates that Mayo offered Dr. Elegbede the MCJ plastic surgery position in January 2023, six months before Plaintiff's July 2023 misconduct and termination.  Pl. Resp. 2; Defs. Mot. 11 (citing Thielen Dep. 56:3–7, Ex. 1).  Plaintiff cites no record evidence that Dr. Elegbede assumed Plaintiff's specific duties or his Cosmetic Center role.  See generally Pl. Resp.; see Kilgore, 646 F. App'x at 774 (evidence that an individual hired pre-termination was a replacement was sufficient where the record also

---

[10]  Plaintiff implicitly concedes that he does not have evidence sufficient to create a reasonable inference of a McDonnell Douglas prima facie case because he argues only that he can recover under the convincing mosaic framework.  Pl. Resp. 20.

[11]   That Dr. Elegbede is also over forty does not defeat an inference of age discrimination under the ADEA so long as he is "substantially younger" than Dr. Waldorf.  O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996).

3:24-cv-00657-CRK-MCR

demonstrated the replacement took on the plaintiff's particular duties and role, and the decisionmaker made frequent discriminatory comments).

Plaintiff attempts to construct a narrative that MCJ adopted a scheme to hire Dr. Elegbede in January of 2023 with the intent to "get rid of" Dr. Waldorf. Pl. Resp. at 24. Plaintiff's narrative that MCJ hired Dr. Elegbede in January 2023 as part of a plan to "get rid of" him is speculative. Id. Speculation does not create a genuine dispute. See Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). Plaintiff identifies no email, no deposition testimony, no contemporaneous document, and no age-based remark that would allow a reasonable jury to find a discriminatory plan. See generally Pl. Resp.; c.f. Kilgore, 646 F. App'x at 774. He also identifies no evidence that Mayo accelerated or altered Dr. Elegbede's start date after learning of Plaintiff's drug-diversion violation. See generally Pl. Resp. On this record, even construing the evidence in Plaintiff's favor, the only reasonable inference is that Mayo filled a position in January 2023 and later terminated Plaintiff in July 2023 for violating the DDP. Defs. Mot. 11. Because Plaintiff cannot identify a valid comparator nor a substantially younger replacement, he fails to present evidence from which a reasonable factfinder could infer intentional discrimination under McDonnell Douglas.

### B.    Convincing Mosaic

A plaintiff who cannot proffer sufficient evidence to create a reasonable inference in his favor under the McDonnell Douglas framework may still defeat summary judgment with a "convincing mosaic" of circumstantial evidence from which

**OPINION – 16**

a reasonable jury could infer intentional discrimination. <u>Smith</u>, 644 F.3d at 1328. The tiles of the mosaic may include (1) "suspicious timing, ambiguous statements . . . and other bits and pieces from which an inference of discriminatory intent might be drawn," (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual. <u>Lewis II</u>, 934 F.3d at 1185–86 (citing <u>Silverman v. Bd. of Educ.</u>, 637 F.3d 729, 734 (7th Cir. 2011)). The "systematically better treatment of similarly situated employees" inquiry is less exacting than the <u>McDonnell Douglas</u> comparator test, which requires comparators to be similarly situated in "all material respects." <u>See</u> <u>Lewis I</u>, 918 F.3d at 1227–28; <u>Lewis II</u>, 934 F.3d at 1185–86. Evidence about an employee who does not meet the strict <u>McDonnell Douglas</u> standard may still be probative in a convincing mosaic analysis. <u>Tynes</u>, 88 F.4th at 946–47. The court asks whether, taken with the rest of the record, that evidence would allow a reasonable factfinder to infer intentional discrimination. <u>Id.</u>

"Similarly situated employee" evidence is probative only to the extent it supports an inference that the decisionmaker intentionally discriminated by treating the plaintiff differently from others. <u>See</u> <u>Lewis II</u>, 934 F.3d at 1196 (Tjoflat, J., concurring) (citing <u>Stimpson</u>, 186 F.3d at 1331; <u>Smith</u>, 644 F.3d at 1327–28). The identity and conduct of the decisionmaker therefore remain central. <u>See</u> <u>Id.</u> The question is whether the record permits an inference of intentional discrimination by that decisionmaker. <u>Tynes</u>, 88 F.4th at 946 (quoting <u>Smith</u>, 644 F.3d at 1327–28)). Disciplinary measures imposed by different supervisors are not apt comparisons.

**OPINION - 17**

Jones v. Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989). Similarly situated employee evidence must involve misconduct comparable in degree or kind to support an inference of discrimination.[12] Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1312 (11th Cir. 2023); Mann v. Koch Foods of Ashland LLC, No. 24-10709, 2025 WL 2181452, at *4 (11th Cir. Aug. 1, 2025).

A plaintiff may create a reasonable inference of pretext in several ways, including (1) casting sufficient doubt on the employer's stated nondiscriminatory reasons so a reasonable factfinder could conclude they did not actually motivate the decision; (2) identifying evidence on the record that the stated reason is false and discrimination was the real reason; or (3) creating an inference that the employer failed to clearly articulate and follow its formal policies. Lewis II at 1186. Pretext is evident only where the record as a whole allows a reasonable jury to find that age discrimination was the but-for cause of the termination. See Gross, 557 U.S. at 176–

---

[12] In Lewis II, the court explained that a plaintiff need not identify a comparator similar in "all material respects," and that "failure to produce a comparator does not necessarily doom the plaintiff's case." Lewis II, 934 F3d at 1186. Nonetheless, proffered comparator evidence must involve conduct that is comparable in degree or kind so that it supports an inference of discriminatory intent. Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1312 (11th Cir. 2023); see also Mann v. Koch Foods of Ashland LLC, No. 24-10709, 2025 WL 2181452, at *4 (11th Cir. Aug. 1, 2025) ("[plaintiff's] failure to establish a single similarly situated comparator" means a jury could not find intentional discrimination under a convincing mosaic lens). Different supervisors or materially different circumstances break that inference; the core question remains whether the record would allow a jury to find intentional discrimination by the decisionmaker. Tynes, 88 F.4th at 946–47. Thus, the convincing mosaic acts not as a separate test, but directs courts to ask the ordinary summary judgment question: does the circumstantial record create a triable issue on discriminatory intent. Lewis II, 934 F.3d at 1186, citing Smith, 644 F.3d at 1328; see also Berry, 84 F.4th at 1311; McCreight v. AuburnBank, 117 F.4th 1322, 1335–36 (11th Cir. 2024).

3:24-cv-00657-CRK-MCR

78.    Courts do not sit as a super-personnel department to second guess non-discriminatory business judgments, thus, an employer may act for a good reason, a bad reason, or no reason at all, so long as the reason is not discriminatory.  See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999); Chapman, 229 F.3d at 1030.

Here, Plaintiff offers no facts supporting suspicious timing, ambiguous statements, systematically better treatment of similarly situated employees, or other pretext evidence from which a reasonable jury could infer that Defendants intentionally discriminated against him.  First, there is no evidence on the record that could create a reasonable inference of suspicious timing or ambiguous statements surrounding Dr. Waldorf's termination.  His conduct was reported the same day, June 23, 2023, and management immediately initiated a DDiRT investigation.  Defs. Mot. 4–5, (citing Clower Dep. 7, 20–22; Minch Dep. 161–163).  The DDiRT interviewed Ms. Carter and others witnesses three business days later on June 28, 2023, and met on July 7, 2023, to set next steps.  Defs. Mot. 5 (citing Voils Dep. 20–25, 100; 104–105); see generally Pl. Resp.  On July 10, 2023, the day Dr. Waldorf and Ms. Lovett returned from vacation, the DDiRT interviewed both.  Pl. Resp. 9; (citing Waldorf Dep. 69).

Plaintiff's theory that MCJ monitored him to manufacture a violation, so it could terminate him and replace him with a younger physician is speculative and unsupported by the record.  Pl. Resp. 6, 23, 27.  Dr. Waldorf asserts that his termination was timed to Dr. Elegbede's hire but cites no evidence linking the two

3:24-cv-00657-CRK-MCR

events.  See generally Pl. Resp.  It is undisputed on the record that MCJ offered Dr. Elegbede the position six months before Dr. Waldorf violated the DDP.  See Defs. Mot. 11; Pl. Resp. 2; see also Berry, 84 F.4th at 1312 ("intervening discovery of misconduct" defeats an inference of suspicious timing).  There is no evidence on the record sufficient to support a reasonable inference that a temporal link exists between the decision to hire Dr. Elegbede and Dr. Waldorf's termination.  See generally Pl. Resp.; Defs. Mot.; see e.g., Brunson v. Dekalb Cnty. Schs., No. 22-10177, 2023 WL 4363997, at *3 (11th Cir. July 6, 2023) ("bits and pieces" of evidence strung together are insufficient to "piece together" a timeline of age discrimination).  Thus, Plaintiff's theory of age bias rests on speculation, not evidence, and does not create an inference that age discrimination was the but-for cause of his termination.  See Martin v. Fin. Asset Mgmt. Sys., Inc., 959 F.3d 1048, 1058 (11th Cir. 2020).

Second, Plaintiff offers no evidence from which a reasonable jury could find that Defendants treated similarly situated employees systematically better because of age.  Pl. Resp. 21–23.  Plaintiff names Drs. Clay, Perdikis, and TerKonda as such similarly situated employees, but identifies no facts supporting an inference of intentional discrimination.  See generally Pl. Resp.  Viewing the record and all reasonable inferences in Plaintiff's favor, the most that can be inferred by a reasonable factfinder is that Drs. Clay, Perdikis, and TerKonda administered Botox without documentation or charge.  See generally Id.  Critically, there is no evidence that the Executive Team in Dr. Waldorf's case knew of any misconduct by Drs. Clay,

OPINION - 20

3:24-cv-00657-CRK-MCR

Perdikis, or TerKonda.[13]  Compl. ¶ 20; Defs. Mot. 11; <u>see generally</u> Pl. Resp.  Because
Plaintiff has not identified evidence on the record that the Executive Team was aware
of any alleged misconduct by the named physicians, they are not similarly situated
in a manner that permits an inference of intentional discrimination by Defendants.

Likewise, Plaintiff identifies Drs. Bruce and King as employees who engaged
in similar conduct and received better treatment but offers no evidence from which a
reasonable factfinder could infer intentional discrimination.  <u>See</u> Pl. Resp. 15–17.  As
to Dr. Bruce, Plaintiff cites an incident where she injected Botox samples into a family
member and staff for training without charge or documentation, which Mayo
investigated without terminating her.  <u>See</u> Pl. Resp. 15–16; Defs. Mot. 13.  It is
undisputed that Dr. Bruce used sample Botox, and Dr. Waldorf used MCJ-supply
Botox, so Mayo evaluated Dr. Bruce under the Drug Sample Policy and Dr. Waldorf
under the DDP.  Pl. Resp. 16; Defs. Mot. 14.  The events occurred six years apart and
were decided by different decisionmakers.  Pl. Resp. 13–16; Defs. Mot. 14.  As to Dr.
King, Plaintiff cites a 2018 incident at Mayo's Minnesota campus in which Dr. King
injected a family member with Botox at home without charge or documentation.  Pl.
Resp. 17.  Plaintiff does not contest that Mayo investigated, found Dr. King used
samples obtained outside Mayo's supply, and imposed "coaching."  Defs. Reply 9–10.
Dr. King worked at a different campus, was reviewed by different decisionmakers,
the events occurred five years earlier, and Mayo found no drug diversion.  <u>See</u> <u>Id.</u>

---

[13]  The decisionmakers with respect to Dr. Waldorf's discharge were the Executive
Team and Dr. Thielen, who decided to require his resignation or proceed with
termination.  Pl. Resp. 10; Defs. Reply 2.

**OPINION – 21**

3:24-cv-00657-CRK-MCR

Plaintiff identifies no evidence that the Executive Team, the decisionmaker in his case, reviewed either Dr. Bruce or Dr. King's conduct. Pl. Resp. 15–17; Defs. Reply 10. Even viewing the record in Dr. Waldorf's favor, no reasonable jury could infer that Drs. Bruce and King were disciplined differently because of intentional age discrimination because each incident was reviewed by a different decision-making authority. See Tynes, 88 F.4th at 946; Jones, 874 F.2d at 1541. The incidents also involved different supply sources, invoked different policies, occurred at different campuses, and produced different findings. Defs. Reply 9–10. The material differences in Dr. Waldorf, Dr. King and Dr. Bruce's circumstances foreclose any reasonable inference that they received systematically better treatment or that the reason for Dr. Waldorf's termination was pretextual.

Third, Plaintiff fails to identify evidence of pretext by any other means. Pl. Resp. 22–25. His claims that (1) MCJ applied its policies inconsistently or ambiguously, (2) that others engaged in worse misconduct yet received lighter discipline, and (3) that Mayo failed to follow its policies after his termination do not support a reasonable inference of discrimination. Id. Plaintiff identifies no ambiguity in MCJ's Drug Diversion Policy and no inconsistent enforcement that would support an inference of discrimination. See Compl. ¶¶ 25, 26, 45, 46; Pl. Resp. 4, 25. He does not dispute that he administered Botox from MCJ supply without documentation or charge. See Pl. Resp. 4. The DDP prohibits "intentionally and without proper authorization using or taking possession of a prescription medication or medical gas from Mayo supplies," and states that termination is the expected outcome for drug

**OPINION - 22**

3:24-cv-00657-CRK-MCR

diversion.  <u>See</u> Defs. Mot. 3; DDP 1.  The Executive Team reviewed Dr. Waldorf's conduct under that policy and terminated his employment.  Pl. Resp. 3; Defs. Mot. 6–7.  Plaintiff does not dispute Defendants' evidence that other MCJ professionals were also terminated for non-controlled substance diversion.  Defs. Mot. 2, 7 (citing Defs. Resp. to Pl. First Set of Interrogs. 7).  On this record, the undisputed policy text, MCJ's consistent enforcement for noncontrolled drug diversion, and the absence of age-based evidence foreclose any reasonable finding of pretext or any tile in a convincing mosaic of discriminatory intent.

Plaintiff claims that younger physicians received lighter discipline for conduct he calls worse than his own, but he offers no evidence from which a reasonable jury could infer intentional age discrimination.  <u>See</u> Compl. ¶¶ 40–41; Pl. Resp. 18.  Drs. Rinker, Gabriel, and Martinez engaged in different kinds of misconduct, were governed by different policies, were investigated under different procedures, and reviewed by different decisionmakers.  <u>See</u> Pl. Resp. 18–19; Defs. Mot. 19–20.  Other than noting that these physicians are younger, Plaintiff identifies no evidence that they avoided discipline because of age or that his termination was because of age.  <u>See generally</u> Compl.; Pl. Resp.  Even assuming common decisionmakers were involved, the conduct of Drs. Martinez, Gabriel, and Rinker is so dissimilar in comparison to Dr. Waldorf's that any difference in discipline cannot support an inference of intentional age bias.  <u>See also</u> <u>Mann</u>, 2025 WL 2181452, at *4 (materially different circumstances do not support an inference of discrimination).  These

**OPINION – 23**

3:24-cv-00657-CRK-MCR

comparisons do not permit a reasonable inference that age motivated systematically better treatment.  Pl. Resp. 18–19; Defs. Mot. 19–20.

Plaintiff also points to MCJ's grant of emeritus status and MCJ's decision not to report his conduct to law enforcement as evidence of pretext, but those post-termination actions reflect administrative discretion, not age bias.  They do not undermine the Executive Team's non-discriminatory basis for discharge.  Pl. Resp. 11–12.  It is undisputed that MCJ granted emeritus status at Plaintiff's request, even though his misconduct would have barred the "good standing" ordinarily required. Id.; Defs. Reply 12.  It is also undisputed that MCJ did not report the incident to law enforcement, Pl. Resp. 11–12, that the DDP requires reporting only to "appropriate" government entities, and that Florida law does not require reporting diversion of noncontrolled substances.  DDP 2; Defs. Reply 12.

Even crediting Plaintiff's inferences, the record does not present facts from which a reasonable jury could conclude that there were age-skewed reporting decisions or a shift in MCJ's explanation.  The record does not present facts from which a reasonable jury could conclude that MCJ's stated reason for termination, violation of the DDP, was false or that discrimination was the real reason.  See Lewis II, 934 F.3d at 1186; Cf. Kragor, 702 F.3d at 1310–12 (decisionmaker later told colleague plaintiff was an "exceptional" employee who should not have been fired). Here, there are no post-termination statements undermining MCJ's DDP rationale. See generally Pl. Resp.; Def. Mot.  The post-termination actions, granting emeritus status despite the "good standing" criterion and declining to report noncontrolled

**OPINION – 24**

3:24-cv-00657-CRK-MCR

substance conduct to law enforcement, do not present facts from which a reasonable jury could conclude age discrimination.

Viewing the summary judgment record in the light most favorable to Plaintiff, he has not assembled a convincing mosaic of circumstantial evidence of intentional age discrimination. He does not dispute that he injected Ms. Lovett with Botox without documentation or charge. Pl. Resp. 3–4. He does not dispute the DDP, which states that termination is an expected consequence of drug diversion. See DDP 1–2. The evidence does not undermine Defendants' stated reason enough for a reasonable jury to find pretext. See Kragor, 702 F.3d at 1310–11; Lewis II, 934 F.3d at 1186. He identifies no evidence that the Executive Team considered age, no proof of discriminatory animus, and no basis to find that age was the but-for cause of discharge. See Mazzeo, 746 F.3d at 1270–72; see also Melvin v. Fed. Express Corp., 814 F. App'x 506, 513 (11th Cir. 2020). He does not link bias to the actual decisionmakers through age-based remarks, harsher discipline of truly comparable employees, or replacement by substantially younger workers. See Smith, 644 F.3d at 1329–31. Post-termination actions, such as granting emeritus status or not reporting a noncontrolled-substance incident, reflect administrative discretion and are insufficient to create an inference of pretext. See Damon, 196 F.3d 1354 at 1361 (an imprudent or unfair employment decision does not show pretext where there is no evidence that the decisions were discriminatory). Therefore, on this record, no reasonable jury could find intentional age discrimination.

**OPINION - 25**

3:24-cv-00657-CRK-MCR

## II.    FLSA Third-Party Retaliation Claim

The record does not support Dr. Waldorf's third-party FLSA retaliation claim. The FLSA protects the employee who "files any complaint,"[14] not an associate of that employee who engaged in no protected activity of his own.[15] 29 U.S.C. § 215(a)(3). The private right of action likewise authorizes suit "by any one or more employees for and [o]n behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Thus, the FLSA does not provide a third-party retaliation cause of action for Dr. Waldorf.[16]

Even assuming, arguendo, that a third-party FLSA theory is cognizable, the claim fails under the ordinary FLSA retaliation framework. A prima facie case requires the plaintiff to present facts from which a reasonable jury could conclude (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) the action was causally connected to the protected activity. Wolf v. Coca-Cola Co.,

---

[14] An employee "has filed any complaint" only when the communication is sufficiently clear and detailed to give the employer fair notice, understood, in light of content and context, as an assertion of FLSA rights and a call for their protection. Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 14 (2011).

[15] The EPA is part of the FLSA, so a sex-based unequal-pay complaint is "under or related to" the Act and can support § 215(a)(3) retaliation. 29 U.S.C. § 206(d)(1); 29 U.S.C. § 215(a)(3); EEOC v. White & Son Enters., 881 F.2d 1006, 1008–11 (11th Cir. 1989).

[16] Title VII similarly forbids discrimination based on race, color, religion, sex, and national origin, and it prohibits retaliation for opposing unlawful practices or for participating in Title VII proceedings. 42 U.S.C. §§ 2000e-2(a), 2000e-3(a). It authorizes suit by a "person claiming to be aggrieved" and so, permits third-party retaliation claims. 42 U.S.C. § 2000e-5(f)(1); Thompson v. N. Am. Stainless, LP, 562 U.S. 170, 176–78 (2011); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67–68 (2006). The court is unaware of any case in the Eleventh Circuit that has recognized a third-party retaliation cause of action under the FLSA.

**OPINION - 26**

3:24-cv-00657-CRK-MCR

200 F.3d 1337, 1342–43 (11th Cir. 2000).    Causation requires decisionmaker knowledge.  See Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000).  If the employer articulates a legitimate, nonretaliatory reason for the adverse action, the plaintiff must produce evidence that the stated reason is false, and retaliation was the real reason.  Wolf, 200 F.3d at 1343.

Plaintiff identifies no evidence that the Executive Team knew about Ms. Lovett's complaint when they asked him to resign or face termination.  Pl. Resp. 10; Defs. Reply 2.  Temporal proximity does not aid his claim because his termination followed his admitted DDP violation, an intervening, legitimate ground for discharge. See Brungart, 231 F.3d 791 at 799 (explaining that close temporal proximity may support causation but cannot overcome unrebutted evidence of lack of knowledge or intervening acts).  MCJ articulated a legitimate, nonretaliatory reason—violation of the DDP—and supported it with record evidence.  Defs. Mot. 11–14.  Plaintiff offers no evidence that this reason was false or that retaliation was the real reason.  Wolf, 200 F.3d at 1343.

The FLSA's text does not provide a private right of action for third-party or associational retaliation, and even if it did, Plaintiff's claim fails on the undisputed merits for lack of decisionmaker knowledge, lack of causal evidence, and lack of pretext.  Wolf, 200 F.3d at 1342–43; Brungart at 799.  Therefore, Defendants are entitled to summary judgment on the FLSA retaliation claim.

**OPINION - 27**

3:24-cv-00657-CRK-MCR

### III.    Florida State Claim

In addition to bringing a federal claim for age discrimination under the ADEA, Plaintiff brings a parallel age discrimination claim under the FCRA, Fla. Stat. §§ 760.01-.11; Compl. ¶ 1.  The court exercises supplemental jurisdiction over the FCRA claim as it arises from the same common nucleus of facts.  28 U.S.C. § 1367(a).  Although the court has granted summary judgment on the ADEA claim, it retains supplemental jurisdiction on the FCRA and accordingly, grants summary judgment in favor of Defendants on the parallel FCRA claim.

### A.    Supplemental Jurisdiction

Federal district courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  A federal district court also may hear state law claims that "are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  Courts analyze FCRA age discrimination claims under the same framework as ADEA claims.  Mazzeo, 746 F.3d at 1266.  Florida courts likewise follow federal law interpreting Title VII and the ADEA when applying the FCRA.  City of Hollywood v. Hogan, 986 So. 2d 634, 641 (Fla. 4th DCA 2008).  Federal district courts apply the same summary judgment standard across ADEA, FCRA, and Title VII claims.  See, e.g., Lewis v. Michaels Stores, Inc., No. 3:05-cv-1323-J-33MCR, 2007 WL 2254502, at *4 (M.D. Fla. Aug. 3, 2007).  If the court dismisses the federal claim that supplied original jurisdiction, it may decide whether to retain the state claim after considering judicial economy, convenience, fairness,

3:24-cv-00657-CRK-MCR

and comity.  28 U.S.C. § 1367(c)(3); <u>Palmer v. Hosp. Auth. of Randolph Cnty.</u>, 22 F.3d 1559, 1567–69 (11th Cir. 1994).

The court has federal question jurisdiction over the ADEA and FLSA claims. 28 U.S.C. § 1331.  It has supplemental jurisdiction over the FCRA claim because it arises from the same employment decision and alleged age-based motive as the ADEA claim, and thus forms part of the same case or controversy.  28 U.S.C. § 1367(a); <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 725 (1966); <u>Palmer</u>, 22 F.3d at 1567–69.  Because the court has dismissed the ADEA and FLSA claims, it may retain the FCRA claim where judicial economy, convenience, fairness, and comity allows.  28 U.S.C. § 1367(c)(3).

Retaining the FCRA claim promotes judicial economy.  The court can apply the same facts, arguments, and ADEA framework already briefed, rather than require a Florida state court to duplicate the analysis.  <u>See</u> <u>Barker v. FedEx, Inc.</u>, No. 2:19-cv-280-JLB-NPM, 2021 WL 1214874, at *7 (M.D. Fla. Mar. 31, 2021) (analyzing and granting summary judgment on ADEA and FCRA claims together); <u>Cardelle v. Miami Beach Fraternal Ord. of Police</u>, 593 F. App'x 898, 901 (11th Cir. 2014) (affirming summary judgment on ADEA and FCRA claims).  Retention does not inconvenience or prejudice the parties.  Plaintiff chose a federal forum, and both parties are already before this court.  The FCRA claim turns on the same record as the federal claims. <u>See</u> <u>Mazzeo</u>, 746 F.3d at 1266.  Comity is not impaired because federal and Florida state courts apply ADEA and Title VII precedent to FCRA claims.  <u>See, e.g.</u>, <u>Bligh v. Collier Cnty. Dist. Sch. Bd.</u>, 818 F. App'x 942, 943–44 (11th Cir. 2020) (analyzing

**OPINION – 29**

ADEA and FCRA age-discrimination claims under the same standard); <u>Hogan</u>, 986 So. 2d at 641.  Because judicial economy, convenience, fairness, and comity all favor retention, the court will retain and decide the FCRA claim.

### B.    Florida Civil Rights Act Claim

The court's analysis of ADEA and FCRA age discrimination claims is materially the same.  <u>Mazzeo</u>, 746 F.3d at 1266; <u>see</u> Fla. Stat. § 760.10(1)(a).  Because the FCRA mirrors the ADEA, courts apply federal ADEA and Title VII precedent as well as Florida law to determine whether liability exists under FCRA.  <u>Mazzeo</u>, 746 F.3d at 1266; <u>Hogan</u>, 986 So. 2d at 641.  On summary judgment for an FCRA claim, Florida courts apply a <u>McDonnell Douglas</u> framework.  <u>Johnson v. Great Expressions Dental Centers of Florida, P.A.</u>, 132 So. 3d 1174, 1179–80 (Fla. 4th DCA 2014). Florida courts have not expressly adopted the federal "convincing mosaic" formulation for summary judgment of FCRA age claims, though in <u>Johnson</u>, the court noted a proffered claim failed even under a convincing mosaic lens.  <u>Id.</u> at 1180. Federal courts, however, routinely apply the convincing mosaic analysis to FCRA claims, including those removed from state court.  <u>See, e.g.</u>, <u>Collado v. United Parcel Serv., Inc.</u>, No. 6:18-cv-1734-Orl-22DCI, 2020 WL 13646263, at *14 (M.D. Fla. Oct. 8, 2020) (applying convincing mosaic to FCRA despite no Florida authority); <u>Reed v. Forney Indus., Inc.</u>, 800 F. App'x 782, 788 (11th Cir. 2020) (applying convincing mosaic lens to FCRA claim removed from state court).

Under <u>McDonnell Douglas</u>, Plaintiff's FCRA claim fails for the same reason as his ADEA claim: he cannot point to evidence on the record sufficient to create a

3:24-cv-00657-CRK-MCR

reasonable inference of a prima facie case.[17]   Plaintiff's response concedes his cited younger physicians are not <u>McDonnell Douglas</u> comparators and argues they need not be, but he still offers no record evidence that they are similarly situated in a way that supports an inference of discrimination.  <u>See</u> Pl. Resp. 22 n.9 ("Mayo says these younger physicians are not <u>McDonnell Douglas</u> comparators . . . [b]ut they do not have to be.") (citing Defs. Mot. 11–15; <u>Jenkins</u>, 26 F.4th at 1249–51; <u>Lewis I</u>, 934 F.3d at 1187–89).   Nor does he assemble a convincing mosaic.   His theory rests on speculation, which is insufficient to survive summary judgment.  <u>See</u> <u>Williams v. Sch. Bd. of Palm Beach Cnty.</u>, 386 So. 3d 565, 569 (Fla. 4th DCA 2024).   Because Plaintiff presents neither direct nor circumstantial evidence from which a reasonable factfinder could infer intentional age discrimination, summary judgment on the FCRA claim is warranted.

## CONCLUSION

Plaintiff does not identify evidence on the record sufficient to create a convincing mosaic from which a reasonable jury could conclude that age animus motivated Defendants' decision to terminate him.   Plaintiff's federal and state age discrimination claims therefore fail.   His FLSA retaliation claim also fails because the statute does not permit a third-party retaliation cause of action, and the record

---

[17]  Even if Florida courts limited the analysis to <u>McDonnell Douglas</u> rather than the "convincing mosaic" approach, the outcome is the same.   Plaintiff cannot point to sufficient evidence of intentional age discrimination to withstand summary judgment under a <u>McDonnell Douglas</u> analysis.   Without that showing, his claim cannot survive summary judgment under either theory.

**OPINION - 31**

3:24-cv-00657-CRK-MCR

includes evidence MCJ acted for a legitimate, nonretaliatory reason. For these reasons, Defendants are entitled to summary judgment on all claims.

Judgment will enter accordingly.

/s/ Claire R. Kelly
Claire R. Kelly, Judge[*]

Dated:      November 24, 2025
            New York, New York

---

[*] Judge Claire R. Kelly, of the United States Court of International Trade, sitting by designation.

**OPINION – 32**